## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC,[1] | Case No. 22-10602 (JTD) |
| Debtor. | |

## DECLARATION OF JAY QUICKEL, PRESIDENT AND CEO OF AGWAY FARM & HOME SUPPLY, LLC, IN SUPPORT OF FIRST DAY MOTIONS

I, Jay Quickel, declare and state as follows:

1.    I am the Chief Executive Officer ("CEO") and President for Agway Farm & Home Supply, LLC, a Delaware limited liability company ("Debtor") that has filed a voluntary petition (the "Chapter 11 Petition") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing this Chapter 11 case (the "Case").  The Chapter 11 Petition was filed on July 5, 2022 (the "Petition Date").

2.    To minimize the adverse effects of filing the Chapter 11 Petition while at the same time maximizing value for the benefit of stakeholders, the Debtor has filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings").  I submit this Declaration in support of the Chapter 11 Petition and the First Day Pleadings.  I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and maximize recoveries; and (c) best serves the Debtor's estate and creditors' interests.  Further, it is my belief

---

[1]  The last four digits of the Debtor's federal tax identification number are 1247. The Debtor's address is 6606 W. Broad Street, Richmond, VA 23230.

that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of this Chapter 11 case.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management or the Debtor's professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  The Debtor has authorized me to submit this Declaration.

4.      I am also personally familiar with the Debtor's records submitted in support of the First Day Pleadings.  The Debtor's records are made by employees or agents of the Debtor who report to me and who have a business duty to enter the records of the Debtor accurately and at or near the time of the event which they record.  In general, the Debtor retains its files electronically in its computer system which is backed up regularly.

5.      I began serving as the CEO of the Debtor in December 2020.  Prior to that, I was the executive vice president of the Farm Supply Division (the "Division") of Southern States Cooperative ("Southern States").  I served as the executive vice president of the Division until the sale of the Division in 2020 whereby the Division rebranded and organized as Agway Farm & Home Supply, LLC.

6.      This Declaration is divided into three parts.  Part I provides an overview of the Debtor's business, its corporate structure and its prepetition indebtedness.  Part II discusses the Debtor's recent financial performance, its proposed turnaround plan and the circumstances surrounding the commencement of this Chapter 11 case and what the Debtor views as the path forward.  Finally, Part III sets forth relevant facts in support of the First Day Pleadings.

## I.      OVERVIEW OF THE DEBTOR'S BUSINESS

**A.      Historic Overview**

7.      The original Agway Cooperative was formed in 1964.

8.      In 1999, the original Agway Cooperative sold or closed all of its retail outlets and sold its warehouse system to Southern States.  Southern States acquired the Division and the "Agway" brand name.

9.      In 2020, Agway Holdings, LLC acquired substantially all of the assets of the Division from Southern States. Upon the sale, the Division rebranded and organized as Agway Farm & Home Supply, LLC in Delaware.

10.      The Debtor is a Delaware limited liability company, owned 100% by Agway Holdings, LLC. Agway Holdings, LLC is a Delaware limited liability company.

**B.      The Debtor's Business Operations**

11.      The Debtor is a wholesale product distribution company that serves a broad network of independent retail stores and provides full-service retail advisory support. The Debtor services dealer locations along the east coast, including Maine, New Hampshire, Vermont, Massachusetts, Maryland, New York, Delaware, Rhode Island, New Jersey, Connecticut, Pennsylvania, Kentucky, West Virginia, Virginia, North Carolina, South Carolina, Georgia, and Ohio.

12.      The Debtor's headquarters is located in Richmond, Virginia and the Debtor has warehouses and distribution centers in Cloverdale, Virginia and Westfield, Massachusetts. Additionally, the Debtor maintains a satellite distribution center in West Springfield, Massachusetts.

13.      In the ordinary course of business, the Debtor provides wholesale distribution services across six different major categories: (1) seasonal home & hardware; (2) farm products; (3) lawn & garden; (4) bird food & supplies; (5) pet food & supplies; and (6) animal health needs (collectively, the "Product Sales").

14.      The Debtor also licenses the right for dealers to utilize the Agway brand ("Dealer Fees") and produces revenue from freight costs ("Freight Revenue").

15.     In 2021, the Debtor's unaudited gross revenues were $225,151,432 with an unaudited net loss of $9,118,531. In 2022, through May 31, unaudited gross revenues were $23,255,753 with an unaudited net loss of $7,358,072.

16.     The Debtor's Product Sales channel accounted for 98.2% of its revenue in 2021, with the Dealer Fees channel and Freight Revenue channel accounting for the other 1.8%.

17.     Within the Product Sales channel, the Debtor sells more than fifteen thousand (15,000) distinctive stock keeping units or "SKUs" with varying levels of perishability. For example, the Debtor sells both bird seed and grass seed. While bird seed itself does not have an expiration date, heat and humidity invite pests and mold that spoil the product. In regard to grass seed, there is an applicable expiration date that is subject to further testing.  Absent continued operations to liquidate the Debtor's assets, the estate would suffer a diminution of value.

18.     The Debtor classifies each of its products, or SKUs, into one of: Class A, B, C, or D based upon the "liquidity" of the product or how quickly the product sells. Class A products are the most liquid while Class D products are the least liquid.

19.     The Debtor maintains a website that provides a portal for both dealers and vendors to transact business with the Debtor.

20.     The Debtor employs approximately twenty-two (22) permanent employees ("Permanent Employees"), four (4) part-time employees assisting on an as-needed basis ("Ad Hoc Employees"), and five (5) staffing agency temporary workers ("Staffing Agency Employees"). The Permanent Employees, Ad Hoc Employees and Staffing Agency Employees shall be referred to, collectively, as the "Employees." The table below summarizes how the population of Employees are distributed across the Debtor's operations.[2]

---

[2] Excludes four Ad Hoc Employees.

| Function | Full-time | Contractors | Total |
|---|---|---|---|
| Accounting and Finance | 2 | 4 | 6 |
| Distribution Operations/Inventory Support | 13 | - | 13 |
| Executive Officer | 1 | - | 1 |
| IT Support | - | 1 | 1 |
| Sales, Customer Care and Pricing | 5 | - | 5 |
| Transportation and Logistics | 1 | - | 1 |
| | | | |
| Totals | 22 | 5 | 27 |

21.     All 22 Permanent Employees are full-time Employees. All full-time Employees are eligible for the various employee programs offered by the Debtor as discussed in more detail below.

