**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC,[1] | Case No. 22-10602 (JKS) |
| Debtor. | **Objection Deadline: July 27, 2022 at 4:00 p.m. (ET)**<br>**Hearing Date: August 3, 2022 at 2:00 p.m. (ET)** |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO PAY PRE-PETITION AMOUNTS TO CERTAIN CRITICAL VENDORS**

Agway Farm & Home Supply, LLC, a Delaware limited liability company (the "Debtor") hereby moves (the "Motion") this Court for entry of an order, substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), authorizing, but not directing, the Debtor to pay, in the ordinary course of business, the prepetition, fixed, liquidated, and undisputed claims (the "Critical Vendor Claims") of certain critical vendors (collectively, the "Critical Vendors") which provide services and/or goods that the Debtor deems, in the exercise of its business judgment, to be essential for the continued operation of the Debtor's business and the preservation of the value of its assets as set forth in the First Day Declaration (defined below) and the Declaration of Jay Quickel filed concurrently herewith (collectively, the "Quickel Declarations").

The Debtor is highly mindful of its fiduciary obligations to preserve and maximize the value of the estate. Accordingly, the preservation and maximization of the going concern value of the Debtor's business, including the preservation of key business relationships, are among the Debtor's primary goals as the Debtor transitions into chapter 11. Providing top quality products and seamless service to the customers is key to meeting those goals. For these reasons, the Debtor

[1] The last four digits of the Debtor's federal tax identification number are 1247. The Debtor's address is 6606 W. Broad Street, Richmond, VA 23230.

seeks to minimize adverse business effects – as well as the cash flow impact – of the Debtor's chapter 11 filing to the fullest extent possible by obtaining authority to pay certain vendors that are of paramount importance to the Debtor's business operations. Specifically, the Debtor seeks to pay Critical Vendors that provide technology services and security systems and services. The services provided by the Critical Vendors are detailed below.

The Debtor will experience irreparable harm if the Debtor is not authorized to pay the Critical Vendors as set forth in the Motion. While the Debtor is hopeful that many of its vendors will continue to do business with the Debtor because doing so makes good business sense, the Debtor anticipates that certain vendors that supply services that are critical to its business will: (a) refuse to deliver goods and services without payment of its prepetition claims; (b) refuse to deliver services on reasonable credit terms absent payment of prepetition claims, thus requiring the Debtor to increase operating costs; or (c) suffer significant financial hardship such that the Debtor's non-payment of its prepetition claims could have a significant impact on the Critical Vendor's business such that it will not have the ability to supply the Debtor with the needed goods and services.

In addition, the Debtor requests entry of orders (a) authorizing all applicable banks and other financial institutions (collectively, the "Banks"), when requested by the Debtor in its sole discretion, to receive, process, honor, and pay any and all checks, drafts, and other forms of payment, including fund transfers, on account of the Critical Vendor Claims, whether such checks or other requests were submitted before, on, or after the Petition Date; (b) authorizing the Banks to rely on the representations of the Debtor as to which checks are subject to this Motion, provided that any such Banks shall not have any liability to any party for relying on such direction and representations by the Debtor for inadvertently honoring or dishonoring any check or fund transfer; (c) providing that the Banks shall, at the discretion of the Debtor, receive, process, honor, and pay

all prepetition and post-petition checks and fund transfers on account of the Critical Vendor Claims that had not been honored and paid as of the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and that any such Banks shall not have any liability to any party for relying on such direction by the Debtor; and (d) authorizing the Debtor to issue new post-petition checks or effect new post-petition fund transfers to replace any checks, drafts and other forms of payment which may be inadvertently dishonored or rejected.

The Debtor requests that the relief sought herein be granted on an emergency basis because the Critical Vendors which provide services that the Debtor deems, in the exercise of its business judgment, are essential for the continued operation of the Debtor's business and the preservation of the value of its assets.

**Jurisdiction and Venue**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105(a) and 52l(a)(l), of the Bankruptcy Code, as supplemented by Bankruptcy Rules 1007(a)(l), (a)(3) and (d) and Local Rules 1001-l(c) and 1007-2.

