**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC,[1] | Case No. 22-10602 (JKS) |
| Debtor. | **Objection Deadline: July 27, 2022 at 4:00 p.m. (ET)**<br>**Hearing Date: August 3, 2022 at 2:00 p.m. (ET)** |

**DEBTOR'S MOTION FOR AN ORDER APPROVING (1) KEY EMPLOYEE
INCENTIVE PLAN; (2) KEY EMPLOYEE RETENTION PLAN, AND (3) GRANTING
RELATED RELIEF**

Agway Farm & Home Supply, LLC (the "Debtor"), the debtor and debtor in possession

herein, brings this motion ("Motion") seeking entry of an order, substantially in the form attached

hereto as **Exhibit A**, approving the Debtor's proposed non-insider key employee retention program

(the "KERP"), and the Debtor's proposed key employee incentive plan (the "KEIP") pursuant to

the Term Sheet attached hereto as **Exhibit 1**, pursuant to sections 105(a), 363(b), and 503(c) of

title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code")

and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

In support of the Motion, the Debtor submits the following Memorandum of Points and

Authorities, the First Day Declaration of Jay Quickel [Docket No. 10] ("First Day Declaration")

and the Declaration of Jay Quickel filed concurrently herewith (collectively, the "Quickel

Declarations"), as well as the Declaration of Lance Miller filed concurrently herewith (the "Miller

Declaration"). As set forth in the Quickel Declarations, the Debtor filed its bankruptcy case (the

"Case") to complete the open and competitive process begun more than five (5) months ago to sell

substantially all of its assets. Once all of its assets are sold, the Debtor intends to discontinue

operations and wind up its affairs. In connection with this Sale Process (defined below), the Debtor

---

[1] The last four digits of the Debtor's federal tax identification number are 1247. The Debtor's address is 6606 W. Broad Street, Richmond, VA 23230.

seeks approval of the KEIP and KERP to ensure that certain of the Debtor's key employees remain during the Sale Process and are incentivized to deliver their best performance throughout the Sale Process.  The Debtor is already operating with a thin staff and without implementation of the KEIP and KERP, the participating employees will likely pursue other employment and may not be incentivized to perform optimally.  If any of the participating employees leave the Debtor's employ, it could severely harm, if not halt altogether, the Sale Process.  Furthermore, incentivizing the Key Executive (defined below) is particularly crucial to the Debtor given the necessarily expedited nature of the marketing and sale process, coupled with the reality that the Debtor will likely be unable to replace its executive team given the Debtor's operational/financial restrictions while in bankruptcy.  For these reasons, the Debtor believes that the KEIP and KERP are critical at this juncture of its Case, and therefore, respectfully requests this Court grant this Motion in its entirety.

## **Jurisdiction and Venue**

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a) and 52l(a)(l), of the Bankruptcy Code, as supplemented by Bankruptcy Rules 1007(a)(l), (a)(3) and (d) and Local Rules 1001-l(c) and 1007-2.

13710355.v2

4.      The Debtor filed its respective voluntary petition for relief under chapter 11 of the United States Code Bankruptcy Code on July 5, 2022 ("Petition Date").

5.      The Debtor is continuing in possession of its property, and operating and managing its business, as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.      A committee of creditors ("Committee") was formed pursuant to a Notice of Appointment filed by the Office of the United States Trustee on July 18, 2022.

**Description of the Debtor's Business**

7.      The Debtor's headquarters is located in Richmond, Virginia and the Debtor has warehouses and distribution centers in Cloverdale, Virginia and Westfield, Massachusetts. Additionally, the Debtor maintains a satellite distribution center in West Springfield, Massachusetts.

8.      The Debtor is a wholesale product distribution company that serves a broad network of independent retail stores and provides full service retail advisory support.  The Debtor provides a vast network of farm and home retailers across six different major categories: (1) seasonal home & hardware; (2) farm products; (3) lawn & garden; (4) bird food & supplies; (5) pet food & supplies; and (6) animal health needs.  Additional information regarding the Debtor's business can be found in the Quickel Declarations.

**The Sale Process**

9.      More than five months ago, the Debtor began the process of marketing substantially all of its assets.  While the Debtor has not finalized agreements with any parties with respect to the sale of the Debtor's assets, the Debtor filed the Case to stabilize its business operations and maximize the value of its assets, whether as a bulk sale or as more than one (1) incremental sales of distinct assets and, pending such sale(s), to continue sales of its inventory at discounted rates ("Sale Process").  In connection with the Sale Process, the Debtor seeks approval of the KEIP and KERP to ensure that certain of the Debtor's key

employees remain during the Sale Process and are incentivized to deliver their best performance throughout the Sale Process.

10.    Specifically, due to various events described in more detail in the First Day Declaration, in March 2022, the Debtor initiated a wind-down plan in which the Debtor: (1) laid off about one-half of the Debtor's employees; (2) offered to let some employees stay onboard on a contract work basis; and (3) offered a retention bonus to certain critical employees to incentivize them to stay.  Pre-petition, the Debtor provided and paid retention bonuses to most of the Participating Employees (defined below).  The Participating Employees have agreed to continue to stay in the Debtor's employ in exchange for further retention payments, authority for which is requested in this Motion.

11.    As of the Petition Date, the Debtor was in contact with and had entered into negotiations with several strategic potential buyers with varying interest in various types of sales. The Debtor continues its discussion with multiple strategic companies to hopefully come to terms on one or more agreements to sell all or a portion of its assets subject to overbid. If it cannot do so, the Debtor will seek to auction its remaining assets.

