**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC,[1] | Case No. 22-10602 (JKS) |
| Debtor. | Hearing Date: August 3, 2022 at 10:00 a.m. (ET) Objection Deadline: July 27, 2022 at 4:00 p.m. (ET) |

**DECLARATION OF JAY QUICKEL, PRESIDENT AND CEO OF AGWAY
FARM & HOME SUPPLY, LLC, IN SUPPORT OF DEBTOR'S MOTION FOR AN
ORDER APPROVING (1) KEY EMPLOYEE INCENTIVE PLAN; (2) KEY EMPLOYEE
RETENTION PLAN, AND (3) GRANTING RELATED RELIEF**

I, Jay Quickel, declare and state as follows:

1.　　I am the Chief Executive Officer ("CEO") and President for Agway Farm & Home Supply, LLC, a Delaware limited liability company ("Debtor") that has filed a voluntary petition (the "Chapter 11 Petition") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing this Chapter 11 case (the "Case"). The Chapter 11 Petition was filed on July 5, 2022 (the "Petition Date").

2.　　I submit this Declaration in support of the Debtor's Motion for an Order Approving (1) Key Employee Incentive Plan; (2) Key Employee Retention Plan; and (3) Granting Related Relief (the "Motion"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Motion.

3.　　Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management or the Debtor's professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of

---

[1]　The last four digits of the Debtor's federal tax identification number are 1247. The Debtor's address is 6606 W. Broad Street, Richmond, VA 23230.

the Debtor's operations and financial condition.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  The Debtor has authorized me to submit this Declaration.

4.      As more fully set forth in the Declaration filed on July 5, 2022 in support of the first day motions in this case at Docket No. 10 ("First Day Declaration"), the Debtor is a wholesale product distribution company that serves a broad network of independent retail stores and provides full service retail advisory support.  The Debtor provides a vast network of farm and home retailers across six different major categories: (1) seasonal home & hardware; (2) farm products; (3) lawn & garden; (4) bird food & supplies; (5) pet food & supplies; and (6) animal health needs (collectively, the "Product Sales").

5.      More than five (5) months ago, the Debtor began the process of marketing substantially all of its assets.  While the Debtor still has not finalized agreements with any parties with respect to the sale of the Debtor's assets, the Debtor filed the Case to stabilize its business operations and maximize the value of its assets whether as a bulk sale or as more than one (1) incremental sales of distinct assets, and pending such sale(s), to continue sales of its inventory at discounted rates ("Sale Process").  In the time leading up to the Debtor's bankruptcy filing, the Debtor's workforce has been instrumental in maintaining the ongoing business of the Debtor and in ensuring that orders continue to be filled, thereby maximizing value with respect to the Sale Process.  The Sale Process has required a substantial commitment of time and effort on the part of the Debtor's employees and a willingness to continue to work for the Debtor in the face of the uncertainty inherent in chapter 11 proceedings and the Sale Process.  Despite the Debtor's and its employees' efforts to date, further efforts will be necessary to maximize value for all of the Debtor's stakeholders.

6.      In connection with the Sale Process, the Debtor seeks approval of the KERP to ensure that certain of the Debtor's key employees remain during the Sale Process and are incentivized to deliver their best performance throughout the Sale Process.

7.      Specifically, due to various events described in more detail in the First Day Declaration, in March 2022, the Debtor initiated a wind-down plan in which the Debtor: (1) laid

off about one-half of the Debtor's employees; (2) offered to let some employees stay onboard on a contract work basis; and (3) offered a retention bonus to certain critical employees to incentivize them to stay. Pre-petition, the Debtor provided and paid retention bonuses to most of the Participating Employees. The Debtor determined the terms for such pre-petition retention bonuses with significant input from its counsel and from its financial advisors.

8.      The Key Employees have agreed to continue to stay in the Debtor's employ in exchange for further retention payments, for which authority to pay is requested in the Motion.

