## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC[1] | Case No. 22-10602 (JKS) |
| Debtor. | **Objection Deadline: September 15, 2022 at 4:00 p.m.**<br>**Hearing Date: September 22, 2022 at 10:00 a.m.** |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER: (I) (A) APPROVING BIDDING PROCEDURES AND PROTECTIONS IN CONNECTION WITH A SALE OF THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) SCHEDULING AN AUCTION AND SALE HEARING; (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (D) GRANTING RELATED RELIEF; AND (II) (A) AUTHORIZING SALE OF DEBTOR'S INTELLECTUAL PROPERTY AND CERTAIN EQUIPMENT FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (B) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor-in-possession (collectively, the "Debtor"), by its undersigned counsel, hereby moves (the "Motion") this Court, for entry of interim and final orders, pursuant to sections 105(a), 363, and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court District of Delaware (the "Local Rules"), as follows:

First, (a) approving the Bidding Procedures (as defined herein) in connection with the sale of: (i) the Debtor's brand/trademark portfolio, domain name/registration, dealer agreements and customer list (collectively, the "IP") and certain equipment (the "Equipment"), all as set forth in the schedules to the Agreement (as "Agreement" is defined below) (collectively, the "Purchased Assets"); and (ii) any or all other remaining assets of the Debtor (the "Remaining Assets" and collectively with the Purchased Assets, the "Assets"), including the approval of a break-up fee of

---

[1] The last four digits of the Debtor's federal tax identification number are 1247. The Debtor's address is 6606 W. Broad Street, Richmond, VA 23230.

3% of the purchase price (the "Break-up Fee") in connection with the sale of the each of the Purchased Assets and the Inventory Assets (defined below), (b) scheduling the related auction and hearing to consider approval of the sale(s), (c) approving the form and manner of notice thereof, and (d) granting related relief; and

Second, at a later hearing to be scheduled by this Court pursuant to the above-referenced relief, (a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and interests, except as provided in the Successful Bidder(s)' asset purchase agreement(s), and (b) granting related relief.

In support of this Motion, the Debtor relies upon, and incorporates by reference, the Declaration of Jay Quickel in Support of the First Day Motions [Docket No. 10], the Declaration of Jay Quickel in Support of this Motion (collectively, the "Quickel Declarations"), and the Declaration of Adam Meislik in support of this Motion (the "Meislik Declaration"), and the first day pleadings and applications (the "First Day Pleadings") filed in this Case on July 5, 2022.  In further support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M),  (N), and (O) and the Debtor confirms its consent pursuant to Local Rule 9013-l(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13760846.v2

3.      The statutory predicates for the relief requested herein are (i) sections 105, 363, and 503, of the Bankruptcy Code, and (ii) Rules 2002(a)(2), 6003, 6004, 6006 and 9014 of the Bankruptcy Rules and Local Rules 2002-1 and 6004-1.

4.      The Debtor is authorized to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      An official committee of unsecured creditors (the "Committee") was appointed on July 18, 2022.  No request has been made for the appointment of a trustee or an examiner.

<strong><u>BACKGROUND</u></strong>

**A.      Summary of the Debtor's Business**

6.      The Debtor's headquarters is located in Richmond, Virginia and the Debtor has warehouses and distribution centers in Cloverdale, Virginia and Westfield, Massachusetts.

7.      The Debtor is a wholesale product distribution company that serves a broad network of independent retail stores and provides full service retail advisory support.  The Debtor provides a vast network of farm and home retailers across six different major categories: (1) seasonal home & hardware; (2) farm products; (3) lawn & garden; (4) bird food & supplies; (5) pet food & supplies; and (6) animal health needs (collectively, the "Product Sales").

8.      The Debtor services dealer locations along the east coast, including Maine, New Hampshire, Vermont, Massachusetts, Maryland, New York, Delaware, Rhode Island, New Jersey, Connecticut, Pennsylvania, Kentucky, West Virginia, Virginia, North Carolina, South Carolina, Georgia, and Ohio.

9.      Within the Product Sales channel, the Debtor sells more than fifteen thousand (15,000) distinctive stock keeping units ("SKUs") with varying levels of perishability. For example, the Debtor sells pet food, bird seed and grass seed. While bird seed itself does not have an expiration date, heat and humidity invite pests and mold that spoil the product. In regard to grass seed, there is an applicable expiration date that is subject to further testing.

10.     The Debtor classifies each of its products, or SKUs, into one of: Class A, B, C, or D based upon the "liquidity" of the product or how quickly the product sells. Class A products are the most liquid while Class D products are the least liquid.

**B.      Events Leading to Bankruptcy and Wind Down**

11.     Due to various events described in more detail in the First Day Declaration, including but not limited to issues in transitioning its systems away from Southern State's internal systems and the notice of default by its secured creditor Gibraltar Business Capital ("Gibraltar"), the Debtor began to consider its sale or restructuring options.

12.     Beginning in the fall of 2021, the Debtor began extensively marketing the sale of its business as a going concern or a refinance of the company so that it could continue operations, with the help of Focus Management Group, Force 10 Partners and Critical Point Partners.

13.     By February 2022, the Debtor or its advisors had contacted over 25 potential interested parties and had entered into negotiations with several strategics (at least 7 different interested parties) ("Strategic(s)") and with varying interests in various types of a sale.  Of the over 25 potential interested parties, approximately 13 were lenders and other financial companies that considered possible refinancing or restructuring options.  The Debtor received one letter of intent from a Strategic that offered to purchase a significant portion of the Debtor's inventory but the offer was rejected because the offered price was too low and the due diligence period was too long.

14.     At the same time, Gibraltar prohibited the Debtor from purchasing additional inventory, making it nearly impossible for the Debtor to meet the demands of its customers during the peak spring season.

15.     In March 2022, as a cost saving measure and to manage the business through this process, the Debtor: (1) laid off about one-half of the Debtor's employees; (2) offered to let some employees stay onboard on a contract work basis; and (3) offered a retention bonus to certain critical employees to incentivize them to stay.

16.     Nevertheless, the Debtor continued its efforts to market the company for sale until it became clear that a buyer could not be found to purchase the company as a going concern.

17.     After the Debtor paid off Gibraltar in full, it became clear that the Debtor would need to winddown operations.  The Debtor initially made the decision to complete an assignment for the benefit of creditors but later, determined that the best option was to seek bankruptcy protection.