22.     The Ad Hoc Employees are composed of former full-time employees that are now providing assistance to the Debtor on an as-needed basis. The Ad Hoc Employees are paid through the Debtor's payroll on the same basis as the Permanent Employees.

23.     The Debtor does not pay the Staffing Agency Employees directly. Instead, the Debtor pays each distinctive staff agency (individually, a "Staffing Agency" and collectively, "Staffing Agencies") a weekly fee for each individual. The Staffing Agency Employees are staffed and paid by the following Staffing Agencies:

| Number of Staffing Agency Employees | Staffing Agency | Weekly Cost |
|---|---|---|
| 2 | Accounting Principals/Parker & Lynch | $5,720 |
| 3 | Robert Half | $8,940 |

C.     **The Debtor's Prepetition Indebtedness**

Secured Debt

24.     As of the Petition Date, the Debtor had secured debt obligations owed to CIT Bank N.A. and CCA Financial, LLC for various equipment financing.  The debt owed to CCA Financial, LLC is secured by handheld barcode scanners located at the Debtor's Cloverdale, Virginia

distribution center. The debt owed to CIT Bank N.A. is secured by various laptops and computer hardware. Payments to the secured creditors are current.

25.     Prior to the Petition Date, the Debtor had a line of credit in the amount of approximately $20,000,000 with Gibraltar Business Capital ("Gibraltar"). In January 2022, Gibraltar served the Debtor with a notice of default. After the notice of default, and before the Petition Date, the Debtor paid off its balance with Gibraltar.  As a result, the Debtor's secured debt obligation to Gibraltar was extinguished.

Unsecured Debt

26.     The Debtor has approximately five hundred (500) unsecured creditors totaling approximately $28 million.

27.     The total of the claims of the twenty largest unsecured claims is approximately $15.5 million, subject to defenses and counterclaims of and by the estate.

28.     There are twelve formal legal actions pending as of the Petition Date: (1) *American Wood Fibers, Inc. v. Agway Farm & Home Supply, LLC et al.* in Wood County Circuit Court, Wisconsin, Case Number: 2022CV000100; (2) *Growmark, Inc. et al. v. Agway Farm & Home Supply, LLC* in the Circuit Court for Frederick County, Maryland, Case Number C-10-CV-22-000147; (3) *Madison Wood Preservers, Incorporated v. Agway Farm & Home Supply, LLC*, in the Circuit Court of Madison County, Virginia, Case Number CL22005849-00; (4) *Ragan & Massey, Inc. v. Agway Farm & Home Supply, LLC*, in the 21st District Court for the Parish of Tangipahoa, Louisiana, Case Number: 20220000608; (5) *HUB Group, Inc. v. Southern States Cooperative Inc. and Agway Farm & Home Supply, LLC*, in the Superior Court of the State of Delaware, Case Number: N22C-04-131 PRW CCLD; (6) *Southeast Seed Inc. v. Agway Farm & Home Supply, LLC* in the County Court of the Eighth Judicial Circuit in and for Gilchrist County, Florida, Case Number: 21-2022-CC-000023CCAXMX; (7) *Rhino Seed & Landscape Supply LLC v. Southern States Inc. d/b/a Agway Farm & Home* in Livingston County Circuit Court, Michigan, Case Number: 22-31440-CB; (8) *Animal Health International, Inc. v. Agway Farm & Home Supply, LLC* in the Circuit Court for the City of Richmond, Virginia, Case Number: CL22002471-00; (9)

*Gallagher North America Inc. v. Agway Farm & Home Supply, LLC* in the 7th Judicial Circuit Court, Clay County, Missouri, Case Number: 22CY-CV05137; (10) *Miller Manufacturing Company v. Agway Farm & Home, LLC* in Fourth Judicial District of the County of Hennepin, Minnesota, Case Number: 27-cv-22-7648; and (11) *FIMCO, INC. v. Agway Farm & Home Supply, LLC* in the Circuit Court of the City of Richmond, Virginia, Case Number: 760CL22002275-00.

29.    The twelfth legal action pending as of the Petition Date is *Envirem Organics, LTD v. Agway Farm and Home Supply LLC* in the Superior Court of Waldo County Maine, Case Number CV202209. On June 15, 2022, Envirem obtained a prejudgment levy against the Debtor's bank account in the amount of $109,535.90. It is unclear how Envirem was able to do so as the Debtor was never: (1) served with a complaint; (2) provided notice of the case; and (3) provided notice of the prejudgment levy. Further, the amount claimed and withheld by Envirem does not match the amount owed in the Debtor's records.

## II.  RECENT FINANCIAL PERFORMANCE AND EVENTS LEADING TO THE CHAPTER 11 CASE

30.    In November 2020, the Debtor entered into an agreement with RSM, LLC ("RSM") to provide technology conversion services whereby the Debtor would migrate from Southern State's internal systems to their own internal systems (the "System").

31.    Per the terms of the agreement, conversion to the System was to begin in January 2021 with a deadline of July 2021 for the System to be fully implemented and integrated. Through no fault of the Debtor, implementation of the System did not begin until September 2021.

32.    Due to the delay, the Debtor was unable to timely reconcile payments from customers in order to timely pay the Debtor's vendors, which caused irreparable damage to the Debtor.

33.    Additionally, the Debtor believes that one of its largest freight providers, HUB Group, Inc. ("HUB"), began to violate the terms of its agreement with the Debtor. Specifically, HUB began to retroactively charge the Debtor for unauthorized expenses. These unauthorized charges caused the Debtor to be unable to pay certain bills and expenses, causing great financial

hardship on the Debtor. As of the Petition Date, HUB is in the process of returning $140,000.00 worth of the Debtor's inventory. However, there will be a shrink from spoilage as a result and labor to restock.

34.     In January 2022, the Debtor was sent the notice of default from Gibraltar.  As a result of the default, Gibraltar refused to advance funds under its agreement with the Debtor and as such, the Debtor was unable to purchase additional inventory.