## Background

### A. Case Commencement

4. The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 1, 2022 (the "Petition Date").

5. The Debtor is continuing in possession of its property, and operating and managing its business, as debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed in the Debtor's chapter 11 case.

6. A committee of unsecured creditors (the "Committee") was appointed pursuant to a Notice filed on July 18, 2022.

### B. Description of the Debtor's Business

7. The Debtor is a wholesale product distribution company that serves a broad network of independent retail stores and provides full-service retail advisory support.

8. The Debtor provides a vast network of farm and home retailers with over fifteen thousand (15,000) individual SKUs to serve their seasonal home & hardware, farm products, lawn & garden, bird food & supplies, pet food & supplies and animal health needs.

9. A more detailed description of the Debtor's background, structure, operations, recent financial history and events leading to the bankruptcy filing is detailed in the Declaration of Jay Quickel in Support of First Day Motions [Docket No. 10] ("First Day Declaration").

## THE CRITICAL VENDORS

### C. Critical Vendors

10. On a regular basis, the Debtor, in the ordinary course of its business, makes payments to certain Critical Vendors, such vendors being critical to its business process, including but not limited to technology services and security systems and services. If the Critical Vendors are not paid, their unwillingness to continue to service the Debtor could cause an interruption of the Debtor's business.[2] Such interruption could have drastic consequences for the operations of

[2] The Debtor may need to identify vendors as Critical Vendors even if the Debtor's relationships to those vendors are contractual. Additionally, for contracts of short duration or where the vendor is operating under a purchase order,

the Debtor's business due to the lack of service providers in many situations, or the amount of time needed to locate and convert to alternative sources. Such interruption also could negatively affect the Debtor's revenue and further strain the Debtor's liquidity. In identifying who qualified as a Critical Vendor, the Debtor considered whether the vendor or supplier would be expensive or time-consuming to replace, whether the manufacturing processes are specifically tailored to that vendor's products or services, whether the vendor is the sole source or limited-source supplier of goods or services of the quality and quantity required by the Debtor, without whom the Debtor could not continue to operate without disruption, and whether the goods or services provided by such vendor are necessary to maximizing the value of the Debtor's estate.

**1. Technology Services**

11. The Debtor requires various technology services in order to maintain its systems and processes, including but not limited to data migration, integration platforms, cloud solutions, inventory management and enterprise resource planning software. It would be nearly impossible for the Debtor to switch vendors and move all of its data, software and other cloud-based information during the pendency of this Case. Not to mention that it would likely cause the sales process to slow down and risks the loss of critical information. The inability to pay such technology service providers would cause insurmountable hardship and would require a significant amount of time and resources from the Debtor in order to find reliable technology services from other parties.

**2. Warehouse Repairs and Maintenance**

12. The Debtor requires various repairs to its equipment, trucks, and distribution centers, including but not limited to, a boiler system that must be properly maintained. The Critical Vendors in this category are highly specialized as to the Debtor's trucks, equipment and

---

there is a risk that failure to pay prepetition amounts may result in the counterparties refusing to renew those contracts or accept a new purchase order. Moreover, to the extent the Debtor's relationships with the Critical Vendors are contractual, the Debtor will likely assume those contracts with those Critical Vendors later in the Case, in which case the prepetition obligations owed to those Critical Vendors would be paid in full. Accordingly, the relief requested herein should only affect the timing of payment of those Critical Vendor Claims and will not prejudice the rights of other parties in interest.

warehouse. It would be difficult and timely to find new vendors to perform such services and repairs. Further, the inability to pay such service providers would cause insurmountable hardship and could significantly disrupt the Debtor's sales, thereby reducing the value for creditors.

**3. Security Systems and Services**

13. The Debtor requires various safety and security systems and services, including but not limited to alarm systems and fire sprinkler systems. It would be difficult and timely to uninstall and re-install the systems that are already in place with a new vendor. The inability to pay such service providers would cause insurmountable hardship and would require a significant amount of time and resources from the Debtor in order to find reliable security services from other parties.