12.    Pending such sale discussions, the Debtor has implemented a strategy for the sale of its inventory using discounted rates.  As of the Petition Date, Class A products are being discounted 20%, Class B 35%, Class C 50% and Class D 50% (the "Sale Discount Rates").  As part of the Debtor's first day motions, the Court approved the Debtor's continued sales of its inventory at the Sale Discount Rates on an interim basis, pending a final hearing to be held on August 3, 2022.

13.    The Debtor expects to continue sales of its inventory at the Sale Discount Rates until sometime in August or September 2022 when the Debtor documents a bulk offer for the purchase of its inventory and the sale of inventory on a piecemeal basis would cease, or the Debtor determines it must conduct an auction for the sale of its remaining assets.  Any auction or bulk sale would be subject to the Bankruptcy Court's approving after notice and an opportunity for hearing.

14.    The Debtor only has 22 permanent employees and 5 staffing agency workers remaining, all of whom are critical to the Sale Process.  The Debtor is not seeking to pay all 27 employees through this Motion, but rather, only 15 of the employees (including Mr. Quickel). In particular, the remaining employees have a high degree of skilled labor and knowledge with respect to the Sale Process. They know exactly where the inventory is located, are skilled forklift drivers who are familiar with the warehouse "pick and pack" trolley system and able to gather the necessary items quickly and safely, package the items correctly, and load them correctly on trucks for delivery.

15.    The Debtor is concerned that one or more of its employees may terminate his/her employment at any moment.  In fact, certain employees have already expressed concern over the bankruptcy process and that they need to find alternative employment that is more stable.  The Debtor believes the employees may be able to find attractive alternative employment quickly due to the overall industry labor shortages for these skilled laborers and will thus leave the Debtor's employment.

16.    Prepetition, the Debtor entered into agreements and provided and paid retention bonuses to most of the Participating Employees (defined below) with the expectation that the Case would be filed significantly earlier than the Petition Date, and that the Participating Employees' employment would terminate on or prior to June 30, 2022.   Because the sale process took longer than expected, the Debtor's filing was delayed, and the Debtor has continued to need the Participating Employees to assist with the liquidation of the Debtor's assets.  When it became apparently the employees would need to stay past June 30, 2022, the Debtor entered into another agreement with most of the Participating Employees to pay a retention bonus on July 29, 2022.  The KERP is intended to, and if approved, will supersede that prepetition agreement.  Similarly, the Debtor also entered into an agreement with the Key Executive to pay him a retention bonus on July 29, 2022.  The KEIP is intended to, and if approved, will supersede that prepetition agreement with the Key Executive.

17.     If any one of the employees terminates his/her employment with the Debtor, it will adversely affect the Sale Process, if not halt the process altogether, to the detriment of the Estate and its creditors.

**<u>Necessity for the KEIP and KERP</u>**

18.     The success of the Sale Process and this Case will depend on the willingness of the participating employees to remain focused and motivated and, in many instances, to take on additional responsibilities to manage the chapter 11 process and continue operations in a constrained and challenging environment.  As such, the Debtor cannot afford to lose the participating employees.  Each participating employee is already filling multiple roles, and each is critically necessary to maximize the value of the Sale Process.  To incentivize the participating employees to stay, particularly in light of the filing of the Case, the Debtor, in conjunction with input from its advisors, developed the KEIP and KERP, tailored to the Debtor's business and the demands of this Case.

19.     The KERP covers fourteen (14) employees[2] listed in **Exhibit 2** and the KEIP covers only Jay Quickel, the Debtor's President and CEO, who is the person most closely involved in the Sale Process, including the day-to-day communications with potential purchasers.

20.     The Debtor, after consultation with its advisors and market comparison in the bankruptcy context, developed the KEIP to properly incentivize a key executive (Mr. Quickel) (the "<u>Key Executive</u>"), as well as to ensure retention of the fourteen (14) key employees (the "<u>Key Employees</u>") (the Key Executive and the Key Employees, collectively, are hereinafter referred to as the "<u>Participating Employees</u>").  The total to be paid to the Key Executive will not exceed $75,000.00 and the total to be paid to the Key Employees will not exceed $285,000.00.

---

[2] Exhibit 2 is a list of the fourteen (14) employees participating in the KERP, along with their titles, base salary, and proposed payments.  Exhibit 2 is only being provided to the United States Trustee and counsel to the Committee (once retained).  The Debtor will also submit a copy of Exhibit 2 to the Court.

21.     As discussed in further detail herein, these Participating Employees were carefully selected because they have unique and specialized knowledge with respect to the Debtor's assets and industry which makes them essential to the Debtor's continued operations, will be required to perform significantly more work while the Debtor is in bankruptcy, and the Debtor believes that adequately incentivizing their excellent performance will ultimately inure to the benefit all of the Debtor's stakeholders.

22.     Some of the Participating Employees may be required to perform additional duties as a result of the filing of this Case, some of which will require extensive coordination with the Debtor's bankruptcy counsel and other advisors with respect to various issues that arise in connection with the bankruptcy process, including matters relating to the sale and marketing of the Debtor's assets and compliance with reporting requirements.  At all stages of this Case, issues will require immediate attention that, if not handled promptly and skillfully, will erode the value of the Debtor's assets.  Further, the Key Executive will continue to be responsible for coordinating responses to interested parties' extensive diligence requests.