9.      As of the Petition Date, the Debtor was in contact and had entered into negotiations with several strategic potential buyers with varying interests in various types of sales. The Debtor continues its discussion with various strategic companies to hopefully come to terms on one or more agreements to sell all or a portion of its assets subject to overbid. If it cannot do so, the Debtor will seek to auction its remaining assets.

10.     Pending such sale discussions, the Debtor has implemented a strategy for the sale of its inventory using discounted rates. As of the Petition Date, Class A products are being discounted 20%, Class B 35%, Class C 50% and Class D 50% (the "Sale Discount Rates"). As part of the Debtor's first day motions, the Court approved the Debtor's continued sales of its inventory at the Sale Discount Rates on an interim basis, pending a final hearing to be held on August 3, 2022.

11.     The Debtor expects to continue sales of its inventory at the Sale Discount Rates until sometime in August or September 2022 when the Debtor documents a bulk offer for the purchase of its inventory and the sale of inventory on a piecemeal basis would cease, or the Debtor determines it must conduct an auction for the sale of its remaining assets.

12.     The Debtor only has 22 permanent employees and 5 staffing agency workers remaining, all of whom are critical to the Sale Process. In particular, the remaining employees have a high degree of skilled labor and knowledge with respect to the Sale Process. They know exactly where the inventory is located, are skilled forklift drivers who are familiar with the

warehouse "pick and pack" trolley system and able to gather the necessary items quickly and safely, package the items correctly, and load them correctly on trucks for delivery.

13.     The Debtor is already operating with a thin staff and the Debtor is concerned that one or more of its employees may terminate his/her employment at any moment.  The Sale Process that the Debtor has undertaken to maximize value for its assets has a necessary byproduct of creating a great deal of uncertainty for the very company personnel charged with maximizing that value.  In fact, multiple employees have already terminated their employment with the Debtor and other employees have already expressed concern over the bankruptcy process and that they need to find alternative employment that is more stable.  The Debtor believes the employees may be able to find attractive alternative employment quickly due to the overall industry labor shortages for these skilled laborers and will thus leave the Debtor's employment.

14.     If any one of the employees terminates their employment with the Debtor, it will adversely affect the Sale Process, if not halt the process altogether, to the detriment of the Estate and its creditors.  The Key Employees are vital to the success of the Sale Process.

15.     As the Debtor prepared to file this Case, it recognized that to successfully implement the Sale Process, it needed to extend its plan to retain the Key Employees.  The Debtor, along with its advisors, including but not limited to its proposed counsel and Focus Management Group USA, Inc., its financial advisors, designed a comprehensive plan to motivate and incentivize the Key Employees to remain with the Debtor and to work to maximize the value of the Estate through the Sale Process.

16.     Prepetition, the Debtor entered into agreements and provided and paid retention bonuses to most of the Key Employees with the expectation that the Case would be filed significantly earlier than the Petition Date, and that the Key Employees' employment would terminate on or prior to June 30, 2022.   Because the sale process took longer than expected, the Debtor's filing was delayed, and the Debtor has continued to need the Key Employees to assist with the liquidation of the Debtor's assets.  The Debtor then entered into another agreement with

most of the Key Employees to pay a retention bonus on July 29, 2022. The KERP is intended to, and if approved, will supersede that prepetition agreement.

17.     The terms of the KERP generally follow the structure used for the pre-petition retention bonuses discussed above, which were structured with significant input from the Debtor's advisors, but were further refined based on a market comparison in the bankruptcy context with input from its proposed counsel in this case. The Debtor gave special consideration to the active and competitive nature of the current labor market, including that the Debtor has already lost multiple employees to other, more stable, jobs.

18.     The Debtor's management determined that adopting the KERP would maximize its ability to retain the Key Employees through the anticipated thirty to sixty days needed to complete the Sale Process. The Debtor's management identified the Key Employees who should be included in the KERP and, with the help of its financial advisors, to structure proposed payments to them in a way that would fit within the Debtor's budget.