### C.     The Proposed Bid and Sale Procedures

18.     As described in more detail below, the asset purchase agreement (the "<u>Agreement</u>") between the Debtor and the stalking horse bidder, True Value Company, L.L.C. ("<u>TV</u>") has been extensively negotiated between the parties at arm's length and in good faith, and confers several substantial benefits on the Debtor's estate.  The Agreement allows the Debtor to continue pursuing sale opportunities for higher and better offers, while allowing the Debtor to continue its sales of inventory and seek buyers of the Remaining Assets.

19.     The Debtor marketed its assets extensively for months prior to the commencement of this Case and since the Petition Date.  In addition to the Stalking Horse Bid for the Purchased Assets, the Debtor has engaged with other interested parties that may seek to purchase the Remaining Assets, either in whole or in part, but that have not yet finalized the terms of an agreement as of the time of this filing.  The bidding process discussed herein is designed to complete the sale process for the Purchased Assets and balance the needs of a meaningful sales process for the sale of the Remaining Assets, all in the best interests of the estate's stakeholders with the economic realities facing these Debtor.  Accordingly, once approved, the Bidding Procedures will allow the Debtor to complete the sale process for the Purchased Assets and establish procedures that can be utilized to complete the sale of the Remaining Assets (unless any of the Remaining Assets will be sold by an auctioneer for which the Debtor will file a separate motion for approval) and avoid the costs and expenses associated with seeking approval of another set of bidding procedures.

20.     In fact, as the Debtor was preparing this Motion to be filed, it finalized and executed an Asset Purchase Agreement ("<u>FL Hardware APA</u>" and together with the Agreement, the "<u>Agreements</u>") with Florida Hardware, LLC ("<u>FL Hardware</u>") to sell, subject to overbids and the

13760846.v2

Bidding Procedures, certain of the Remaining Assets (namely, a portion of the Debtor's remaining inventory). A copy of the proposed FL Hardware APA is attached hereto as **Exhibit 5.** The Debtor intends to sell the inventory assets subject to the FL Hardware APA ("Inventory Assets") pursuant to the Bidding Procedures and an auction on the same timeline and in accordance with all of the procedures as set forth herein. Also of note, FL Hardware, as the stalking horse bidder for the Inventory Assets to be sold under the FL Hardware APA, will be entitled to a break-up fee of 3% of the final purchase price, currently estimated to be $39,000.

21.    In order to ensure that the Debtor receives the maximum value for the Assets, including the Inventory Assets[2], the Debtor will market the Assets and conduct a fair and open auction subject to the Bidding Procedures set forth as **Exhibit 1** to the Bidding Procedures Order. To the extent that there are inconsistencies between the description of the Bidding Procedures below and the terms of the Bidding Procedures, the terms of the Bidding Procedures shall control.

**C.      Key Terms of Stalking Horse Bid, Proposed Bidding and Sale Procedures**

22.    The key provisions of the Stalking Horse Bid for the Purchased Assets are the following: The Purchased Assets will be sold to the Stalking Horse Bidder, subject to overbids, for the sum of $725,000 unless increased by an overbid. The Assets will be sold free and clear of all liens, claims and encumbrances. If the Stalking Horse Bidder is not the Successful Bidder, it shall be entitled to a break-up fee in the amount of $21,750.

23.    The key provisions of the stalking horse bid for the Inventory Assets are the following: The Inventory Assets will be sold to FL Hardware for 39% of the cost of the Inventory Assets, unless increased by an overbid. As of July 21, 2022, the total purchase price was approximately $1.3 million. The Debtor expects that the final purchase price will be lower than that due to the de minimis asset sales such that some of the Inventory Assets are sold prior to the auction. The Assets will be sold free and clear of all liens, claims and encumbrances. If FL Hardware is not the Successful Bidder, it shall be entitled to a break-up fee in the amount of 3%

---

[2] The Inventory Assets are subject to all of the same procedures as described in this Motion relating to the Assets, and reference to the Agreement shall mean the FL Hardware APA where applicable.

of the Purchase Price (as "Purchase Price" is defined in the FL Hardware APA), currently estimated at $39,000.

24.    The key provisions of the proposed Bidding Procedures are the following:

a)    <u>Assets to be Sold</u>: As described in greater detail in the Agreement, the Purchased Assets shall include all of the IP and certain of the Debtor's fixed assets and equipment as set forth in Schedule 1.2 to the Agreement (the "<u>Equipment</u>").  See Agreement, §1.1.  The Debtor is actively engaged with interested parties for the sale of the Remaining Assets.

b)    <u>Participation Requirements</u>: To ensure that only bidders with a serious interest in purchasing the Purchased Assets participate in the Bidding Process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "<u>Qualified Bidder</u>." These requirements include (i) execution of a confidentiality agreement; (ii) providing the Debtor with certain financial assurances as to such bidder's ability to close a transaction; (iii) submission of an irrevocable bid on the same or better terms as proposed by the Stalking Horse Bidder provided, however, that if such bid is accepted as the Successful Bid or a Backup Bid (each as defined in the Agreement), such bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures; (iv) a good faith deposit in the amount of $108,750; (v) submission of a written covenant against anti-competitive behavior; (vi) submission of a statement that the bidder has acted in good faith and will comply with the Bidding Procedures; and (vii) an acknowledgement and representation that the bidder has had an opportunity to complete due diligence related to the Purchased Assets.

c)    <u>Due Diligence</u>: The Bidding Procedures permit all Qualified Bidders an opportunity to participate in the diligence process.

d)    <u>Bid Deadline</u>: The Debtor is requesting a deadline for submission of bids of 5:00 p.m. (prevailing Eastern time) on October 10, 2022. See Bidding Procedures Order, ¶ 6.

e)      <u>Bid Requirements</u>: The Bid must: (i) be in writing; (ii) disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such Bid (provided, however, that if the entity that is the Bidder is a special purpose vehicle or other entity without existing operations (as determined by the Debtor), the Bid must disclose the identity or identities of each ultimate owner or participant in the entity that is the Bidder); (iii) be in the form of a duly authorized, executed, and non-contingent purchase agreement, together with all schedules, exhibits, and related documents thereto; and (iv) include clearly marked versions of the Bid against the Agreement showing all changes requested by the Bidder. Further, a "Qualified Bid" is a bid that: (1) is in an amount equal to at least $819,250, which consists of (i) the consideration set forth in the Agreement in the amount of $725,000, plus (ii) the amount of the Break-up Fee of $21,750, plus (iii) overbid of $72,500; (2) received before October 10, 2022 at 12:00 p.m. (Eastern time); and (3) meets the requirements set forth in Paragraph 25 below.  Bid increments thereafter shall be in the amount of $10,000.00 or such other amount as adjusted pursuant to the terms of the Bidding Procedures.