35.     Due to the cumulative effect of the events outlined above, in March 2022, the Debtor initiated a wind-down plan in which the Debtor: (1) laid off about one-half of the Debtor's employees; (2) transitioned some employees to stay onboard on an hourly, as-needed basis; and (3) offered a retention bonus to certain critical employees to incentivize them to stay.

36.     Per the terms of the wind-down plan, the Debtor will continue laying off Employees until the end of July when the Debtor intends, subject to Court approval, to conduct an auction of the Debtor's assets or an inventory or asset sale to certain businesses (individually, a "Strategic" or collectively, "Strategics").

37.     As of the Petition Date, I have been in contact and have entered into negotiations with several of the Strategics with varying interests in the intellectual property, fixed assets and inventory of the Debtor. For example, one Strategic is interested in purchasing substantially all of the intellectual property of the Debtor while another Strategic is interested solely in the inventory of the Debtor. The Debtor has already received three letters of intent offering to purchase portions of the three categories listed above.

38.     Pending the sale discussions with the Strategics, the Debtor has implemented a discounted rate on the Debtor's inventory. As of the Petition Date, Class A products are being discounted 20%, Class B 35%, Class C 50% and Class D 50% (the "Sale Discount Rates").

### III.     FIRST DAY PLEADINGS

39.     Concurrently with the filing of this Case, the Debtor filed the First Day Pleadings seeking relief related to the administration of this Case, the Debtor's operations, and the Debtor's creditors, customers and employees.  Below is a list of the First Day Pleadings:

a.      Application for Entry of an Order Authorizing Employment and Retention of Stretto as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date (the "Claims Agent Application").

b.      Emergency Motion for an Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code (the "Cash Management Motion");

c.      Emergency Motion for Order Authorizing Payment of Prepetition Employee Wages, Benefits and Associated Expenses and Granting Related Relief (the "Wage Motion");

d.      Emergency Motion for Order Under Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or discriminating against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance (the "Utilities Motion");

e.      Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Prepetition Claims of Shippers and Warehouseman; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief (the "Shippers Motion");

f.      Emergency Motion for an Order Under Sections 105(a), 363(b), 363(c) and 503(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Assume Existing Insurance Policies; and (b) Pay All Obligations in Respect Thereof (the "Insurance Motion"); and

g.      Emergency Motion for an Order Approving Procedures under Sections 363 and 105(A) and Federal Rule Of Bankruptcy Procedure 2002 for Authority to Establish De Minimis Asset Sale Procedures (the "De Minimis Sales Motion").

40.     The Debtor has narrowly tailored the First Day Pleadings to meet its goals of: (a) continuing its operations in Chapter 11 with as little disruption and loss of productivity as possible pending the liquidation and sale process; (b) maintaining the confidence and support of its key customer and employee constituencies during the bankruptcy process; and (c) establishing procedures for the efficient administration of this Case.

41.     I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on the Debtor's employees and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

42.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtor's efforts to maximize the recovery to its creditors through a sales process.

43.     The success of this Case depends upon the Debtor's ability to maintain its operations pending the sale of the Debtor's assets.  The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

44.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted based upon the following:

**The Claims Agent Application**

45.     By the Claims Agent Application, the Debtor seeks for entry of an order (the "Retention Order"), appointing Stretto, Inc. ("Stretto") as the official claims and noticing agent (the "Claims and Noticing Agent") in this Case, effective as of the Petition Date.

46.     In choosing Stretto to act as the Claims and Noticing Agent I obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, based on all engagement proposals obtained and reviewed, it appears that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.

47.     Although the Debtor has not yet filed its schedules of assets and liabilities, it anticipates that there will be significantly more than 500 entities to be noticed.  Local Rule 2002-1(f) provides that "[i]n all cases with more than 200 creditors or parties in interest listed on the creditor matrix, unless the Court orders otherwise, the debtor shall file [a] motion [to retain a claims and noticing agent] on the first day of the case or within seven (7) days thereafter."  In view of the number of parties to notice and potential claimants, I believe that the appointment of a claims and noticing agent is required by Local Rule 2002-1(f) and is otherwise in the best interests of the Debtor's estate and its creditors.

48.     The services to be provided and the fees to be incurred by Stretto are set forth in more detail in the Claims Agent Application.

**The Cash Management Motion**

49.     Pursuant to 11 U.S.C. §§ 105(a), 345(b), and 363(c), the Debtor seeks authorization to maintain its existing Cash Management System (as defined in the Cash Management Motion).

50.     The Debtor maintains the following six (6) accounts at J.P. Morgan Chase Bank (the "Bank"): (1) a depository account for incoming collections (ending in 5362) ("Collections Account"); (2) a payroll account (ending in 6881) ("Payroll Account"); (3) a general operating account (ending in 7772) ("Operating Account"); (4) a disbursement account (ending in 8176) ("Disbursement Account"); (5) an employee credit card collateral account (ending in 0511) ("Employee Credit Card Collateral Account"); and (6) a manual checking account used for manual

disbursements and for small checks (ending in 1319) ("Manual Disbursement Account" and collectively, the "Bank Accounts").[3]

51.     The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's day-to-day business operations.  The Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the various Bank Accounts required to effectuate the collection, disbursement, and movement of cash. Because of the nature of the Debtor's business and the disruption that would result if it was forced to close its existing Bank Accounts and establish a new cash management system, it is critical that the existing Cash Management System remain in place.

52.     The Cash Management System preserves the orderly flow of cash and also permits the Debtor to accurately track deposits and disbursements. The Cash Management System facilitates the Debtor's cash monitoring, forecasting, accounting and reporting, and enables the Debtor to maintain control over the administration of its Bank Accounts. If the Bank Accounts had to be closed and new ones re-opened, the Debtor's business operations would be disrupted and the Debtor and its estate would experience material disruptions in collecting customer payments and incur a significant increase of administrative expenses.