**D. The Terms and Conditions of Payment of Critical Vendor Claims**

14. Per the Debtor's accounting records, the Debtor estimates it owes its Critical Vendors $15,000.00 as of the Petition Date. Out of an abundance of caution, the Debtor requests a prepetition allowance of $30,000.00 to compensate for any delayed invoice submissions by its Critical Vendors for any amounts due prior to the Petition Date. The Debtor further estimates that the essential Critical Vendors of services will be willing to continue to provide such services to the Debtor postpetition, on prepetition terms, if the Debtor makes payments to the essential Critical Vendors. The Debtor believes that payment of the Critical Vendor Claims subject to the conditions set forth herein increases the likelihood that such Critical Vendors will continue to offer existing trade terms or even improve trade terms for the Debtor, thereby maximizing the value of the Debtor's estate upon a sale of its assets. To avoid undue delay and disruption in the provision of such essential services and goods, and the consequent harm to the Debtor's business, estate and creditors, and to maximize the value of the Debtor's assets, the Debtor seeks immediate authority, but not direction, to pay, on a case-by-case basis, the claims of the Critical Vendors.

15. Subject to the Court's approval, the Debtor intends to pay the Critical Vendor claims only to the extent necessary to preserve the Debtor's business and maximize the value of its assets for the benefit of its estate and creditors. To that end, the Debtor proposes to condition the payment of Critical Vendor claims upon each vendor's agreement to continue supplying

services on terms that are acceptable to the Debtor. The Debtor will use its reasonable best efforts to require the applicable Critical Vendor to provide trade credit terms for the postpetition delivery of goods and services that are at least as favorable as prepetition trade terms. Specifically, in some circumstances, the Debtor may require certain Critical Vendors to enter into a contractual agreement evidencing such terms.

16. Additionally, the Debtor requests that if a Critical Vendor does not continue to provide services on agreed-upon trade terms, that: (a) any payment to that Critical Vendor on account of a Critical Vendor claim is an improper postpetition transfer, and, therefore, recoverable from the Critical Vendor; and (b) upon recovery of the payment by the Debtor, the Critical Vendor claim shall be reinstated as if the payment had not been made. In lieu of recovery of such payments, if there exists an outstanding postpetition balance due from the Debtor to a Critical Vendor, the Debtor may recharacterize and apply any payment made pursuant to an order granting the Motion to such outstanding postpetition balance and such Critical Vendor will be required to repay to the Debtor such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## THE COURT MAY AUTHORIZE THE PAYMENT OF THE PREPETITION CLAIMS TO THE CRITICAL VENDORS

### A. Paying Critical Vendor Claims is Proper Pursuant to 11 U.S.C. §105

17. The relief requested herein is proper based on section 105(a) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business. Allowing a debtor to honor prepetition obligations under section 105(a) authority is appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing property available to



13710274.v1

satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

18. The Supreme Court has even recognized the need to pay certain prepetition claims in appropriate circumstances. In *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), the Supreme Court reasoned that critical vendor orders supported "significant Code-related objectives that the priority-violating distributions serve." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017). In *Jevic*, the Supreme Court offered several appropriate considerations for courts in determining whether to grant motions for payment of critical vendors including the following: (i) preserve the debtor as a going concern; (ii) make the disfavored creditors better off; (iii) promote the possibility of a confirmable plan; (iv) help to restore the *status quo ante*; or (v) protect reliance interests. *Id. at 986.*

19. For the reasons set forth herein, and in light of the critical need for the Debtor to preserve the going concern value of its business in order to effect a successful sale, payment of the Critical Vendor Claims as requested herein is proper in accordance with section 105 of the Bankruptcy Code.

**B. Paying Critical Vendor Claims is Proper Under the Doctrine of Necessity**

20. Payment of the Critical Vendor Claims is further supported by the doctrine of necessity. The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization. See *In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment); see also *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit the pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor."). These courts' approaches to payment of prepetition claims is particularly appropriate where prepetition creditors — here, the Critical Vendors— provide vital goods and services to a debtor that would be unavailable if the debtor did not satisfy its prepetition

obligations. See *In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the Debtor and payment of creditors in full or at least proportionately'") (citation omitted).