23.     To be sure, the proposed KEIP is necessary to incentivize the Key Executive and the proposed KERP is essential to minimizing employee departures and stabilizing the Debtor's operations through the contemplated Sale Process and the continued sales of inventory.  As described more fully in the Quickel Declaration, the Debtor filed this Case to maximize the value of its assets through a sale.  In the time leading up to the Debtor's bankruptcy filing, the Debtor's workforce has been instrumental in maintaining the ongoing business of the Debtor and in ensuring that orders continue to be filled, thereby maximizing value with respect to the Sale Process.  The Sale Process has required a substantial commitment of time and effort on the part of the Debtor's employees and a willingness to continue to work for the Debtor in the face of the uncertainty inherent in chapter 11 proceedings and the Sale Process.  Despite the Debtor's and its employees' efforts to date, further efforts will be necessary to maximize value for all of the Debtor's stakeholders.

24.     As described more fully in the Miller Declaration, the Key Executive will be required to continue to communicate and work with potential purchasers as they evaluate the Debtor's assets in order to maximize the value to the Estate.  The Key Executive is absolutely essential to a successful Sale Process.

25.     Without approval of the proposed KEIP and KERP, there is a very real concern that key employees will resign.  It is therefore critical to the success of the Sale Process and the Case that the Participating Employees have the incentive to continue their extraordinary efforts, to remain in the Debtor's employ through the Sale Process, and to work enthusiastically to increase the value of the assets to be sold.  Accordingly, the Debtor seeks approval of the KERP for certain non-insider employees and the KEIP for the Debtor's CEO and President.

## I.     <u>RELIEF REQUESTED</u>

26.     By this Motion, the Debtor seeks entry of an order under Bankruptcy Code section 105, 363(b) and, to the extent applicable, section 503(c)(3): (i) authorizing the implementation of the Debtor's proposed KEIP with respect to payments to a certain key insider employee and the KERP with respect to retention payments to certain key employees who are not included in the KEIP; (ii) approving the terms of the KEIP and KERP; and (iii) granting related relief, including allowing all payments under the KEIP and KERP as administrative expenses of the Debtor's bankruptcy estate ("<u>Estate</u>").

## II.     <u>BASIS FOR RELIEF</u>

27.     The Debtor seeks approval of the KEIP and KERP to ensure the continuation of the sales of inventory pending the conclusion of the Sale Process and to maximize the value of the Debtor's assets for all of the Debtor's stakeholders.

28.     Without the approval of the KEIP and KERP, valuable key employees will likely depart, leaving the Debtor and its Estate without key executives and employees to manage the completion of the Sale Process to the detriment of the Estate.  Accordingly, it is crucial that the Debtor retain certain key employees and incentivize the Debtor's CEO to

13710355.v2

deliver his best performance. The Participating Employees were selected only after it was determined that each participant was critical to the maintenance of the Debtor's operations and the continued sales of inventory.  Without the KEIP and KERP, the Participating Employees may pursue other employment and/or may not be incentivized to perform optimally.  In fact, the Debtor has already lost a substantial amount of its workforce to other employment opportunities.  The KERP Participants are trained, knowledgeable, and would be extremely difficult to replace.  For these reasons and others, the Debtor believes that implementing the KEIP and KERP is critical at this juncture of the Case.

29.     Given the increased demands placed upon the potential KERP Participants during this Case (which have already extended beyond the timeline originally anticipated), the Debtor believes it is important to motivate these individuals to remain committed to their business.  The KERP will provide the Debtor with the means to retain the KERP Participants, thereby preserving value for the Debtor, its Estate, its creditors, and other parties in interest.

A.     **Overview of the KEIP and KERP**

30.     As the Debtor prepared to file this Case, it recognized that to successfully implement the Sale Process, it needed to develop a plan to retain the Participating Employees. The Debtor designed a comprehensive plan to motivate and incentivize the Participating Employees to remain with the Debtor and to work to maximize the value of the Estate through the Sale Process.  In developing the KEIP and KERP, the Debtor performed a market comparison in the bankruptcy context. The Debtor gave special consideration to the active and competitive nature of the current labor market, including that the Debtor has already lost multiple employees to other, more stable, jobs.  In light of the circumstances the Debtor faced, the Debtor has adopted the KEIP and KERP that, if approved by the Court, would be available to the Participating Employees in two payments – the first upon approval of this Motion, and the second upon the Participating Employees' termination without cause, or November 30, 2022 at the latest. The Debtor's management determined that adopting the KEIP and KERP would maximize its ability to retain the Participating Employees through the anticipated thirty

to sixty days needed to complete the Sale Process. The Debtor's management identified the Participating Employees who should be included in the KEIP and KERP and, with the help of its financial advisors, to structure proposed payments to them in a way that would fit within the Debtor's budget. The specifics of the KEIP and KERP are detailed below.

**B.**    **Description of the KEIP and KERP**

       **1.**    **The Participating Employees**

       31.    The Debtor has identified the Key Executive to receive payments under the KEIP and the Key Employees to receive payments under the KERP. All of the Participating Employees possess institutional knowledge and skills that are essential to the Sale Process efforts. In addition to the responsibilities related to the Debtor's everyday business operations, the Participating Employees in many instances have assumed, and may continue to assume, added responsibilities in connection with this Case and the Sale Process, such as continuing operations (including the ongoing sale of inventory sales) stabilizing the Debtor's vendor base, ensuring the Sale Process is completed and sold assets properly transitioned, and otherwise taking whatever steps are necessary to obtain the highest and best value for the Debtor's Estate. The Debtor submits that payments made under the KEIP are necessary to incentivize the Key Executive to perform these duties in an optimal manner and reward him for achieving the defined metrics. Likewise, without the KERP, the Debtor likely will lose non-executive personnel who are critical to the success of the Case and the Sale Process, as well as the Debtor's operations more generally.