19.     The amounts to be paid under the KERP appear to be reasonable and were determined based on a thorough analysis of the Debtor's needs and requirements to complete the Sale Process, as well as a consideration of the percentage of the payments to be made, relative to the Key Employees' salaries, as well as the size of the Estate, the nature of the Debtor's industry, and the competitive labor market. The total to be paid to the Key Employees under the KERP will not exceed $285,000.00.

20.     The Debtor has identified the Key Employees to receive payments under the KERP. All of the Key Employees possess institutional knowledge and skills that are essential to the Sale Process efforts, including but not limited to where the Debtor's inventory is located, are skilled forklift drivers who are familiar with the warehouse "pick and pack" trolley system and able to gather the necessary items quickly and safely, package the items correctly, and load them correctly on trucks for delivery.   In addition to the responsibilities related to the Debtor's everyday business operations, the Key Employees in many instances have assumed, and will continue to assume, added responsibilities in connection with this Case and the Sale Process, such as continuing

operations (including the ongoing sale of inventory sales) stabilizing the Debtor's vendor base, ensuring the Sale Process is completed and sold assets properly transitioned, and otherwise taking whatever steps are necessary to obtain the highest and best value for the Debtor's Estate.

21.　　The Key Employees were carefully selected because they have unique and specialized knowledge with respect to the Debtor's assets and industry, will be required to perform significantly more work while the Debtor is in bankruptcy, and the Debtor believes that adequately incentivizing their excellent performance will ultimately inure to the benefit all of the Debtor's stakeholders.

22.　　Some of the Key Employees may be required to perform additional duties as a result of the filing of this Case, some of which will require extensive coordination with the Debtor's bankruptcy counsel and other advisors with respect to various issues that arise in connection with the bankruptcy process, including matters relating to the sale and marketing of the Debtor's assets and compliance with reporting requirements.  At all stages of this Case, issues will require immediate attention that, if not handled promptly and skillfully, will erode the value of the Debtor's assets.

23.　　The Key Employees were selected for participation in the KERP because they are not members of senior management, but are nonetheless critical and practically impossible to replace. Some hold titles such as "director," "vice president," or "manager," but, despite their seniority, do not serve on the Board, take no part in the management of the Debtor, do not have sufficient control over corporate policy to be deemed an insider; rather, they hold such titles in name only.  The Key Employees generally do not attend senior management meetings or participate in board meetings or corporate governance, and many of their duties are limited to particular divisions.  Further, although the Key Employees are vital to the Debtor's business, they do not have the ability to influence the direction of the Debtor's business operations or their reorganization.  No KERP Participant is a bona fide officer or director of the Debtor, is not appointed by the Board, or is a named executive officer.  Each KERP Participant is required to

report to a more senior corporate official for approval before taking any significant action with respect to the Debtor's corporate policies or the disposition of significant assets.

24.     Without approval of the proposed KERP, there is a very real concern that key employees will resign.  It is therefore critical to the success of the Sale Process and the Case that the Debtor's employees have the incentive to continue their extraordinary efforts, to remain in the Debtor's employ through the Sale Process, and to work enthusiastically to increase the value of the assets to be sold.

25.     The success of the Sale Process and this Case will depend on the willingness of the Key Employees to remain focused and motivated and, in many instances, to take on additional responsibilities to manage the chapter 11 process and continue operations in a constrained and challenging environment.   The Debtor cannot afford to lose the Key Employees.   Each participating employee is already filling multiple roles, and each is critically necessary to maximize the value of the Sale Process.

26.     Not only is the KERP calculated to achieve the desired performance, but any payouts under the KERP program is reasonable in light of the facts and circumstances of the Case. The Debtor believes that the KERP will help facilitate the Case by incentivizing, retaining, and protecting crucial employees to ensure that regular business operations continue during and through the Sale Process.

27.     For all of the reasons set forth in the Motion, the Debtor believes the relief requested is absolutely necessary to the Sale Process in order to maximize the return to all creditors and requests the Motion be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  July 20, 2022                   _____
                                        Jay Quickel
                                        President and Chief Executive Officer