f)      <u>Stalking Horse Protections</u>.  If the Agreement is terminated such that the Stalking Horse Bidder is entitled to the Break-up Fee as described in Section 3.3 of the Agreement, the Debtor shall pay a break-up fee to the Stalking Horse Bidder in an amount equal to $21,750.  See Bidding Procedures Order, ¶ 8, 9, 10.  In the event a Qualified Bidder submits a Qualified Bid that is higher than that of the Stalking Horse Bidder, the Stalking Horse Bidder shall be allowed to credit bid the amount of the Break-up Fee in any Overbids.  See Bidding Procedures Order ¶ 9.

g)      <u>Backup Bidders.</u>  If an Auction is conducted, the entity with the second highest or otherwise best Qualified Bid at the Auction, as determined by the Debtor, in the exercise of its business judgment, will be designated as the backup bidder (the "<u>Backup Bidder</u>").  The Backup

Bidder shall be required to keep its initial Bid (or, if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) open and irrevocable until the later of (i) 12:00 p.m. (prevailing Eastern time) on the first business day following the Backup Sale Hearing, and (ii) the closing of the transaction with the Successful Bidder.  Following the Sale Hearing, if the Successful Bidder fails to consummate the Successful Bid, the Debtor shall proceed to consummate the Backup Bid with the Backup Bidder (the "Backup Sale Hearing").  A hearing to authorize a sale to the Backup Bidder will be held before the Court on no less than five (5) days' notice, with objections due at least one (1) day prior to such hearing. For the avoidance of doubt, the scope of such hearing shall be limited to issues relating to the identity of the Backup Bidder. See Bidding Procedures Order, ¶ 20.

h)      Conduct of Auction: If more than one Qualified Bid is received (other than the Stalking Horse Bidder's bid) the Debtor will conduct an Auction on October 14, 2022 at 10:00 a.m. (prevailing Eastern time), at the offices of Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801, or such other place as the Debtor shall notify all proposed attendees. All parties may attend the Auction via Zoom video conference pursuant to instructions to be provided no later than twenty-four (24) hours prior to the Auction.  See Bidding Procedures Order, ¶ 7. The Auction will be recorded stenographically.

i)      Evaluation of Qualified Bids: The Debtor will review each Bid received from a Bidder to determine, in consultation with the Committee, the Committee's counsel and the Committee's financial advisor (the "Consultation Parties"), whether it meets the requirements set forth herein and in the Bidding Procedures Order.  The Debtor shall attempt to inform Bidders whether or not their Bids have been designated as Qualified Bids by the Debtor and the Consultation Parties no later than twenty-four (24) hours after such Bids are received and/or to

address any questions the Debtor has with the Bid. Notwithstanding anything herein to the contrary, (a) the Agreement submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, and (b) the Stalking Horse Bidder is a Qualified Bidder.

j)     <u>Sale Hearing</u>: The Debtor requests that a Sale Hearing take place no later than October 17, 2022. See Bidding Procedures Order, ¶ 19.

k)     <u>Selection of Successful Bid(s)</u>: Upon the conclusion of the Auction, the Debtor, in consultation with the Consultation Parties, will determine in their reasonable judgment what is the highest or otherwise best Qualified Bid at the Auction.  The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, as determined by the Debtor, to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid.  Within twenty-four (24) hours following the conclusion of the Auction, the Debtor shall file a notice on the Bankruptcy Court's docket identifying (with specificity) the Successful Bidder for the Assets and any applicable Backup Bidder.

l)     Notwithstanding anything to the contrary above, the Debtor after consultation with the Consultation Parties, shall have the right to revise the Bidding Procedures for Overbids during the Auction as the Debtor believes in its reasonable business judgment that such revisions to the bidding process will increase the value to the Estate.

25.     Other Highlighted Terms Under Local Rule 6004-1(b)(iv):

a)     <u>Local Rule 6004-1(b)(iv)(A).</u> To the best of the Debtor's knowledge, the Stalking Horse Bidder is not an insider within the meaning of section 101(31) of the Bankruptcy Code.

b)     <u>Local Rule 6004-1(b)(iv)(B).</u> The Stalking Horse Bidder has not entered into any interim agreements or other arrangements with the Debtor but the Stalking Horse Bidder retains

its rights to do so in the future, at which time the Debtor will disclose any such agreement to the Court and all necessary parties.

c)      <u>Local Rule 6004-1(b)(iv)(C).</u> The relief requested herein does not include the granting of any release in favor of any entity.

d)      <u>Local Rule 6004-1(b)(iv)(F).</u> The Stalking Horse Bidder is submitting a good faith deposit of $183,000.

e)      <u>Local Rule 6004-1(b)(iv)(G).</u> The Debtor does not currently have any interim management or other agreement with the Stalking Horse Bidder.

f)      <u>Local Rule 6004-1(b)(iv)(H).</u> The Debtor is not seeking to release any sale proceeds without further order of the Court.

g)      <u>Local Rule 6004-1(b)(iv)(I).</u> The Debtor is not seeking to have the sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

h)      <u>Local Rule 6004-1(b)(iv)(J).</u> The Debtor is retaining all books and records as set forth in Section 2.1 of the Agreement, with the exception of those books and records referenced in Section 1.1(a) of the Agreement.  See Agreement § 1.1(a).

i)      <u>Local Rule 6004-1(b)(iv)(K).</u> The Debtor is not seeking to sell avoidance actions.

j)      <u>Local Rule 6004-1(b)(iv)(L).</u> The Debtor is seeking to sell the Assets free and clear of successor liability claims. See Agreement, § 1.1, 1.3, 4.2.

k)      <u>Local Rule 6004-1(b)(iv)(M).</u> As set forth in Sections 1.1, 1.3, and 4.2 of the Agreement, the Debtor is seeking to sell the Assets free and clear of all Liens, Claims, and Encumbrances (as each is defined in the Agreement) to the fullest extent permitted by section 363 of the Bankruptcy Code.