53.     In addition, closing the Collections Account would cause a severe adverse impact in the Debtor's cash flow.  A significant number of transactions pass through the Collections Account because customer payments, with limited exception, are always paid to the Collections Account.  Closing the Collections Account would require customers to reset to a new bank account would harm the Debtor's ability to collect cash in a timely and complete manner.  Having to advise the Debtor's customers of a new account to process transactions would be daunting to say the least

---

[3] The Debtor plans to close the Manual Disbursement Account post-petition. However, the Debtor requests that its Manual Disbursement Account be permitted to remain in place until a petty cash system is fully established at the Debtor's distribution centers.

and would likely result in the loss of revenue for the Debtor. The Collections Account is a zero-balance account that sweeps daily to the Operating Account, meaning the Collections Account is zeroed out with a $0.00 balance at the end of every day. The Operating Account then further disburses the cash, on an as-needed basis, into the Payroll Account and Disbursement Account. The Debtor clearly relies on the Collections Account for its operations and closing the Collections Account would result in irreparable harm and decline to the liquidity to the Debtor.

54.    Finally, closing the Employee Credit Card Collateral Account and having to open a new credit card would cause an administrative burden on the Debtor. Managers and supervisors at both of the distribution centers use the credit cards on a regular basis to purchase supplies needed to maintain operations, often to address time-sensitive issues. Further, if the Employee Credit Card Collateral Account is closed, the Debtor will be forced to replace it with a petty cash account which is time consuming and cumbersome to manage. On the Petition Date, the Debtor expects approximately $3,000 of outstanding charges owed on the company credit cards. Through the Motion, the Debtor seeks authority to continue using the Employee Credit Card Collateral Account and prohibiting the Bank from cancelling the Employee Credit Card Collateral Account.

55.    To protect against the unauthorized payment of prepetition obligations, the Debtor represents that, if it is authorized to continue to use the Bank Accounts, it will not pay, and the Bank will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court

56.    Requiring the Debtor to close the Bank Accounts and to open new accounts will disrupt the Debtor's operations and materially distract the Debtor's management. It will disrupt the Debtor's operations because (a) any changes to the Disbursement Account or Operating Account will slow down the payment to crucial vendors as many are paid through electronic fund transfers; (b) any changes to the Collections Account could inhibit the Debtor's ability to process and collect customer payments; (c) any changes to the Payroll Account could disrupt and delay payment for payroll, administrative fees, and related taxes; (d) having to close the Employee Credit Card Collateral Account and open a new account would cause a huge administrative burden on the

Debtor; (e) it would increase the work of the Debtor's accounting personnel, who are already dealing with the many and varied issues related to the Case; and (f) it would needlessly cost the Debtor time and money and would result in no discernable benefit to the Debtor's bankruptcy estate or its creditors and other parties in interest.

57.     In addition, the Debtor requests that the Bank be permitted to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for all checks drawn on the Bank Accounts which are cashed at the Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date. The Debtor further requests that the Bank be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts on account of a prepetition claim unless: (a) authorized in an order of this Court, as represented to the Bank by the Debtor; (b) not otherwise prohibited by a "stop payment" request received by the Bank from the Debtor; and (c) supported by sufficient funds in the Bank Account in question.

58.     I believe closing the Bank Accounts will also increase the work of the Debtor's accounting personnel, who are already dealing with the many and varied issues related to the Case and it would needlessly cost the Debtor time and money and would result in no discernable benefit to the Debtor's bankruptcy estate or its creditors and other parties in interest.

59.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor has and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (i) Bank services (the "Service Charges"), (ii) checks deposited with the Bank which have been dishonored or returned for insufficient funds in the applicable amount, and (iii) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements (the "Bank Account Agreements"). The Debtor incurs an average of approximately $6,800 per month in fees owed related to Service Charges. The Debtor seeks authority, in its sole discretion, to pay: (i) all undisputed prepetition Cash Management Claims; and (ii) any such routine Cash

Management Claims that accrue to the Bank post-petition, in a monthly aggregate amount not to exceed $8,000.

60.     In the ordinary course of business, the Debtor uses business letterhead, invoices, envelopes, promotional materials, and a number of other business forms and correspondence (collectively, the "Existing Forms").  Because the Existing Forms were used prepetition, they do not reference the Debtor's current status as a debtor in possession. The Debtor is seeking authorization to continue using all Existing Forms in the forms existing immediately prior to the Petition Date.

61.     The Debtor is also requesting authorization to continue using its existing checks without the "Debtor in Possession" designation; provided, however, that if the Debtor is required to generate new checks during the pendency of the Case, then the checks will include this designation.

62.     I believe that most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the notice of the commencement of the Case being given to creditors and other parties-in-interest. Changing the Debtor's Existing Forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, such changes would be disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor.

63.     In connection with keeping the Bank Accounts open, the Debtor seeks an order authorizing and directing the Bank to honor postpetition checks, if any, drawn and transfers from the Bank Accounts.

64.     Further, in the event that the Bank refuses to honor a check drawn or a transfer made on a Bank Account maintained by the Debtor (provided there are sufficient good funds in the Bank Account to complete the transfer), the Bank must immediately turn over the deposits held in the applicable Bank Account upon the Debtor's request.

65.     I believe preserving the Cash Management System will enable the Debtor to continue to track all receipts and payments accurately and to provide complete reporting to the United States Trustee for the District of Delaware.

66.     In sum, the Bank Accounts and Cash Management System facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's business. Because of the disruption to the business that would result if the Debtor were forced to close these Bank Accounts, I believe it is critical that the Debtor maintain its Cash Management System and the Bank Accounts.

**The Wage Motion**

67.     The Debtor filed the Wage Motion seeking the entry of an interim and final order, authorizing but not directing, the Debtor, in its discretion, to pay, continue, or otherwise honor various prepetition employee-related obligations (collectively, the "Prepetition Obligations") to or for the benefit of their current employees (individually, an "Employee" or collectively, the "Employees"), for wages, compensation, severance, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtor prior to the Petition Date (as described below, individually, "Employee Program" or collectively, the "Employee Programs") and have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests.

68.     I discussed and summarized above the Debtor's Employees. I believe it is absolutely critical that the Debtor be able to assure the Employees that their wages, compensation and salaries ("Wages") and the Employee Programs will continue unaffected by the Debtor's chapter 11 filing in order to effectuate a successful outcome in the Case.  Moreover, if the Debtor fails to pay the Prepetition Obligations and fails to continue the Employee Programs in the ordinary course, the Employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on workforce

morale and would likely result in unmanageable turnover, thereby resulting in immediate and irreparable harm to the Debtor and its estate.