21. The Debtor is mindful that in *In re B&W Enterprises*, 713 F.2d 534 (9th Cir. 1983), the Ninth Circuit refused to extend the necessity of payment doctrine beyond the railroad organization case where the debtor made unauthorized postpetition payments to trade suppliers on prepetition debts. In *B&W*, after conversion to chapter 7, the trustee sought to recover the payments under section 549 of the Bankruptcy Code. That case is factually distinguishable from the instant one in that *B&W* did not seek prior court approval for the payments, and was in liquidation, thereby rendering the "necessity" of such payments moot.

22. The Debtor strongly believes that the payment of the Critical Vendor Claims is essential to the ongoing viability of its business operations pending a sale that the Court may exercise its equitable powers to grant the relief requested in this Motion. As the *Ionosphere Clubs* court explained:

> The "necessity of payment" doctrine . . . [permits] immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until its pre-reorganization claims have been paid.

*Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) quoting *In re Leigh & New England Rwy Co.*, 657 F.2d 570, 581 (3d Cir. 1981).

23. This doctrine applies in all chapter 11 cases because the "rationale for the necessity of payment rule, *i.e.*, facilitating the continued operation and rehabilitation of the debtor . . . is also a paramount goal of chapter 11." *Ionosphere Clubs*, 98 B.R. at 176 (citation omitted). The "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."



13710274.v1

24. For the reasons discussed herein, payment of the Critical Vendor Claims is necessary to the Debtor's effective reorganization. In particular, and as further set forth above, without payment of the Critical Vendor Claims, the Debtor's business and operations will be detrimentally impacted because the Debtor will not be able to obtain the critical services provided by the Critical Vendors. As a result, the Debtor will be forced to incur exorbitant costs in order to find alternative sources of the critical services (to the extent such services are even available) or may lose favorable trade terms which are essential to its operations and may lose key customers due to interruptions in its supply chain. In addition, certain of the Critical Vendors might have valid reclamation claims under section 546(c) of the Bankruptcy Code for goods delivered during the 45 days prior to the Petition Date and/or may have valid claims under section 503(b)(9) of the Bankruptcy Code for the value of goods received within 20 days prior to the Petition Date.

**C. Payment of Critical Vendors Claims is Proper Under 11 U.S.C. § 363**

25. Courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. See e.g. *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks."); *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain claims).

26. Once a debtor has articulated a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)): accord *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) ("in evaluating the rejection decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate.").

27. Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *F.D.I.C. v. Faigin*, No. CV 12–03448-DDP, 2013 WL 3389490, at *5, 2013 U.S. Dist. LEXIS 94899 (C.D. Cal. July 8, 2013) ("The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest.") (citations omitted). Courts should decline to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence. *See, In re Pomona Valley Med. Group, Inc.,* supra; *In re AWTR Liquidation Inc.,* 548 B.R. 300, 314 (Bankr. C.D. Cal. 2016) ("The effect of the business judgment rule is to raise the burden of proof from ordinary negligence to gross negligence—'i.e., failure to exercise even slight care.'"); *Mann v. GTCR Golder Rauner, LLC*, 483 F.Supp.2d 884, 902 (D. Ariz. 2007) ("Because the business judgment rule is a 'powerful presumption,' it can only be 'rebutted in those *rare cases* where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'") (citations omitted).

28. As discussed above, the Debtor has determined, in the sound exercise of its business judgment, that the services provided by the Critical Vendors are vital to the Debtor's continued business operations to maintain the Debtor's goodwill pending a sale. As such, the failure to honor its obligations to the Critical Vendors could have a material adverse impact on the Debtor's continued operations and, thus, its efforts to maximize value upon a sale. Accordingly, the preservation and protection of the Debtor's business through ongoing relationships with the Debtor's Critical Vendors provides a sufficient business justification for payment of Critical Vendor Claims, even if such payment were deemed to be outside the ordinary course of business.