       **2.**    **The Terms of the KEIP**

       32.    As more fully set forth in the Miller Declaration, the proposed KEIP is a postpetition incentive plan designed to incentivize the Key Executive to optimize the value received by the Debtor's Estate through the Sale Process. Awards under the KEIP will be paid out within thirty (30) days after the closing of the sale(s) of substantially all of the Debtor's assets. The amount to be paid will be 2% of the proceeds of all such sales consummated during this Case (i.e., after bid protection, including break-up fee and expense

13710355.v2

reimbursements, amounts have been deducted) up to a cap of $75,000.00 (or 24.6% of his annual base salary).

33.     In order to participate in the KEIP, the Key Executive must sign a general release of prepetition claims acceptable to the Debtor other than any severance already approved and owed to the Key Executive upon their departure.  Further, in the event the KEIP Participant voluntarily resigns before the conclusion of the Sale Process, he will forfeit any right to a distribution under the KEIP.

34.     It is important to note that the KEIP is not a "pay to stay" retention plan. Instead, the KEIP incentivizes the Key Executive by tying payments directly to the results of the Sale Process.  Accordingly, the KEIP is a true incentive plan that successfully aligns the interests of the Debtor, its employees, and its stakeholders, in that it motivates the Key Executive to achieve the highest sale price, which in turn will improve recoveries for the Debtor's stakeholders.

35.     The total cost of the KEIP is no more than $75,000.00.

**3.       The KEIP Design is Consistent with Chapter 11 Practice and Market Forces**

36.     As a general matter, the use of key employee incentive plans is common practice in chapter 11 cases.  The structure of the plans in chapter 11 cases varies based on the unique circumstances of each case, but based on recent precedents provided the Debtor by its proposed counsel, the general terms and conditions in the bankruptcy market are consistent with the KEIP proposed by the Debtor, including the metrics and proposed payment amounts.

**4.       The Terms of the KERP**

37.     The Debtor seeks to implement the KERP for non-management personnel who are not insiders in order to ensure that the Debtor does not suffer significant and costly turnover of essential employees during the Sale Process.  To develop the KERP, the Debtor's management, along with its financial advisors, analyzed its workforce to determine which non-insiders were necessary to a successful sale process.  None of the Key Employees are insiders, as that term is defined in section 101(a)(31) of the Bankruptcy Code.  Each of the

Key Employees has developed valuable institutional knowledge regarding the Debtor's ongoing business operations, and keeping such employees in their current roles over the near term will be crucial to the successful completion of the Sale Process.

38.     Under the proposed program, KERP Participants will receive two equal payments.  The first payment to a KERP Participant will be due on the first payroll cycle after entry of an order approving this Motion.  The second payment will be due on the earlier of termination of the KERP Participant's employment without cause, or November 30, 2022.  As noted above, the payments proposed to be made under the KERP will not exceed $285,000 in the aggregate, with the total of the two payments ranging from $3,707 to $49,926 per KERP Participant (ranging between a total of 10% and 28% of each of the KERP Participants' annual base salary).

1.     The key terms of the KERP are summarized as follows:

- ***Eligible Participants.***  Those employees listed on Exhibit 2. Although some of the potential KERP Participants have titles that include "vice president" or "manager," none is an "insider" of the Debtor.  The KERP Participants do not include any employee who (a) is appointed or hired directly by the Debtor's Board of Directors (the "Board"); (b) reports directly to the Board; (c) regularly attends Board meetings; (d) exercises managerial control over, or has responsibility for the Debtor's operations as a whole; or (e) dictates the Debtor's overall corporate policy, governance, or disposition of corporate assets.

- ***KERP Awards.***  The payments to be made under the KERP consist of fixed cash amounts payable in two installments and are contingent on continued employment of the KERP Participant through the applicable payment dates.  Retention amounts and associated terms will be documented in employee retention letters, to be issued by the Debtor's CEO (the "Retention Letters").

- ***Aggregate Payment Amount; Allocation.***  The total payments to be made under KERP shall be subject to an aggregate cap of $285,000.00.

- ***KERP Structure and Payment Dates.***  Following all requisite approvals, retention amounts will be paid according to the following structure:  50% paid on the first payroll cycle after entry of an order approving this Motion ("First Payment"), and 50% (the "Second Payment") paid on the earlier of: (i) termination of the KERP Participant's employment without cause; or (ii) November 30, 2022.  In order to receive the First Payment, the KERP Participant must continue to be employed by the Debtor on July 29, 2022.  In the event a KERP Participant voluntarily resigns or is terminated by the Debtor

13710355.v2

for any reason other than business need prior to July 29, 2022, he/she will forfeit any right to a distribution under the KERP. In order to receive the Second Payment, the KERP Participant must continue to be employed by the Debtor until the Debtor terminates the KERP Participant's employment without cause, or November 30, 2022.  In the event a KERP Participant voluntarily resigns or is terminated by the Debtor for any reason other than business need prior to the Debtor's termination of his or her employment without cause, or November 30, 2022, he/she will forfeit any right to a distribution under the KERP.

- *Form of KERP Awards.*  All payments made pursuant to the KERP will be made in cash.

- *Performance Criteria*.  The KERP has no performance criteria.  In order to participate in the KERP, the Key Employees must sign a general release acceptable to the Debtor other than any severance already approved and owed to the participating employee upon their departure.

### 5.    The KERP Design is Consistent with Chapter 11 Practice and Market Forces

39.    Generally, the use of key employee retention plans is common practice in chapter 11 cases. The structure of the plans vary based on the unique circumstances of each case, but the general terms and conditions are consistent with the KERP proposed by the Debtor, including the proposed KERP Payment.  The KERP covers fourteen non-insiders with each of the First Payment and the Second Payment totaling two (2) weeks of such KERP Participant's base salary.  The total cost of the program is $111,233 for the First Payment and $171,424 for the Second Payment.