13760846.v2

l)      Local Rule 6004-1(b)(iv)(O). As discussed in more detail below, the Debtor is seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).  See Bidding Procedures Order ¶ 22.

**D.     The Proposed Bid and Sale Procedures**

**(1)     ACCESS TO DILIGENCE MATERIALS**

26.     To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtor an executed confidentiality agreement in the form and substance satisfactory to the Debtor.

27.     A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Bidder."  All requests for Diligence Materials must be directed to the Debtor.

28.     For any entity who is a competitor of the Debtor or is affiliated with any competitor of the Debtor, the Debtor reserves the right to withhold any Diligence Materials that the Debtor, after consultation with the Consultation Parties, determines are business-sensitive or otherwise not appropriate for disclosure to such entity.

29.     No distribution of Diligence Materials will continue after the Bid Deadline (defined below), unless requested by a potential bidder and the Debtor, after consultation with the Consultation Parties, determines that providing Diligence Materials is in the best interests of the Debtor's estate.  The Debtor shall provide the Stalking Horse Bidder with access to all Diligence Materials and other information provided to any Preliminary Interested Bidder that were not previously made available to the Stalking Horse Bidder as soon as reasonably practicable and in no event later than one (1) business day after the date the Debtor made such information available to any Preliminary Interested Bidder; provided, however, that this requirement shall be deemed satisfied by the Debtor if such information is posted to the data room established by the Debtor. Neither the Debtor nor any of its representatives will be obligated to furnish any information relating to the Assets to any entity other than to the Stalking Horse Bidder and Preliminary Interested Bidders.  The Debtor makes no representations or warranties as to the information to be

provided through this due diligence process or otherwise, except to the extent set forth in the Agreement or in any other definitive agreement the Debtor executes with a Successful Bidder (as defined herein).

**(2)    BID QUALIFICATION PROCESS**

30.    To be eligible to participate in the Auction (as defined herein), each offer, solicitation, or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtor, after consultation with the Consultation Parties, to satisfy each of the following conditions (other than the Bid of the Stalking Horse Bidder, which shall be deemed a Qualified Bid (as defined below)):

> (a)    Form: The Bid must: (i) be in writing; (ii) disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such Bid (provided, however, that if the entity that is the Bidder is a special purpose vehicle or other entity without existing operations (as determined by the Debtor), the Bid must disclose the identity or identities of each ultimate owner or participant in the entity that is the Bidder); (iii) be in the form of a duly authorized, executed, and non-contingent purchase agreement, together with all schedules, exhibits, and related documents thereto; and (vi) include clearly marked versions of the Bid against the Agreement showing all changes requested by the Bidder.

> (b)    Good Faith Deposit: The Bid must be accompanied by a cash deposit in the amount equal to $108,750 to be held in trust by the Debtor's counsel (the "Good Faith Deposit").

> (c)    Assets: The Bid must clearly identify which Assets the Bidder intends to purchase and which liabilities and obligations the Bidder agrees to assume or pay.

> (d)    Same or Better Terms:  The Bid must be on terms and conditions that are substantially the same as or better than, not more burdensome in any material way than, and no more conditional than the terms of the Agreement, as determined by the Debtor, after consultation with the Consultation Parties.  The Bid may not contain additional representations and warranties, covenants, termination rights, financing, due diligence contingencies, or closing conditions, other than as may be included in the Agreement (it being agreed and understood that such Bid shall modify the Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Stalking Horse Bidder as the stalking horse bidder, such as the Break-up Fee).

> (e)    Corporate Authority:  The Bid must include written evidence reasonably acceptable to the Debtor and Consultation Parties demonstrating that the Bidder has full power and authority (including full corporate or other organizational power and authority) to consummate the proposed transaction contemplated by the Bid.

(f)     Proof of Financial Ability to Perform:  To the extent that the Bid is not accompanied by evidence of the Bidder's ability to consummate the transaction contemplated by the Bid with unrestricted and fully available cash, the Bid must include written evidence of a firm, irrevocable commitment for financing or other evidence of ability to consummate the proposed transaction, documented to the satisfaction of the Debtor, in consultation with the Consultation Parties, by the submission of recent financial documentation (audited, if available), that will allow the Debtor (in consultation with the Consultation Parties) to make a reasonable determination as to the financial and other capabilities of the Bidder to consummate the transaction contemplated by the Bid.

(g)     Contingencies:  The Bid may not be conditioned on obtaining financing, obtaining any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(h)     Irrevocable:  The Bid must be irrevocable through the Auction; provided, however, that if such Bid is accepted as the Successful Bid or a Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(i)     Bid Deadline.  Regardless of when an entity qualifies as a Preliminary Interested Bidder, the following parties must receive a Bid in writing, transmitted via email (in .pdf or similar format) so as to be received no later than 5:00 p.m. (prevailing Eastern time), on or before **October 10, 2022** (the "Bid Deadline"): (i) the Debtor, Attn: Jay Quickel, Jay.Quickel@agway.com; (ii) counsel to the Debtor, Shulman Bastian Friedman & Bui LLP, Attn: Alan J. Friedman, afriedman@shulmanbastian.com, Melissa Lowe, mlowe@shulmanbastian.com, and Max Casal, mcasal@shulmanbastian.com; and (iii) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and Paul J. Labov, plabov@pszjlaw.com.

(j)     Amount of Bid.  Each Bid must clearly show the amount of the purchase price.  In addition, a Bid (either standing alone or in combination with other Bids) must include a cash purchase price that is in an amount equal to at least $819,250, which consists of (i) the credit bid consideration set forth in the Agreement in the amount of $725,000, plus (ii) the amount of the Break-up Fee of $21,750, plus (iii) $72,500.  The value of any noncash consideration shall be determined by the Debtor in its reasonable business judgment (in consultation with the Consultation Parties).  Bid increments thereafter shall be in the amount of $10,000 or such other amount as adjusted pursuant to the terms of the Bidding Procedures.

(k)     Affirmative Statement.  Each Bid shall be accompanied by an affirmative statement that: (i) all Bidders submitting such Bid have acted in good faith consistent with section 363(m) of the Bankruptcy Code; (ii) all Bidders submitting such Bid have and will continue to comply with the Bidding Procedures; (iii) the Bid does not entitle such Bidder to, and such Bidder disclaims any right to, any

break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement; and (iv) all Bidders submitting such Bid waive any substantial contribution (administrative expense) claims under section 503(b) of the Bankruptcy Code related to bidding for the Debtor's assets or otherwise participating in the Auction.