69.     The Debtor paid payroll to the Employees on July 1, 2022 for the two (2) week period ending on June 24, 2022.  As such, the Employees will accrue wages and other Pre-Petition Obligations for the period of June 25, 2022 through July 5, 2022 for which the Debtor seeks authority to pay post-petition in the ordinary course on July 15, 2022.  None of the Employees will receive more than the maximum amount provided for in Section 507(a)(4).

70.     The Prepetition Payroll Obligations owed by the Debtor are summarized below[4]:

| Category | Amount |
|---|---|
| Employee Wages | $ 51,294.12 |
| Deductions | $ 10,000.00 |
| Obligations to Ad-Hoc Employees | $ 1,030.60 |
| Obligations to Staffing Agencies | $ 17,000.00 |
| Employee Business Expenses and Reimbursements | $ 0.00 |
| Employee Health Benefits - Medical and Dental Insurance | $ 0.00 |
| Employee Vision Insurance | $ 0.00 |
| Life, Accident/Critical Illness/Hospital Indemnity | $ 0.00 |
| Severance | $ 36,174.13 |
| Total Employee Compensation Owed | $115,498.85 |

71.     The pre-petition wages that will have accrued but remain unpaid as of the Petition Date include wages for me, the Debtor's CEO, in the amount of $8,212.00.

72.     While the Debtor expects that there will be no outstanding checks for Pre-Petition Obligations for Wages that have not yet cleared the Debtor's bank accounts, in an abundance of caution, the Debtor seeks authority through this Motion for any checks for Pre-Petition Obligations that have not yet cleared the Debtor's bank accounts to be honored post-petition.  In the event there are any outstanding checks, the Debtor estimates the amount of such checks will total less than $20,000.

73.     The Employees are paid bi-weekly, each approximately one week in arrears. Bi-weekly payroll averages approximately $100,000 to $120,000.  The Debtor's payroll payments are

---

[4] The amounts included are approximate amounts and may fluctuate. In addition, for certain of the categories, the Debtor does not believe they owe any amounts prepetition. However, the Debtor includes these categories to the extent it is discovered that amounts are, in fact, due prepetition.

made by Paycom Software, Inc. ("Paycom") through a separate contractual arrangement, in which the Debtor pays Paycom for the amount of payroll payments made.

74.     Further, as of the Petition Date, the Debtor, through Paycom, made deductions from the Employees' paychecks for payments on behalf of the Employees for various federal, state, and local income, FICA, and other taxes, as well as for garnishments, support payments and tax levies. The Debtor may also have made deductions to satisfy the employee contribution payments for any voluntary benefits programs, such as medical insurance, dental insurance, short-term disability insurance, 401(k) accounts, or any other voluntary benefit programs offered through the Debtor (collectively, the "Deductions").

75.     By virtue of the timing of the filing of the Case, the Employees have not been paid all their compensation earned through the Petition Date.  The Debtor estimates that, as of the Petition Date, accrued but unpaid wages for the Employees aggregate approximately $69,324.72, including payments to the Staffing Agencies.  In addition, the applicable Deductions may not have yet been taken. To the extent that the Deductions have been taken, however, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions. The Debtor estimates that, as of the Petition Date, they are holding Deductions already taken aggregating approximately $10,000.00  which the Debtor seeks to pay to third parties in accordance with their prepetition practice.

76.     The Debtor estimates that, as of the Petition Date, accrued but unpaid compensation, including the Deductions and unpaid fees to Staffing Agencies, totals approximately $79,324.72.  The Debtor seeks authority to pay, continue, or otherwise honor its Prepetition Obligations in the ordinary course of its business. None of the amounts to be paid to the Employees for prepetition wages will exceed the $15,150.00 cap set forth in Bankruptcy Code Section 507(a)(4).  The Debtor believes that the costs associated with paying such amounts are

relatively minimal compared with the damage to the Debtor's estate that would follow if employee morale were harmed by the Debtor's failure to meet its payroll obligations.[5]

77.    The Debtor, in the ordinary course of its business, reimburses the Employees for certain business-related expenses that the Employees incur.  These include expenses for travel, mileage, office supplies, and other incidental expenses.  The monthly reimbursable expense is fairly small but it is essential to the continued operation of the Debtor's business that the Debtor be permitted to continue reimbursing the Employees for such business expenses.

78.    The Debtor requires that, to be reimbursed for business expenses, an Employee must submit expense reports, together with appropriate supporting documentation. The Debtor expects that the total amount of unreimbursed business expenses as of the Petition Date will be $0.00, but certainly will not exceed $5,000.00.

<u>Vacation and Sick Time</u>

79.    As part of their overall compensation, the ten Non-Exempt Employees are entitled to receive a certain number of vacation hours per year.  Vacation time starts to accrue immediately upon employment. Vacation time accrues as follows:

| Years of Service | Bi-Weekly Accrual (Hours) Full-Time Employees | Bi-Weekly Accrual (Hours) Full-Time Employees |
|---|---|---|
| 0-4 | 3.08 | 1.54 |
| 5-14 | 4.62 | 2.31 |
| 15-24 | 5.54 | 2.77 |
| 25+ | 7.08 | 3.54 |

80.    Unused vacation time rolls over from year to year but can never accumulate to more than forty (40) hours.  Any accrued but unused vacation time above forty (40) hours at the end of the plan year is forfeited. Upon termination or retirement, a Non-Exempt Employee generally

---

[5] The Debtor recognizes the importance of maintaining their Employees and intend to separately seek relief to be heard at the "second day" hearing by and through which they seek approval of a key employee retention plan and/or a key employee incentive plan.

receives "cash out" payments for any accrued and unused vacation days according to applicable law.

81.     All Non-Exempt Employees are granted a balance of 56 hours of sick time at the beginning of each year. Employees cannot use sick time until they have been employed for thirty (30) days.  Unused sick time is not paid out upon separation from the Debtor.

82.     The Debtor estimates that, as of the Petition Date, total accrued but unpaid vacation leave is approximately $14,500.00.

83.     All Exempt Employees are eligible for unlimited paid time off ("PTO") to be used for vacation, personal days or sick days in accordance with federal, state or local laws. Unlimited PTO does not accrue, have any cash value, and is not paid out upon separation.