29. The relief requested in this Motion contemplates the payment of Critical Vendor Claims of those Critical Vendors who agree to provide postpetition goods to the Debtor on

customary trade terms or other terms acceptable to the Debtor, and is therefore consistent with and appropriate under section 363 of the Bankruptcy Code.

30. Courts in this district regularly grant relief consistent with that which the Debtor is seeking in this Motion. See, e.g., *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 1, 2019) (authorizing the payment of prepetition critical vendor claims); *In re ATD Corp*., No. 18-12221 (KJC) (Bankr. D. Del. Oct. 24, 2018) (same); *In re VER Techs. Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. May 4, 2018) (same); *In re Claire's Stores, Inc*., No. 18-10584 (Bankr. D. Del. Apr. 17, 2018) (same); *In re Charming Charlie Holdings, Inc*., No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (same); *In re True Religion Apparel, Inc*., No. 17-11460 (CSS) (Bankr. D. Del. July 31, 2017) (same); *In re GST AutoLeather, Inc*., No. 17-12100 (LSS) (Bankr. D. Del. Nov. 13, 2017 (same); *In re TK Holdings Inc*., No. 17-11375 (BLS) (Bankr. D. Del. Aug. 9, 2017) (same); *In re Sugarfina Inc.,* No. 19-11973 (Bankr. D. Del. Sept. 6, 2019 Doc. 145) (same).

31. Maintaining the services provided by the Critical Vendors is vital to the Debtor's continuing business operations and the success of the Case. In addition, the Debtor has conducted an extensive analysis and review of the Debtor's immediate trade needs and supplier base and have concluded that there is a significant risk that the Critical Vendors will cease doing business with the Debtor unless its Critical Vendor Claims are paid. Should any Critical Vendor stop supplying goods or services to the Debtor, or choose to significantly downgrade the Debtor's trade terms, its business would be adversely affected as a result of, among other things, an adverse impact on the Debtor's ability to meet the demands of its customers which in turn, would result in customers seeking their products elsewhere. As such, the Debtor submits that the amount of the Critical Vendor Claims pales in comparison to the likely damage to the Debtor's business and estate should the relief requested herein not be granted. In light of the foregoing, the Debtor submits that payment of the Critical Vendor Claims is plainly in the best interests of its estate and creditors.

32. Additionally, the Debtor's calculation of the Critical Vendor Claims is also reasonable. To determine the amount of the Critical Vendor Claims, the Debtor considered, among

other things, which vendors/service providers: (a) are absolutely needed to continue to operate without disruption; (b) would be prohibitively expensive or difficult to replace under the circumstances; and (c) would present an unacceptable risk to the Debtor's business should they threaten to discontinue providing services postpetition. The Debtor also considered the financial condition of the vendors/service providers to the extent such information was known, including each vendor's/supplier's level of dependence on the Debtor's continued business and whether such vendor/supplier is itself financially distressed. Once the Debtor gathered this information, the Debtor estimated the amounts that would be required to pay each Critical Vendor to ensure the continued supply of services. The Critical Vendor Claims comprises this estimated amount. Therefore, the Debtor respectfully submits that the Critical Vendor Claims and the other relief sought herein is fully justified pursuant to sections 105 and 363 of the Bankruptcy Code as well as the "doctrine of necessity."

33. The critical services provided by the Critical Vendors are vital to the Debtor's continuing business operations and its ability to maximize estate assets. If the relief sought in this Motion is not granted, Critical Vendors may attempt to assert its considerable leverage and deny the Debtor essential services going forward. Accordingly, in the Debtor's business judgment, the payment of the Critical Vendor Claims as set forth herein is necessary to prevent the immediate and irreparable harm that would arise from a disruption to the Debtor's business operations.