40.    The Key Employees are not insiders.  Instead, the Key Employees were selected for participation in the KERP because they are not members of senior management and are not insiders for purposes of the Bankruptcy Code, but are nonetheless critical and practically impossible to replace. Some hold titles such as "director," "vice president," or "manager," but, despite their seniority, do not serve on the Debtor's Board of Directors, take no part in the management of the Debtor, do not have sufficient control over corporate policy to be deemed an insider; rather, they hold such titles in name only.  The Key Employees generally do not attend senior management meetings or participate in board meetings or corporate governance, and many of their duties are limited to particular divisions.  Further, although the

Key Employees are vital to the Debtor's business, they do not have the ability to influence the direction of the Debtor's business operations or their reorganization.  No KERP Participant is a bona fide officer or director of the Debtor, is not appointed by the Board, or is a named executive officer.  Each KERP Participant is required to report to a more senior corporate official for approval before taking any significant action with respect to the Debtor's corporate policies or the disposition of significant assets.

41.     Thus, none of the Key Employees may be properly considered "officers" of the Debtor. Rather, the Key Employees are critical employees who have the knowledge and experience to carry out the decisions of management in an efficient and effective manner. Some of the Key Employees have, in addition to performing their normal job duties, undertaken significant additional tasks and responsibilities, including providing financial and operational information to fulfill the Debtor's reporting requirements, assisting with marketing efforts and other tasks related to the Case and ongoing Sale Process.

42.     The Sale Process that the Debtor has undertaken to maximize value for its assets has a necessary byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing that value.  As a result, it is entirely appropriate to provide benefits to key personnel in order to counterbalance the employment uncertainty and distraction that such a process necessarily engenders. The Key Employees are vital to the success of the Sale Process.

43.     Based on all of the above, the Debtor submits that the Motion should be granted as a reasonable exercise of the Debtor's business judgment and as being in the best interest of the Estate and creditors.

### III.    MEMORANDUM OF POINTS AND AUTHORITIES

### A.    The Debtor Has Articulated A Valid Business Reason to Implement the KEIP and KERP and Authorization of Each Is Appropriate Pursuant to Bankruptcy Code Section 363(b)(1)

44.    As discussed in detail above and as further detailed hereinbelow and as evidenced by the Miller Declaration and the Quickel Declarations, the Debtor has articulated valid business reasons for implementing the KEIP and KERP, and the facts and circumstances of the Case support approval thereof – namely, the Participating Employees are necessary to maximize value of the Debtor's Estate, including the Sale Process.

45.    Bankruptcy Code section 363(b) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under Bankruptcy Code section 363, this Court may approve a debtor's request for relief when the debtor demonstrates a sound business justification for seeking such relief. See *In re Orexigen Therapeutics Inc.*, Case No. 18-10518 (KG) (Bankr. D. Del. Apr. 23, 2018) (approving the debtor's employee compensation plans based on the debtor's sound business judgment); see also *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions").

46.    As set forth above, the Debtor has valid business reasons for implementing the KEIP and KERP.  The Debtor has determined, in its reasonable business judgment, that implementation of the KEIP and KERP will enhance the value of the Estate and accordingly, is in the best interests of the Estate and the stakeholders in the Case.  In addition to normal day-to-day responsibilities managing the Debtor's businesses and maintaining relationships with employees, key customers, and key suppliers, the Participating Employees serve as the driving force to continue to maximize the value of the Debtor's inventory and bring the Sale

Process to its ultimate resolution.  The Participating Employees are being asked to take on considerable additional responsibilities.

47.    Additionally, as set forth above and more fully in the Quickel Declaration and the Miller Declaration, the amounts to be paid under the KEIP and KERP are reasonable and were determined based on a thorough analysis of the Debtor's needs and requirements to complete the Sale Process, as well as a consideration of the percentage of the payments to be made, relative to the Key Employees' salaries.  Moreover, the overall costs of the KEIP and KERP are reasonable in light of the size of the Estate, the nature of the Debtor's industry, the competitive labor market and the benefit of a successful Sale Process resulting from the Key Employees' efforts.  Accordingly, the Debtor believes that valid business reasons exist for implementing the KEIP and KERP and thus, the KEIP and KERP should be approved.

48.    Once a debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule."  The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" See *Id.* quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).

49.    In that regard, courts have found that a debtor's use of reasonable performance bonuses and other incentives for employees is a valid exercise of a  debtor's business judgment. See e.g. *In re Glob. Home Prod., LLC*, 369 B.R. 778, 787 (Bankr. D. Del. 2007) (approving incentive plan as proper exercise of the debtors' business judgment); *In re Am. W. Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (noting that it is the proper use of a debtor's business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); *In re Interco Inc.*, 128 B.R. 229, 234 (Bankr.

16

E.D. Mo. 1991) (stating that a debtor's business judgment was controlling in the approval of a "performance/retention program").