(l)    Consent to Jurisdiction as Condition to Bidding.  All entities that participate in the bidding process or the Auction (as defined herein) shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") with respect to all matters related to the terms and conditions of the transfer of the Assets, the Auction, and any transaction contemplated by the Bidding Procedures Order.

(m)    Covenant Against Anti-Competitive Behavior.  Each Bid shall be accompanied by a written covenant by the Bidder agreeing not to, without permission from the Debtor, contact any of the Debtor's employees, contractors, vendors, or material customers from the date of such Bid until the Auction.  If the Bidder defaults with respect to the foregoing covenant, the Bid may be deemed by the Debtor, in its reasonable business judgment and in consultation with the Consultation Parties, to not be a Qualified Bid.

(n)    Acknowledgment and Representation.  Each Bid shall include an acknowledgment and representation (i) that the Bidder has had an opportunity to conduct all due diligence regarding the Debtor's assets prior to submitting its Bid and that it has relied solely upon its own independent review, investigation, and inspection of any documents and assets in making its Bid, and (ii) confirms the Bidder's completion of all due diligence required by such Bidder and does not include any due diligence contingencies as further defined in paragraph 26(g) herein.

31.    The Debtor will review each Bid received from a Bidder to determine, in consultation with the Consultation Parties, whether it meets the requirements set forth herein and in the Bidding Procedures Order.  A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder."  The Debtor shall inform Bidders whether or not their Bids have been designated as Qualified Bids by the Debtor and the Consultation Parties no later than twenty-four (24) hours after such Bids are received.  Notwithstanding anything herein to the contrary, (a) the Agreement submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, and (b) the Stalking Horse Bidder is a Qualified Bidder.

(3)    **AUCTION**

32.    If one or more Qualified Bids (other than the Agreement submitted by the Stalking Horse Bidder) is received by the Bid Deadline, the Debtor will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid.  If no Qualified Bid (other than the Agreement) is received by the Bid Deadline, no Auction shall be conducted and the Agreement shall be deemed to be the Successful Bid, the Stalking Horse Bidder shall be deemed to be the Successful Bidder, and the Debtor will seek approval of the Agreement and the Stalking Horse Bid at the Sale Hearing (defined below).  Only Qualified Bidders may participate in the Auction. Prior to the Auction, the Debtor shall provide copies of all Qualified Bids to all Qualified Bidders, including the Stalking Horse Bidder, at the same time.

33.    The Auction shall take place on **October 14, 2022** at 10:00 a.m. (prevailing Eastern time), at the offices of Morris James LLP, 500 Delaware Ave., Suite 1500, Wilmington, DE 19801, or such other place and time as the Debtor, in consultation with the Consultation Parties, shall notify all Qualified Bidders, including the Stalking Horse Bidder, counsel to the Stalking Horse Bidder, and other invitees in accordance with the Bidding Procedures Order.  All parties may attend the Auction via Zoom video conference pursuant to instructions to be provided no later than twenty-four (24) hours prior to the Auction.

(a)    The Debtor Shall Conduct the Auction.  The Debtor shall direct and preside over the Auction.  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or sale of the Debtor's assets.

Only the Debtor, the Consultation Parties, the Stalking Horse Bidder, and any other Qualified Bidder, in each case, along with their representatives, may attend the Auction in person, and only the Stalking Horse Bidder and such other Qualified Bidders will be entitled to make any Bids at the Auction.

Prior to the Auction, the Debtor, after consultation with the Consultation Parties, will share with all Qualified Bidders, including the Stalking Horse Bidder, the highest or otherwise best Qualified Bid received by the Bid Deadline (the "Baseline Bid").  Qualified Bidders will be permitted to revise, increase, and/or enhance their Qualified Bids at the Auction in a manner that would make their Qualified Bids higher or otherwise better than the Baseline Bid (as determined by the Debtor in consultation with the Consultation Parties).  All Qualified Bidders will have the right to make additional modifications to their Qualified Bid or Agreement,

consistent with the Bidding Procedures, as applicable, at the Auction. The Stalking Horse Bidder may credit bid the amount of the Break-up Fee in any subsequent modification to the Agreement.

(b)    Terms of Overbids.    An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid that satisfies each of the following:

> (i)    Minimum Overbid Increment.  Any Overbid after the Baseline Bid shall be made in increments valued at not less than $10,000.00.  For the avoidance of doubt, the Stalking Horse Bidder may credit bid the amount of the Break-up Fee in any Overbids.

> (ii)    Remaining Terms Are the Same as for Qualified Bids.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth herein; provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtor accepts a higher Overbid, in consultation with the Consultation Parties.

(c)    Successful Bidder.  The Auction shall continue until the Debtor determines in its reasonable business judgment (in consultation with the Consultation Parties) that there is a highest or otherwise best Qualified Bid at the Auction (a "Successful Bid," and each Bidder submitting such Successful Bid, a "Successful Bidder").  The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, as determined by the Debtor in consultation with the Consultation Parties, to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid.

(d)    Backup Bidder.  Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the entity with the second highest or otherwise best Qualified Bid at the Auction, as determined by the Debtor, in the exercise of its business judgment, will be designated as the backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep its initial Bid (or, if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) the closing of the transaction with the Successful Bidder, and (ii) thirty days following entry of the Sale Order (the "Outside Backup Date").  Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction (thereafter, the "Defaulting Successful Bidder"), the Debtor may designate the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the Defaulting Successful Bidder's deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available damages from the Defaulting Successful Bidder.

(e)    Closing the Auction. Within twenty-four (24) hours following the

conclusion of the Auction, the Debtor shall file a notice on the Bankruptcy Court's docket identifying (with specificity) the Successful Bidder for the Assets and any applicable Backup Bidder.  Subject to the fiduciary duties of the Debtor or its management or board of directors, attorneys, financial advisors or other professionals, or the Committee, its counsel and its financial advisors, the Debtor shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

**(4)    SALE HEARING**

34.    The Debtor has requested the Bankruptcy Court to schedule a hearing no later than **October 17, 2022 at 11:00 a.m.,** at which the Debtor will seek approval of the transactions contemplated by the agreement with the Successful Bidder (the "Sale Hearing").