84.     By the Wage Motion, the Debtor is not seeking to pay such sums to the Employees but does seek authority for the Employees to use their accrued vacation and sick time in the ordinary course of business pursuant to the Debtor's policies and procedures regardless of the maximum amount provided for in Section 507(a)(4).

Medical, Dental and Vision Insurance

85.     The Debtor offers various PPO and HMO plans with Anthem, Inc. ("Anthem") to the full-time Employees for medical insurance (the "Medical Plan").  The Debtor also offers a Health Reimbursement Account plan to the Employees that are on the Anthem Silver plan and a Health Savings Account to the Employees that are on the Anthem Bronze plan.  As of the Petition Date, approximately twenty (20) Employees were participating in one of the medical insurance plans. The Debtor pays 60-90% of the premiums for those employees.  The cost per month to the Debtor for the Medical Plan is approximately $21,000.00.

86.     The Debtor offers dental insurance to the full-time Employees through MetLife, Inc. (the "Dental Plan").  The Debtor pays 24-75% of the premiums for those employees.  As of the Petition Date, approximately twenty (20) Employees were participating in the Dental Plan. The cost per month to the Debtor for the Dental Plan is approximately $2,200.00.

87.     The Debtor offers vision insurance to the full-time Employees through VSP Vision Care (the "Vision Plan" and collectively with the Medical Plan and the Dental Plan, the "Health Benefits").  The Debtor pays 0% of the premiums for those employees.  As of the Petition Date, approximately twenty (20) employees were participating in the Vision Plan.  The cost per month to the Debtor for the Vision Plan is approximately $0, but the Debtor pays the cost upfront before deducting the value of the Vision Plan for the Employee's paychecks.

Life, Accident/Critical Illness/Hospital Indemnity

88.     The Debtor provides all full-time Employees with a policy for life insurance in the amount of $25,000.00 through Mutual of Omaha with an option for the employee to purchase an additional amount (the "Life Plan").   The Debtor also offers accident, critical illness, and hospital indemnity insurance through Anthem but does not contribute to the cost.

Workers Compensation

89.     As required by statute, the Debtor provides the Employees a workers' compensation benefit program ("Workers' Compensation Program") for income protection, medical services, and rehabilitation services to employees with job-related injuries and illnesses (the "WC Insurance").  The WC Insurance is provided through third-party insurers.  The annual cost of the WC Insurance is approximately $151,965.00.

Severance Payments

90.     As set forth in the First Day Declaration, the Debtor implemented a wind-down process in March of 2022 whereby a substantial number of Employees were laid-off. Per the terms of the wind-down process, Employees will continue to be laid off through the end of July 2022.

91.     As a result of the wind-down process, the Debtor owes and will continue to owe severance payments to the laid-off employees. Any severance payments agreed to will only be paid as of the date of the Employee's separation from the Debtor.  As of the Petition Date, one former Employee has earned but has not been paid their severance payment totaling $970.00.  The Debtor intends to pay such severance payment during the next payroll cycle, which will be after the Petition Date.

92.     The Debtor will owe additional severance payments when employees separate from the Debtor post-petition.  The Debtor expects such payments will total, in the collective, approximately $36,000.  While the Debtor believes these represent post-petition amounts due in the ordinary course for which Court approval is not needed, the Debtor seeks approval for payment of such payments in an abundance of caution.

93.     None of the amounts to be paid to the Employees for Wages plus severance payments will exceed the $15,150 cap set forth in Bankruptcy Code Section 507(a)(4).

94.     The Debtor seeks to honor and continue all of the Employee Programs described above.

95.     By virtue of the timing of the filing of the Case, the Employees have not been paid all their compensation earned through the Petition Date.  In addition, the applicable Deductions may not have yet been taken. To the extent Deductions have been taken, however, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions.

96.     Prior to the Petition Date, the Debtor paid certain of its Prepetition Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Obligations, the Debtor requests that the Court enter an order requiring the Debtor's banks to honor any such checks which are drawn on the Debtor's accounts and authorizing the banks to rely on the representations of the Debtor as to which checks are subject to the Motion. To the extent that any such checks are refused payment, the Debtor additionally requests authority to issue replacement checks and to reimburse the Employees for any loss resulting from the dishonoring.

97.     With respect to the compensation and the Employee Programs described above, the Debtor contracts with several vendors to administer and deliver payments or other benefits to their Employees (the "Administrators").  In certain cases, disbursements made in the ordinary course are paid by the Administrators, which, in turn, invoice the Debtor for reimbursement of payments made.  For example, the Debtor, in the ordinary course of business, pays Paycom as its third-party

payroll administrator fees of approximately $1,000 to $2,000 per month depending on how many paychecks Paycom runs during a given period.

98.     In conjunction with the Debtor's payment of compensation and other benefits, the Debtor believes that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted delivery of certain benefits to Employees.  The Debtor believes that the Administrators may terminate their services to the Debtor unless the Debtor pays the Administrators' prepetition claims for administrative services rendered.  A need to replace any one of the Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Employees.  Accordingly, the Debtor submits that the payment of claims owed to the Administrators is in the best interest of the Debtor's estate.   The Debtor seeks authority to pay up to $10,000.00 in pre-petition amounts owed to Administrators.

99.     I believe that it is absolutely critical that the Debtor be able to assure the Employees that their Wages and the Employee Programs will continue unaffected by the Debtor's chapter 11 filing in order to effectuate a successful outcome in the Case.  The Employees have an intimate knowledge of the operation of the Debtor's business and are absolutely necessary to the Debtor's continued operations. It is absolutely imperative that the Debtor's Employees remain satisfied with their employment, and the inability to assure the Employees their compensation would have a highly negative impact on workforce morale and would likely result in unmanageable turnover, thereby resulting in immediate and irreparable harm to the Debtor and its estate.

100.     Furthermore, I believe that authorizing the Debtor to honor the Employee Programs is consistent with the Debtor's duties and is being performed in the ordinary course of business.

101.     The Debtor represents that: (a) it will not distribute any amounts over $15,150 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Wages or (ii) any other compensation due to an Employee; (b) will not make contributions to any employee benefit plan on account of unpaid prepetition amounts in excess of: (i) the number of Employees covered by such plan multiplied by $15,150, less (ii) the aggregate amount of prepetition Wages

and ordinary course bonus payments, plus the aggregate amount paid by the Debtor on behalf of such Employees to any other employee benefit plan, as provided under section 507(a)(5) of the Bankruptcy Code; and (c) it will not pay any amounts in excess of the estimated outstanding prepetition cap amounts for each category of prepetition claims identified above and in the proposed interim order without further order from this Court, except to the extent required under state law.