**D. Paying Critical Vendor Claims is Also in Furtherance of the Debtor's Duties Under Sections 1107(a) and 1108 of the Bankruptcy Code**

34. Sections 1107(a) and 1108 of the Bankruptcy Code place "a fiduciary duty on a debtor in possession to protect and preserve the debtor's estate, including the going-concern value of an operating business." *In re Pioneer Health Servs.*, 570 B.R. 228, 234 (Bankr. S.D. Miss. 2017). The Debtor is thus a fiduciary "holding the bankruptcy estate and operating the business for the benefit of [its] creditors and (if the value justifies) equity owners." *In re CoServ, LLC*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor-in-possession

is the duty "to protect and preserve the estate, including operating business's going-concern value." *Id.*

35. Courts have noted that there are instances in which a debtor-in-possession can fulfill its duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that pre-plan of reorganization satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* at 497-498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

36. Similarly, in *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004), the court held that certain prepetition claims might be critical under limited circumstances if the following evidence were presented: (1) the payments are necessary for a successful reorganization, (2) the disfavored unsecured creditors will be as well off with reorganization as with liquidation, and (3) the critical vendors would cease doing business with the debtor if the payments are not made. *See, In re Kmart Corp.*, 359 F.3d 866, 872-874 (7th Cir. 2004).

37. Payment of the Critical Vendor Claims undeniably meets each element of the *CoServ* court's standard. First, as described above, the Debtor has narrowly tailored the definition of "Critical Vendor" to encompass only those service providers who are critical because the time and expense that would be involved in transitioning to a new supplier would be prohibitive and would significantly disrupt the Debtor's business. Any interruption of the Debtor's operations could cost the Debtor's estate hundreds of thousands of dollars in lost revenues and furthermore, could cause the Debtor to lose a significant amount of customers.

38. Second, because of the essential nature of the critical services provided by the Critical Vendors and the difficulty associated with finding alternative sources for those services, the potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform, as further described above, is grossly disproportionate to the amount of any Critical Vendor Claim sought to be paid. Third, with respect to each of the Critical Vendor Claims, the Debtor has examined other legal options short of payment of such Critical Vendor Claims and has determined that there exists no practical or legal alternative to payment of the Critical Vendor Claims.

39. Therefore, the Debtor can only meet its fiduciary obligations as Debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Critical Vendor Claims.

**E. The Court Should Authorize the Applicable Banks to Honor Checks and Electronic Fund Transfers in Accordance with the Motion**

40. In connection with the foregoing, the Debtor respectfully requests that the Court (a) authorize the Banks to receive, process, honor, and pay all checks and transfers issued by the Debtor in accordance with the Motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that all Banks may rely on the representations of the Debtor with respect to whether any check or transfer issued or made by the Debtor before the Petition Date should be honored pursuant to the Motion (such banks and other financial institutions having no liability to any party for relying on such representations by the Debtor provided for herein); and (c) authorize the Debtor to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with the Motion are dishonored or rejected by the Banks.

41. The Debtor reserves the right to contest the amount claimed by any of the Critical Vendors in the ordinary course of business. The relief requested herein should not (a) be construed as a request to assume or reject, or for authority to assume or reject, any executory contract or unexpired lease under section 365 of the Bankruptcy Code or otherwise, (b) waive, affect, or impair

any of the Debtor's rights, claims, or defenses, including, but not limited to, those arising from section 365 of the Bankruptcy Code, other applicable law, or any agreement, (c) grant third-party beneficiary status or bestow any additional rights on any third party, (d) be otherwise enforceable by any third party other than the Banks, or (e) impair the Debtor's ability to contest or object to any claims, including the Critical Vendor Claims, asserted against the Debtor on any ground permitted by applicable law.

**NOTICE**

42. The Debtor will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtor; (d) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (e) counsel for the Committee. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

43. Further, to implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these Rules are applicable. As described above, the relief that the Debtor seeks in the Motion is necessary for the Debtor to operate without interruption and to preserve value for its estate.

**NO PRIOR REQUEST**

44. The Debtor has not previously sought the relief requested herein from this or any other Court.

**WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated: July 20, 2022
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman (admitted *pro hac vice*)
Melissa Davis Lowe (admitted *pro hac vice*)
Max Casal (admitted *pro hac vice*)
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Telephone: (949) 340-3400
Facsimile: (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com
E-mail: mcasal@shulmanbastian.com

*Proposed Counsel to the Debtor and Debtor in Possession*