50.     Even following the amendments to Section 503(c) of the Bankruptcy Code (discussed *infra*), the majority of courts have continued to approve employee bonus programs as valid exercises of business judgment. See e.g. *In re Blue Water Automotive Svs. Inc.*, Case No. 08-43196 (MBM) (Bankr. E.D. Mich. May 12, 2008) (approving incentive payments to employees in connection with a potential sale of assets); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 801 (Bankr. Del. 2007) (Bankruptcy Code section 503(c)(1) does not restrict incentive payments to non-insider employees); *In re Dana Corp. ("Dana II")*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) (approving management incentive plan under the business judgment standard); *In re Global Home Prods.*, LLC, 369 B.R. 778 (Bankr. Del. 2007) (approving management incentive program for benefit of nine employees of the debtors provided that such employees fulfilled their obligations to the debtors through the closing of a sale of substantially all of the Debtors' assets); *In re The Standard Register Company, et al.*, Case No. 15-10541 (BLS) (Bankr. Del. March 12, 2015) (approving management incentive program for forty-nine senior or executive employees provided the debtors reached certain EBITDARP goals); *In re Nobex Corp.*, No. 05-20050 (MFW), 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006) (approving a management incentive plan providing for increasing incentive bonus payments to eligible executives calculated according a schedule based on the gross sales price); *In re Bayou Steel, BD Holdings, L.L.C., et. al.,* Case No. 19-12153 (KBO) (Bankr. D. Del. Nov. 15, 2019) (approving management incentive program for 4 executives provided the sale of assets generated a certain amount, which such bonus totaled 33% to 50% of annual base salary); *In re Melinta Therapeutics, Inc.,* Case No. 19-12748 (LSS) (Bankr. D. Del. Feb. 5, 2020) (approving management incentive program for 7 executives provided the sale of assets generated a certain amount, which such bonus totaled 17.4% to 22% of annual base salary);

13710355.v2

51.     Courts have also approved similar incentive plans that contemplate target or task based incentive payments to management and retention payments to non-insiders. See *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Mar. 25, 2009) (approving a retention plan for non-insiders and a task based wind-down incentive plan for certain members of the debtor's management); *In re KB Toys, Inc.*, Case No. 08-13269 (KJC) (Bankr. Del. Jan. 6, 2009) (approving a retention plan for non-insider employees); *In re KB Toys, Inc.*, Case No. 08-13269 (KJC) (Bankr. Del. Jan. 14, 2009) (approving an incentive plan based on successfully completing of identifiable "tasks" consistent with targets, which plan applied to certain members of the debtor's management); *In re Mervyn's Holdings, LLC,* Case No. 08-11586 (KG) (Bankr. Del. Oct. 30, 2009) (approving a retention plan for non-insiders and a task and target based incentive plan for certain members of the debtor's management); see also *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. Del. Oct. 21, 2008) (approving a retention plan for non-insiders and wind-down incentive plan for certain members of the debtor's management); *In re Plastech Engineered Prods., Inc.*, Case No. 08-42417 (PJS) (Bankr. E.D. Mich. June 27, 2008) (approving a management incentive plan tied to the performance of requisite tasks); *In re Movie Gallery, Inc.*, Case No. 07-33849 (DOT) (Bankr. E.D. Va. Feb. 29, 2008) (approving a key employee incentive plan under which management received payments based on performance and non-insiders received payments based on completion of certain tasks associated with their respective positions); *In re F+W Media, Inc., et. al.,* Case No. 19-10479 (KG) (Bankr. Del. Apr. 17, 2019) (approving a retention plan for non-insiders totaling 10% to 29% of their base salary).

52.     In the present case, authorizing the Debtor to provide the KEIP and KERP to the Participating Employees will accomplish a similarly sound business purpose.  The Debtor has determined that the costs associated with additional postpetition compensation payments pursuant to the KEIP and KERP are more than justified by the benefits the Debtor will realize by creating appropriate incentives for the Participating Employees, whose experience, skills and diligent efforts are critical for the Debtor to maximize the value of its business during the

Sale Process – and by the inevitable expense and disruption to the chapter 11 process if Participating Employees were to terminate their employment. Incentivizing the Key Executive is particularly crucial to the Debtor given the expedited nature of the Sale Process, and the substantial likelihood that the Debtor will be unable to replace its executive team given the Debtor's operational and financial restrictions while in bankruptcy.

**B.**    **The Purpose of the KEIP is to Incentivize, and as Such, Is Not Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2)**

53.    Section 503(c) of the Bankruptcy Code was enacted as a curb on courts' authority to authorize the payment of "actual, necessary costs and expenses of preserving [a debtor's] estate" under section 503(b)(1) of the Bankruptcy Code, to "eradicate the notion that executives were entitled to bonuses simply for staying with the [c]ompany through the bankruptcy process." *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007).

54.    Section 503(c)(1) of the Bankruptcy Code "applies to those employee retention provisions that are essentially 'pay to stay' key employee retention programs." *In re Borders Grp., Inc.*, 453 B.R. 459, 471 (Bankr. S.D.N.Y. 2011) quoting *In re Dana Corp. (Dana II)*, 358 B.R. 567, 571 (Bankr. S.D.N.Y. 2006).  "Although a purported KEIP may contain some retentive effect, that 'does not mean that the plan, overall, is retentive rather than incentivizing in nature.'" *Id.* quoting *Dana II*, 358 B.R. at 571; see also *Global Home Prods.*, 369 B.R. at 785 ("The entire analysis changes if a bonus plan is not *primarily* motivated to retain personnel or is not in the nature of severance.") (emphasis added); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (reading section 503(c)(1) of the Bankruptcy Code to mean "a transfer made to ... an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business") (emphasis added). See also *In re Residential Capital, LLC*, 478 B.R. 154, 171 (Bankr. S.D.N.Y. 2012) ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)"); *Nobex*, No. 05-20050 (CSS) (Bankr.

D. Del. Jan. 12, 2006), Hr'g Tr. at 67 (section 503(c)(1) of the Bankruptcy Code does not apply to incentive programs); *In re Warner Holding Co. Inc.*, Case No. 06-10578 (KJC) (Bankr. D. Del. July 20, 2006; Aug. 22, 2006 and Dec. 20, 2006) (ordering various relief requested in connection with debtors' incentive bonus plans pursuant to sections 363(b) and 503(c) of the Bankruptcy Code); *In re Calpine Corp.,* Case No. 05-60200 (Bankr. S.D.N.Y. Apr. 26, 2006), *Hr'g Tr. at* 84-85 (sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to incentive programs).