**(5)    RETURN OF GOOD FAITH DEPOSIT**

35.    The Good Faith Deposits of all Qualified Bidders shall be held in trust by the Debtor's counsel but shall not become property of the Debtor's estates absent further order of the Bankruptcy Court.  The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing.  The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the later of twenty-four (24) hours after (a) the closing of the transaction with the Successful Bidder and (b) the Outside Backup Date.

**D.    Approval of the Stalking Horse and the Break-up Fee**

36.    As discussed herein and in the First Day Declarations, the Debtor engaged in a fulsome and robust marketing process before selecting TV as the Stalking Horse Bidder.  The Debtor requests the Court approve TV as the Stalking Horse Bidder and approve the Break-up Fee.

37.    As part of the negotiations and to ensure the Debtor was able to secure the benefits associated with engaging in a sales process with a stalking horse bid, the Debtor agreed to the following protections for the Stalking Horse Bidder:

Payment of Break-up Fee.  In the event the Stalking Horse Bidder does not end up being approved by the Bankruptcy Court as the Successful Bidder, the Stalking Horse Bidder shall be entitled to receive a break-up fee or 3% of the purchase price to compensate TV

for the costs and fees it incurred in the sales process.  For the avoidance of doubt, the Stalking Horse Bidder does not waive its right to the Break-up Fee by placing an Overbid(s), and may use the amount of the Break-up Fee as noncash consideration/ a credit bid in any Overbid(s).

No Break-up Fees for Other Bidders.  Except for the Stalking Horse Bidder, no other entity submitting an offer or Bid for the Assets or a Qualified Bid shall be entitled to any expense reimbursement, or break-up, termination, or similar fees or payment.

38.     The Debtor agreed to similar protections for FL Hardware as the stalking horse bid for the Inventory Assets.

39.     Based upon the benefits conferred on the estate by virtue of having a stalking horse bid to create a floor for a sales process, the Debtor requests that the Court approve the Break-up Fee and the protections set forth above and in the Agreement and the FL Hardware APA in connection therewith.

**E.      Sale Notice, Notice of Sale Hearing, and Service of the Sale Notice and Bidding Procedures Order**

40.     The Debtor requests the Court approve the sale of the Assets pursuant to the following noticing procedures:

Sale Notice.  The Debtor requests that the Court approve the notice of the sale of the Assets, substantially in the form attached as **Exhibit 3** to the proposed form of Order to the Bidding Procedures (the "Sale Notice").

Service of the Sale Notice and Bidding Procedures Order.  On or before two (2) business days after entry of the Bidding Procedures Order, the Debtor will cause the Sale Notice and the Bidding Procedures Order to be sent by first-class mail, postage prepaid, to the following: (a) all creditors or their counsel known to the Debtor to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Assets; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel to the Stalking Horse Bidder; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) all applicable federal, state, and local taxing and regulatory authorities of the Debtor or recording offices or any other governmental authorities that, as a result of the sale of the Assets, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Assets or have any known interest in the relief requested by the Sale Motion; and (f) all potential bidders previously identified or otherwise known to the Debtor.

Notice.    The Debtor requests an order finding that compliance with the foregoing provisions for the Sale Notice shall constitute sufficient notice of the Debtor's proposed sale of the Assets free and clear of liens, claims, interests, and encumbrances, pursuant to section 363(f) of the Bankruptcy Code and otherwise, and, except as set forth in this Bidding Procedures Order, no other or further notice of the sale shall be required to be provided by the Debtor.

Sale Objections.    The Debtor requests that any objections to the sale of the Assets and the sale contemplated in the Agreement, or the relief requested in the Sale Motion, must: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **October 10, 2022 at 4:00 p.m. (prevailing Eastern time)** (the "Sale Objection Deadline"); and (e) be served on or before the Sale Objection Deadline upon: (i) the Debtor, Jay.Quickel@agway.com; (ii) counsel to the Debtor, Shulman Bastian Friedman & Bui LLP, 100 Spectrum Center Drive, Suite 600, Irvine, California 92618, Attn: Alan J. Friedman, Melissa Lowe and Max Casal, afriedman@shulmanbastian.com, mlowe@shulmanbastian.com and mcasal@shulmanbastian.com, and Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE 19801, Attn: Jeffrey Waxman and Brya Keilson, jwaxman@morrisjames.com and bkeilson@morrisjames.com; (iii) counsel the Stalking Horse Bidder, Beck, Chaet, Bamberger & Polsky, S.C., 330 E. Kilbourn Avenue, Milwaukee, WI 53202, Attn: Devon J. Eggert, deggert@bcblaw.net; (iv) the Office of the United States Trustee, United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: U.S. Trustee; and (v) counsel to the Committee, Pachulski Stang Ziehl & Jones, 919 N. Market Street, Wilmington, DE 19801, Attn: Bradford J. Sandler, bsandler@pszjlaw.com and Paul J. Labov, plabov@pszjlaw.com so as to be received no later than 4:00 p.m. (prevailing Eastern time).

41.    The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction and Sale, and the Sale Hearing to the Debtor's creditors and other parties in interest, as well as to those who have expressed an interest, or those the Debtor and its advisors believe are likely to express an interest, in bidding on the Assets.  Based on the foregoing, the Debtor respectfully requests that this Court approve these proposed notice procedures.

## LEGAL BASIS FOR RELIEF REQUESTED

**A.    The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Assets**

42.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *See e.g. In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *Schipper*); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

43.    Ultimately, the Successful Bid, after being subject to a "market check" in the form of the Auction accepted by the Debtor in the exercise of its reasonable business judgment, will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the estate than any known or practically available alternative. *See, e.g., In re Trans World Airlines,*

*Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's-length fair value transaction").

44.    The Bidding Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers to purchase the Assets. Given the time constraints, and in light of the extensive prepetition marketing process, the Debtor, with the assistance of its advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets.  Additionally, the Bidding Procedures will allow the Debtor to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely sale.  Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtor, its estate and all parties in interest.  Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

45.    The Debtor respectfully submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bidding Procedures, (iii) the deadline for filing objections to the sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, and (v) a description of the sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds.

46.    The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice as provided for herein, constitutes good and adequate notice of the sale and the proceedings with

respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtor further submits that the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtor's marketing process, while minimizing costs to the estate. Accordingly, the Debtor respectfully requests that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bidding Procedures, Auction, Sale, or Sale Hearing is required.