### The Utilities Motion

102.    In the normal course of its business, the Debtor obtains Utility Services provided by a number of entities (each a "Utility Company" and collectively, the "Utility Companies"). The Debtor pays the Utility Companies, on average, approximately $44,198.00 per month for services rendered.  To the best of my knowledge, prior to the commencement of this Case, the Debtor was current with respect to undisputed invoices for Utility Services.

103.    Based upon cash flow from operations, the Debtor expects to have ample liquidity to pay timely all postpetition obligations owed to the Utility Companies.

104.    However, to provide adequate assurance to the Utility Companies as required under section 366(c) of the Bankruptcy Code, the Debtor proposes to deposit on account of each Utility Company listed on the Utilities List (as may be amended) an amount equal to the value of two (2) weeks of Utility Services provided by the Utility Company, based upon the Debtor's estimated average monthly bill as set forth in more detail in the Utilities Motion, as more fully set forth in the Utilities Motion.

105.    If the Motion is not approved, the Debtor could be forced to address requests by its Utility Companies in a disorganized manner during the critical first weeks of this case. Moreover, the Debtor could be blindsided by a Utility Company unilaterally deciding on or after the 30th day following the Petition Date that it is not adequately protected and subsequently discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of Utility Services could potentially shut down operations, and any significant disruption of

operations could put this chapter 11 case in jeopardy. As such, I believe it is imperative that the Utilities Motion be granted on an emergency basis.

**The Shippers Motion**

106.    Critical to the Debtor's operations are (a) reputable common carriers, movers, shippers and freight forwarders (collectively, the "Shippers"), and (b) warehouseman, storage facilities, loading and unloading services, and other providers of storage services (collectively, the "Warehousemen") that transport the products (which include lawn and garden, wild bird seed and supplies, pet products and farm supplies) (the "Goods") to the various authorized dealer locations.

107.    The Debtor and its customers depend on the timely delivery of the Goods. Given that the Shippers and Warehousemen have physical custody over many of the Debtor's Goods, it is essential for the Debtor to incentivize its Shippers and Warehousemen to continue performing and providing the Goods to its customers in a timely manner. If the Shippers and Warehousemen do not receive payment for their prepetition claims, they may not continue to ship the Goods on behalf of the Debtor and the Debtor in return would not be able to meet its customer commitments. This could result in significant operational issues and increased expenses.

108.    Under certain applicable laws, a Shipper or a Warehouseman may have a possessory lien on the Goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the Goods. In addition, pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection for valid possessory liens, which could hinder the Debtor's ability to sell such Goods free and clear of such asserted liens.

109.    On average, the Debtor incurs approximately $35,000 a week in charges to its Shippers and Warehousemen. The Debtor expects that on the Petition Date, it will have outstanding invoices for accrued, unbilled charges for Goods that were delivered prior to the Petition Date (the "Shipping and Warehousing Charges") in the amount of approximately $50,000.00. The Debtor thus requests authority to pay up to $75,000.00 in Shipping and Warehousing Charges postpetition. If the Debtor fails to pay any Shipping and Warehousing

Charges, certain Shippers and Warehousemen could argue that they are entitled to possessory liens for transportation and/or storage with respect to the Goods in their possession and may refuse to deliver or release such Goods before their claims have been satisfied and their liens redeemed. Even if any Shipper and Warehousemen did not have valid liens, their possession and retention of the Goods could severely disrupt the Debtor's business operations.

110.    The value of the Goods in the possession of the Shippers and Warehousemen, coupled with the potential injury to the Debtor if the Goods are not delivered or released, exceeds the amount of the Shipping and Warehousing Charges that the Debtor seeks to pay under this Motion.  The Debtor believes that it is necessary and essential to preserving the value of its estate for it to be permitted to make payments on account of certain Shippers and Warehousing Charges.

111.    In order to ensure that the Debtor has continued access to goods and services provided by the Shippers and Warehousemen (collectively, the "Claimants"), the Debtor will condition payment of any prepetition amounts owed to any Claimant (the "Claims") upon verification that such Claimant will continue to abide by the parties' customary trade terms (the "Customary Trade Terms"), as set forth in the Shippers Motion.  To the extent any Claimant accepts payment from the Debtor premised on their compliance with the foregoing terms, and thereafter fails to comply, the Debtor requests that any payment made to such a Claimant on account of prepetition obligations be deemed an Avoidable 549 Transfer recoverable in cash by the Debtor upon written request.  Upon recovery by the Debtor of any such payment, the claim for which payment was recovered would be reinstated as a prepetition claim in the amount recovered, less any costs incurred by the Debtor.

112.    The Debtor's continued access to the goods and services provided by the Claimants on the Customary Trade Terms is essential to the Debtor's continued operations.  The Debtor anticipates paying the Claimant's Claims only if it reasonably believes that the benefits of making such payment would exceed the costs, delays and disruption associated with bringing an action to compel the turnover of such Goods.

113.    The Debtor will maintain a list summarizing the name of each Claimant that received payment on their claim, the amount paid to each of the Claimants on account of their Claim, and the goods or services provided by such Claimants.

**Insurance Motion**

114.    In the ordinary course of the Debtor's business, the Debtor maintains numerous insurance policies providing coverage for, inter alia: general liability, property, auto, umbrella, workers compensation, employment practices liability, and directors and officers liability set forth in Exhibit A to the Insurance Motion (collectively, the "Insurance Policies").  By this Motion, the Debtor seeks authority to assume all of its insurance policies with Hanover Specialty, Assurant, Trisurar Specialty Insurance Company (RT Specialty), Liberty Mutual, Federal Insurance Company (Chubb), Everest Indemnity Insurance Company, Continental Casualty Company, and DUAL Commercial LLC (the "Insurance Carriers").  The Insurance Policies protect the Debtor from various losses incurred in the ordinary course of business.