55.    The Bankruptcy Code elsewhere defines "insider" as a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).  While a person holding an officer's title is presumptively an officer and thus an insider, that presumption may be rebutted with "evidence sufficient to establish that the person holds the title of an officer in name only and, in fact, does not meet the substantive definition of the same, *i.e.*, he or she is not taking part in the management of the debtor." *In re Foothills Tex., Inc.*, 408 B.R. 573, 574-75 (Bankr. D. Del. 2009).

56.    By its plain language then, section 503(c)(1) of the Bankruptcy Code pertains solely to retention payments to insiders, and section 503(c)(2) of the Bankruptcy Code pertains solely to severance payments to insiders.  Neither of these sections apply to performance-based incentive plans such as the KEIP, which only allots payments based on the successful achievement of certain metrics in connection with the sale of the Debtor's assets and does not provide benefits to the Key Executive simply upon termination of their employment. See *In re Velo Holdings Inc.*, 472 B.R. 201, 208 n.6 (Bankr. S.D.N.Y. 2012) (noting inapplicability of section 503(c)(1) to incentivizing plans); *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of section 503(c)(1) or 501(c)(2) of the Bankruptcy Code).

57.     Certain of the Key Employees hold titles such as "vice president" or "manager," but they do not take part in the management of the Debtor and they hold such titles in name only, rebutting the presumption that such participants are "insiders" within the meaning of the Bankruptcy Code.  The Key Employees generally do not attend senior management meetings or participate in board meetings or corporate governance, and many of their duties are limited to particular divisions.  Their respective scopes of authority are limited, and while their titles reflect their individual roles and functions, the same titles do not confer "officer or director" status upon the Key Employees.  As a consequence, the Key Employees are not "insiders" as defined in the Bankruptcy Code, and the Debtor thus maintains that sections 501(c)(1) and 501(c)(2) do not apply to the instant matter.

58.     The KEIP is not intended to provide bonuses for retention.  In particular, the KEIP comprises only targeted incentive payments to the one key employee who is the most critical to maximizing the value of the Debtor's business through the Sale Process, which payments require a far higher threshold than merely retaining their employment with the Debtor.  Although the Key Executive appears to be an "insider" within the meaning of the Bankruptcy Code, the KEIP has been crafted with great care to ensure the metrics directly incentivize and motivate participants to meet the Debtor's objectives.

59.     Moreover, while the KEIP was not crafted with the goal of retaining the Key Executive, the fact that the KEIP may encourage the Key Executive to remain with the Debtor throughout the Case should not bar implementation of the KEIP.  Indeed, all successful incentive programs have the indirect benefit of incentivizing an employee to remain with the company. See *In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007).  The primary purpose of the KEIP is to maximize value for the benefit of the Estates.

60.     Further, and importantly, the KEIP was not a self-interested transaction.  Namely, the Key Executive did not make the decision with respect to his own compensation.  The amount to be received by the Key Executive under the KEIP was made by Lance Miller, after evaluation of the Key Executive's salary, the potential value to be received from the

sales of the Debtor's assets, and the necessity for the Key Executive to stay with the company through the sale process, including continuing to communicate and work with potential purchasers as they evaluate the Debtor's assets.   As set forth in Mr. Miller's declaration, in considering the amount to be paid under the KEIP, the Debtor and Mr. Miller evaluated other similar incentive plans approved by this Court and determined that, on a percentage basis to the Key Executive's salary, the amount to be paid as an incentive to the Key Executive under the KEIP is significantly lower than other such incentive plans.

61.    Accordingly, the Debtor respectfully submits that sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KEIP.

## C.    The KEIP and KERP are Justified by the Facts and Circumstances of the Case and Satisfy Bankruptcy Code Section 503(c)(3)

62.    In the event the Court believes the KEIP and KERP should be held to a standard beyond just the business judgment test, the components of the KEIP and KERP each also satisfy the standard set forth in Bankruptcy Code section 503(c)(3), which provides:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c)(3).

63.    Courts have held that the requirement that transfers or obligations be "justified by the facts and circumstances of the case" is a reiteration of the reasonable exercise of business judgment (or the "business judgment rule") incorporated into Bankruptcy Code section 363(b) (and as set forth above) and under which courts traditionally evaluated executive compensation programs prior to recent amendments to the Bankruptcy Code. See *In re Dana Corp.*, 358 B.R. at 576.

64.    Notwithstanding the majority case law discussed above, which has held that incentive plans (such as the KEIP) may be approved by a court after applying the business judgment test, some courts have held that section 503(c)(3) sets a bar higher than the simple

business judgment test, requiring a determination by the court that an incentive plan is "justified by the facts and circumstances of the case." See *In re Pilgrim's Pride Corp*., 401 B.R. 229, 236 (Bankr. N.D. Tex. 2009) ("the court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate . . . . when a transaction is proposed between a debtor and its insiders"). This standard, however, has not been widely adopted and "has become the minority view." 4 Collier on Bankruptcy ¶ 503.17 (Alan N. Resnick & Henry J. Sommers eds., 16th ed.). Moreover, once a court has determined that a proposed incentive program is not primarily retentive in nature, the policy concerns that gave rise to section 503(c) of the Bankruptcy Code are no longer implicated. Accordingly, approval of the KEIP in this Case should be subject to the majority business judgment standard test discussed *supra*.