47.    In sum, the Debtor believes the Bidding Procedures will encourage bidding for the Assets and are consistent with the relevant standards governing auctions and bidding procedures in bankruptcy proceedings. Accordingly, the proposed Bidding Procedures are reasonable, appropriate, within the Debtor's sound business judgment and should be approved.

**B.    The Break-up Fee is Appropriate Under the Circumstances**

48.    By the Motion, the Debtor seeks the authority to provide the protections to the Stalking Horse Bidder in the form of the Break-up Fee.  The Break-up Fee is the sum of $21,750. The Break-up Fee is also entitled to various payment protections and bid rights as previously set forth.

49.    Approval of the Break-up Fee is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537. Second, if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party

to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

50.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

> a.     the presence of self-dealing or manipulation in negotiating the break-up fee;
>
> b.      whether the fee hampers, rather than encourages, bidding;
>
> c.     the reasonableness of the break-up fee relative to the purchase price;
>
> d.      whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;
>
> e.     the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;
>
> f.     the correlation of the fee to a maximum value of the debtor's estate;
>
> g.     the support of the principal secured creditors and creditors' committees of the break-up fee;
>
> h.     the benefits of the safeguards to the debtor's estate; and
>
> i.      the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

51.     While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Break-up Fee. In particular, the Break-up Fee is necessary to preserve the value of the Debtor's estate because it will enable the Debtor to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Agreement—a clear benefit to the Debtor's estate. Moreover, there has been no showing of any self-dealing or manipulation of any kind in the negotiation of the Break-up Fee.

13760846.v2

Rather, the Break-up Fee was the result of good faith, arms' length negotiations between the Debtor and the Stalking Horse Bidder (an unaffiliated third-party to the Debtor) and after a fully vetted sale process. Further, the Stalking Horse Bidder would not agree to act as a "stalking horse" without the Break-up Fee given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction. Without the Break-up Fee, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder. The bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the Purchase Price. Therefore, without the benefit of the bid of the Stalking Horse Bidder (i.e., a bid providing the floor), the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

52.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. at 659. The Debtor does not believe that the Break-up Fee will stifle bidding. To the contrary, the Debtor believes that, should the Auction be held, such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id*. at 662.

53.     Here, the bid of the Stalking Horse Bidder serves all three functions. First, the Stalking Horse Bidder would not enter into the Stalking Horse Agreement without the Break-up Fee. Second, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidder. Third, the bid of the Stalking Horse Bidder attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the Stalking Horse Agreement (as a basis for the form Asset Purchase

Agreement) and the schedules thereto, in making their bid. In sum, if all or a portion of the Assets are sold to a Successful Bidder other than the Stalking Horse Bidder, the sale likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

54.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. 'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible.'" *Id.*  Here, the Break-up Fee is 3% of the purchase price

55.     Bid protections, similar to the Break-up Fee sought to be approved by this Motion, have been approved in numerous other chapter 11 cases in this District.  *See In re Beavex Holding*, Case No. 19-10316 (Bankr. D. Del. Mar. 14, 2019) (approving break up fee and expense reimbursement that is 4.5% of the purchase price); *In re Activecare, Inc., et al.,* No. 18-11659 (Bankr. D. Del. Aug. 17, 2018) (approving break up fee that is 3% of the purchase price); *In re Vertullus Specialties, Inc.*, No. 16-11290 (Bankr. D. Del. June 28, 2016) (approving break up fee of 3% of the purchase price and unlimited expense reimbursement); *In re deCode Genetics,* No. 09-14063 (Bankr. D. Del. Dec. 11, 2009) (approving break up fee of 3% of the purchase price and an expense reimbursement of $500,000 for a total of 6.5% of the purchase price in the aggregate).

56.     In sum, the Break-up Fee is reasonable under the circumstances and will enable the Debtor to maximize the value for the Assets while limiting any chilling effect on the sale process. Additionally, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtor obtains fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace. As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above the market.

C.     **The Sale of Assets is Authorized by Section 363 as a Sound Exercise of the Debtor's Business Judgment and is in the Best Interest of the Debtor, Its Estate and Creditors**

57.     In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be conducted by private sale or public auction. In this case, the Debtor has determined that the sale of the Assets by public auction will enable it to obtain the highest or otherwise best offer for the Assets (thereby maximizing the value of its estate) and is in the best interests of their stakeholders.

58.     A sale of the debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for the proposed transaction. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 174 (Bankr. D. Del. 1991).

59.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith. *See Del.& Hudson*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

60.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders. *See, e.g., In re Abbotts Dairies of Pa, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

61.     There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr.

N.D. Ill. 1995) ("The business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted).

62.     Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). In considering a proposed sale, courts look at whether the sale is in the best interests of the estate based on the facts and the history of the case. *In re American West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) *(citing Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)). This requires an examination of the "business justification" for the proposed sale. *In re 240 North Brand Partners, Ltd*., 200 B.R. 653 (B.A.P. 9th Cir. 1996); *In re Wilde Horse Enterprises, Inc*., 136 B.R. 830 (Bankr. C.D. Cal. 1991); *In re Ernst Home Center, Inc*., 209 B.R. 974 (Bankr. W.D. Wash. 1997). The trustee or debtor-in-possession has "broad power" under section 363 to sell property of an estate, and indicates that "the manner of sale is within the discretion of the trustee …." *In re The Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985). *See also Meyers v. Martin (In re Martin)*, 91 F.3d 289, 295 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc*., 788 P.2d 143 (2d Cir. 1986); *Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992).

63.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See e.g. Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *Food Barn Stores*, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [trustee's] duty with

respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)); *995 Fifth Ave., Assocs.*, 96 B.R. at 28.  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *In re Lajijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference."); *Edwards*, 228 B.R. at 561.  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *Integrated Resources*, 147 B.R. at 659 (such procedures "encourage bidding and [to] maximize the value of the debtor's assets.").

64.      The Debtor and its advisors have engaged, and will continue to engage, in a robust marketing and sale process directed at generating significant interest in the Assets to maximize the value to the Debtor's estate.  The Debtor will continue its efforts throughout the bid process.

65.      The Debtor also has engaged, or will engage, a financial advisor specifically to market the Assets for sale across all possible marketing channels.