115.    The Debtor is required to pay, through its insurance companies, premiums for coverage under the Insurance Policies (the "Insurance Premiums").  The Insurance Premiums are based upon a fixed rate established and billed by the Insurance Carriers.  The Debtor pays total annual Insurance Premiums of approximately $1,221,430.

116.    The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain its Insurance Policies on an ongoing and uninterrupted basis. The nonpayment of any Insurance Premiums or related fees under the Insurance Policies could result in the Insurance Carrier terminating the existing policies, declining to renew their Insurance Policies, or refusing to enter into new insurance agreements with the Debtor in the future.

117.    In view of the importance of maintaining insurance coverage with respect to its business activities and the preservation of the Debtor's estate by financing the Insurance Premiums, I believe it is in the best interests of its estate to authorize the Debtor to enter into new insurance premium financing arrangements in the ordinary course of business.

118.    The Debtor submits that payment of obligations due or arising under or related to the Insurance Policies will be paid in the ordinary course of business and in accordance with the terms of the Insurance Policies and in a manner consistent with prepetition practices.

**The De Minimis Sales Motion**

119.    By the De Minimis Sales Motion, the Debtor seeks entry of an order authorizing and establishing expedited procedures (the "De Minimis Asset Sale Procedures") to (a) sell or transfer in the ordinary course of the Debtor's business and without further order of the Court certain assets (mainly inventory), including any rights or interests therein (the "De Minimis Assets"; and the sales of such De Minimis Assets, the "De Minimis Asset Sales") and (b) pay any necessary expenses incurred by the Debtor in connection with the De Minimis Asset Sales.

120.    As of the Petition Date, the Debtor was in contact and had entered into negotiations with certain Strategics with varying interests in various types of sale. The Debtor received one letter of intent from a Strategic that offered to purchase a significant portion of the Debtor's inventory but the offer was rejected because the offered price was too low.  The Debtor continues its discussion with various Strategics to hopefully come to terms on one or more agreements to sell all or a portion of its assets subject to overbid.  If it cannot, it will seek to auction its remaining assets.

121.    Pending the sale discussions with the Strategics, the Debtor has implemented a strategy for the sale of its inventory using the Sale Discount Rates. Further, as stated previously, the Debtor has letters of intent to purchase various portions of the Debtor's intellectual property, fixed assets, and inventory.

122.    The Debtor expects to continue sales of the De Minimis Assets at the Sale Discount Rates until the end of July (although it could be as late as end of August 2022) when the Debtor receives a bulk offer for the purchase of its assets and the sale of De Minimis Assets would cease, or the Debtor determines it must conduct an auction for the sale of its remaining assets.

123.    I believe the sale of the De Minimis Assets at the Sale Discount Rates yield a higher rate of return than will a sale to a Strategic and certainly more than will an auction sale.

124.    The sale of De Minimis Assets must continue without delay post-petition in order to maximize the value of the Estate's assets for creditors.  Some of the De Minimis Assets are perishable and must be sold as soon as possible.  More importantly, the Debtor needs to maximize the sale of the De Minimis Assets before any of its current labor force terminates his/her employment with the Debtor.  If employees start leaving post-petition, the Debtor could lose its ability to sell the De Minimis Assets at the Sale Discount Rates and instead, be forced to sell the inventory at auction for a much lower price.

125.    The Debtor only has about 22 Permanent Employees remaining at this time, all of whom are critical to the continued sale of the De Minimis Assets.  In particular, the remaining employees have a high degree of skilled labor and knowledge with respect to the sale process of the De Minimis Assets. They know exactly where the inventory is located, are skilled forklift drivers who are familiar with the warehouse "pick and pack" trolley system and able to gather the necessary items quickly and safely, package the items correctly, and load them correctly on trucks for delivery.

126.    I am concerned that one or more of its employees may terminate his/her employment at or near the bankruptcy filing.  In fact, certain employees have already expressed concern over the bankruptcy process and that they need to find alternative employment that is more stable.  I believe the employees may be able to find attractive alternative employment quickly due to the overall industry labor shortages for these skilled laborers and will thus leave the Debtor's employment.

127.    If any one of the employees terminates their employment with the Debtor, it will adversely affect the process of the sale of De Minimis Assets, if not halt the process altogether, to the detriment of the Estate and its creditors because, as stated above, the Debtor believes the sale of De Minimis Assets will yield the highest possible return at this time.

128.    As such, I believe the immediate and uninterrupted continuation of the sale of the De Minimis Assets, while the employees are still employed with the Debtor, is absolutely

imperative to maximizing value for the Estate. The Debtor does not expect to sell any De Minimis Assets that are encumbered by liens but includes this request out of an abundance of caution.

129.     Subject to the terms of the De Minimis Asset Sale Procedures set forth in the De Minimis Sale Motion, the Debtor will negotiate such De Minimis Asset Sales in consultation with its counsel, financial advisors and management, at prices that the Debtor, in an exercise of its business judgment, believes are fair and appropriate.

130.     Notwithstanding, to the extent applicable, pursuant to the De Minimis Asset Sale Procedures, the Debtor would be permitted to sell De Minimis Assets that are encumbered by liens or encumbrances only if the transaction satisfies at least one of the five (5) enumerated requirements of section 363(f) of the Bankruptcy Code. Pursuant to the procedures set forth in detail in the De Minimis Sale Motion, if the Debtor sells or transfers any De Minimis Assets that are encumbered by liens, such liens would attach only to the proceeds of the sale or transfer with the same validity, extent, and priority as immediately prior to the De Minimis Asset Sale.

131.     I believe that entry into the De Minimis Asset Sales during the Chapter 11 Case is reasonable and necessary for the benefit of the Debtor's estate, and establishment of the De Minimis Asset Sale Procedures is, therefore, desirable and in the best interests of the estate, its creditors, and all parties in interest. The sale or transfer of the De Minimis Assets will generate additional value for the benefit of the Debtor's estate and all parties in interest. These procedures will conserve the Debtor's resources, ensure maximum yield from the Debtor's inventory, promote the efficient administration of this Chapter 11 Case, and make the De Minimis Asset Sales cost-effective in a manner that will provide the most benefit to the Debtor's estate while still providing appropriate notice to certain creditors and parties in interest.

**F.      CONCLUSION**

132.      For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  July 5, 2022

_____
Jay Quickel
President and Chief Executive Officer