65.    In assessing a debtor's business judgment regarding the implementation of incentive programs, bankruptcy courts have looked to the factors laid out in *Dana* for guidance to evaluate a proposed incentive or retention program under Bankruptcy Code section 503(c)(3). See e.g. *In re Glob. Home Prod., LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) (applying the *Dana* factors). The *Dana* factors include: (a) whether a reasonable relationship existed between the proposed plan and the desired results; (b) whether the cost of the plan was reasonable in light of the overall facts of the case; (c) whether the scope of the plan was fair and reasonable; (d) whether the plan was consistent with industry standards; (e) whether the debtor had put forth sufficient due diligence efforts in formulating the plan; and (f) whether the debtor received sufficient independent counsel in performing any due diligence and formulating the plan. *In re Dana Corp.*, 358 B.R. at 576-77.

66.    The KEIP and KERP satisfy the *Dana* factors. First, there is a reasonable relationship between the plans' designs and the desired results. In consultation with counsel and financial advisors, and reviewing marketing comparisons within the bankruptcy context, the Debtor crafted the KEIP and KERP to motivate and reward Participating Employees for their significant efforts, to ensure that key management personnel continue to manage the

Debtor's day to day operations and affairs, and to compensate non-management Key Employees for the increased demands placed upon them in connection with the chapter 11 process. Specifically, the KEIP and KERP will ensure Participating Employees are sufficiently motivated and that the Debtor has the appropriate staff on hand to facilitate the continued sales of its inventory and potentially an expedited sale of its assets, thereby maximizing value for the Estate and the Debtor's stakeholders.

67.    Second, the cost is reasonable in light of the overall facts of the Case. The Debtor's financial advisors assisted the Debtor with the design of the KEIP and KERP. The cost is reasonable and well-justified given the size of the Debtor's business, the competitive nature of the labor market, the nature of the Debtor's business and the value that maximization of a Sale Process will bring to the Estate.

68.    Third, the KEIP and KERP are consistent with industry standards with respect to eligibility, total cost, metrics, and payout timing.

69.    Finally, consistent with past practice, the Debtor received independent counsel when designing the KEIP and KERP. Also, the plans were formulated in consultation with Focus Management Group USA, Inc., the Debtor's financial advisors, to ensure the KEIP meets the Debtor's goal of incentivizing the Debtor's key employees and the KERP meets the Debtor's goal of retaining critical non-insider employees. The KEIP and KERP were then approved by the Board.

70.    Not only are the KEIP and KERP calculated to achieve the desired performance, but any payouts under the KEIP and KERP programs are reasonable in light of the facts and circumstances of the Case. Accordingly, the Debtor submits that the KEIP will preserve and optimize the Estate's collective value by maintaining operational efficiency, employee productivity, and employee focus during a very uncertain and turbulent period. Further, the Debtor submits that an incentive plan designed in such a manner will sufficiently motivate the Key Executive to maximize value for all stakeholders in the Case. Similarly, the KERP will help facilitate the Case by incentivizing, retaining, and protecting crucial

13710355.v2

employees to ensure that regular business operations continue during and through the Sale Process.

71.     In any event, as discussed in detail above, under any standard applicable to the KEIP and KERP, the Debtor submits that the "cause" discussed in detail hereinabove with respect to the business judgment standard pursuant to section 363(b) and 503(c)(3) of the Bankruptcy Code, also satisfies the "justified by the facts of the case" standard articulated in *Pilgrim's Pride*, as the KEIP is for the express purpose of incentivizing the Key Executive, is necessary and critical to the maximization of value in connection with the sale, is within industry standards, is reasonable from a cost/benefit perspective, is tailored to obtain its designed objectives, and was subject to significant due diligence and input from independent counsel.

72.     Accordingly, the Debtor submits that implementing the KEIP and KERP is a valid exercise of the Debtor's business judgment and that approval of the KEIP and KERP is in the best interests of the Estate, the Debtor and all of the stakeholders in this case.

## NOTICE

73.     The Debtor will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to the Committee; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

74.     The Debtor has not previously sought the relief requested herein from this or any other Court.

## IV.    CONCLUSION

75.     For the foregoing reasons, it is critical that the Debtor implement the KEIP and KERP.  Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, Local Bankruptcy Rules, and case law for the

Court to approve the Motion and grant the relief requested.   The Debtor therefore respectfully requests the Court enter an order that provides for the following:

1.      Pursuant to Bankruptcy Code sections 105(a), 363(b), and 503(c)(3), the Debtor is authorized, but not directed, to take all necessary actions to implement the KEIP and KERP and to make all payments pursuant thereto.

2.      The Debtor is authorized to offer and pay eligible employees in accordance with the KEIP and KERP.

3.      The Debtor is authorized to implement and fund the KEIP and KERP in their entirety, and make payments thereunder.

4.      The claims of the Participating Employees under the KEIP and KERP are entitled to and shall be accorded administrative expense status and priority under Bankruptcy Code sections 503(b)(1)(A) and 507(a)(2).

5.      Notwithstanding any applicability of Bankruptcy Rule 6004, order that the terms of the Court order granting the Motion shall be immediately effective and enforceable upon its entry.

6.      For any and all other and further relief as the Court deems necessary and appropriate.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated:  July 20, 2022
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman (admitted *pro hac vice*)
Melissa Davis Lowe (admitted *pro hac vice*)
Max Casal (admitted *pro hac vice*)
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Telephone: (949) 340-3400
Facsimile: (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com
E-mail: mcasal@shulmanbastian.com

*Proposed Counsel to the Debtor and Debtor in Possession*

13710355.v2