66.      As a preliminary matter, as set forth in the Quickel Declarations filed in support of the Motion, the Debtor conducted a review of the Debtor's strategic alternatives, including an exploration of possible refinancing, restructuring, or sale options and determined that the proposed sale of its business through a various segregated 363 sales governed by the Bidding Procedures would maximize the value of its estate and is in the best interests of its creditors.  The sale of the Assets is an integrated process along with the prepetition and postpetition sale of inventory at

discounted rates and the sale of the Debtor's remaining assets which will be the subject of other motions to fund the chapter 11 case and to confirm a plan which will allow for a distribution to unsecured creditors.  Thus, the sale is supported by good business reasons.

67.    Further, the fairness and reasonableness of the consideration to be paid by the ultimate purchaser(s) will be demonstrated by adequate "market exposure" and an open and fair auction process which is the best means for establishing whether a fair and reasonable price is being paid. In order to ensure a fair auction process, until completion of the Auction, the Debtor is permitted to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any person or entity in connection with any sale or other disposition of the Assets, and interested parties will be afforded a full and fair opportunity to conduct due diligence in connection therewith.

68.    Particularly as to the sale of the Inventory Assets to FL Hardware (subject to overbids), FL Hardware made the highest offer to pay 39% of the cost value of the Inventory Assets.  The alternative to a stalking horse buyer for the Inventory Assets is likely an auction of the Inventory Assets.  The Debtor believes that an auction would yield much less than 39% of the cost value of the Inventory Assets.  In addition, the FL Hardware APA allows the Debtor to continue its de minmis asset sales of inventory until just before the Auction, thereby maximizing the value of the sale of the Debtor's inventory.

69.    Accordingly, the Debtor believes that the sale of the Assets, including the sale of the Purchased Assets and the Inventory Assets, to the Successful Bidder should be approved.

**D.    The Sale of the Assets Free and Clear of Liens, Claims and Other Interests is Authorized by Section 363(f)**

70.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

71.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

72.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *See e.g. In re Dura Automotive Sys., Inc.*, 2007 WL 7728109 n.32 (Bankr. D. Del. Aug. 15, 2007); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (section 363(f) of the Bankruptcy Code is written in the disjunctive, thus a court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

73.    The Debtor is not aware of any liens that attach to the Assets but in an abundance of caution, requests that the Order authorizing the sale of the Assets make clear that the sale is free and clear of all liens, claims, encumbrances and all other interests, including rights or claims based on any taxes or successor or transferee liability.

74.    The Debtor submits that it is also appropriate to sell the Assets free and clear of successor liability relating to the Debtor's business.  Such a provision ensures that a Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability relating to the debtor's business. *See e.g. In re Trans World Airlines, Inc*., 322 F.3d 283, 288–89 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re General Motors Corp.,* 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC,* 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) *("in personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."); *see also WBQ P'ship v. Commonwealth of Virginia Dep't of Medical Assistant Servs*., 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (approving sale of debtor's assets under section 363(f) and precluded governmental entity from collecting depreciation recapture arising from such sale from the purchaser); *Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (sale pursuant to section 363(f) barred successor liability for product defect claims),*aff'd,* 805 F.2d 1515 (11th Cir. 1986); *Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.)*, 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations); *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 258 (3d Cir. 2000) (citing *Leckie* for the proposition that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute.")

75.     The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtor would run the risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid amounts. To that end, a Successful Bidder should not be liable under any theory of successor liability relating to the Debtor's business, but should hold the Assets free and clear.

### E.     The Proposed Notice of Bidding Procedures and Auction is Appropriate

76.     The Debtor believes that it will obtain the maximum recovery for its estate if the Assets are sold through the process set forth above. As set forth in the First Day Declaration, the Debtor has already taken significant steps to market its business and assets.  This includes identifying potential purchasers and developing a list of strategic buyers, and then contacting such potential buyers regarding the transaction, putting appropriate confidentiality provisions in place, and providing relevant transaction related information.

77.     Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of a proposed sale of its assets, including disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections thereto.  The Debtor submits that the proposed notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtor's creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Assets.

78.     Given the efforts undertaken prepetition and the exigent circumstances facing the Debtor, the proposed time frame between the filing of this Motion, the commencement of the bidding process, and the Auction should provide interested purchasers ample time to participate in the Auction.

**G.      The Successful Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser**

79.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

80.    Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" *In re Abbotts Dairies of Penn., Inc*., 788 F.2d 143, 147 (3d Cir.1986); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc*., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

81.    Any Successful Bidder will be an entity making an arms-length, good faith bid following a competitive purchasing process, and will be selected by the Debtor (in consultation with the Consultation Parties) in accordance with the Bidding Procedures. Therefore, the Debtor intends to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**H.      Overbid Increment is Appropriate**

82.    One important component of the proposed Bidding Procedures is the "Overbid" provision. Once the Debtor determines the Baseline Bid and holds the Auction, all subsequent Overbids must be made in increments of at least $10,000 more than the Baseline Bid (the "Overbid").

83.    The Debtor believes that such Overbid is reasonable under the circumstances and will enable the Debtor to maximize the value received for the Assets while limiting any chilling effect in the marketing process. The Overbid increment is also well within the increment level previously approved by courts in this District. *See In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016) (approving $500,000 bid increment); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); *In re Three A's Holdings, L.L.C.*, Case No. 06-10886 (BLS) (Bankr D. Del. Sept. 7, 2006) (approving $500,000 increment).

## H.    Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

84.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtor requests that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

85.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006.  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Collier on Bankruptcy* P. 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, Collier provides that if an objection is filed and

overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

86.     The Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## NOTICE

87.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the Stalking Horse Bidder; (d) any potential overbidders; (e) the Committee; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

88.     The Debtor has not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtor respectfully requests entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, granting the relief requested in this Motion and such other and further relief as may be appropriate and proper.

Dated:  September 1, 2022
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Brya M. Keilson*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

and

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**
Alan J. Friedman (admitted *pro hac vice*)
Melissa Davis Lowe (admitted *pro hac vice*)
Max Casal (admitted *pro hac vice*)
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Telephone: (949) 340-3400
Facsimile: (949) 340-3000
E-mail: afriedman@shulmanbastian.com
E-mail: mlowe@shulmanbastian.com
E-mail: mcasal@shulmanbastian.com

*Counsel to the Debtor and Debtor in Possession*

13760846.v2