# IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| AGWAY FARM & HOME SUPPLY, LLC, | Case No. 22-10602 (JKS) |
| Debtor. | |

**DECLARATION OF JAY QUICKEL IN SUPPORT OF THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER: (I) (A) APPROVING BIDDING PROCEDURES AND PROTECTIONS IN CONNECTION WITH A SALE OF CERTAIN OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) SCHEDULING AN AUCTION AND SALE HEARING; (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (D) GRANTING RELATED RELIEF; AND (II) (A) AUTHORIZING SALE OF DEBTOR'S INTELLECTUAL PROPERTY AND CERTAIN EQUIPMENT FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (B) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Jay Quickel, hereby submit this declaration (the "Declaration") under penalty of perjury.

1. Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify to such facts under oath. I am submitting this declaration in support of Agway Farm & Home Supply, LLC's ("Debtor") Motion for Order: (I) (A) Approving Bidding Procedures and Protections in Connection With a Sale of Certain of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Scheduling an Auction and Sale Hearing; (C) Approving the Form and Manner of Notice Thereof; and (D) Granting Related Relief; and (II) (A) Authorizing Sale of Debtor's Intellectual Property and Certain Equipment Assets Pursuant to Successful Bidder(s)' Asset Purchase Agreement, Free and Clear of Liens, Claims, Encumbrances and Other Interests; and (B) Granting Related Relief

("Sale Motion").  All capitalized terms not otherwise defined herein shall have the meaning ascribed in the Sale Motion.

2.      As explained in more detail in my First Day Declaration filed on July 5, 2022 [Docket 10], the Debtor is a wholesale product distribution company that serves a broad network of independent retail stores and provides full service retail advisory support.

3.      The Debtor services dealer locations along the east coast, including Maine, New Hampshire, Vermont, Massachusetts, Maryland, New York, Delaware, Rhode Island, New Jersey, Connecticut, Pennsylvania, Kentucky, West Virginia, Virginia, North Carolina, South Carolina, Georgia, and Ohio.

4.      Due to various events described in more detail in the First Day Declaration, including but not limited to issues in transitioning the Debtor's systems away from Southern State's internal systems and the notice of default by its secured creditor Gibraltar Business Capital ("Gibraltar"), the Debtor began to consider its sale or restructuring options.

5.      Beginning in the fall of 2021, the Debtor began extensively marketing the sale of its business as a going concern or a refinance of the company so that it could continue operations, with the help of Focus Management Group, Force 10 Partners and Critical Point Partners.

6.      By February 2022, the Debtor or its advisors had contacted over 25 potential interested parties and had entered into discussions with several strategics (at least 7 different interested parties) ("Strategic(s)") and with varying interests in various types of a sale.  Of the over 25 potential interested parties, approximately 13 were lenders and other financial companies that considered possible refinancing or restructuring options.  The Debtor received one letter of intent from a Strategic that offered to purchase a significant portion of the Debtor's inventory but the offer was rejected because the offered price was too low and the due diligence period was too long.

7. At the same time, Gibraltar prohibited the Debtor from purchasing additional inventory, making it nearly impossible for the Debtor to meet the demands of its customers during the peak spring season.

8. In March 2022, as a cost saving measure and to manage the business through this process, the Debtor: (1) laid off about one-half of the Debtor's employees; (2) offered to let some employees stay onboard on a contract work basis; and (3) offered a retention bonus to certain critical employees to incentivize them to stay. Nevertheless, the Debtor continued its efforts to market the company for sale until it became clear that a buyer could not be found to purchase the company as a going concern.

9. After the Debtor paid off Gibraltar in full, it became clear that the Debtor would need to winddown operations. The Debtor considered various options and ultimately determined that commencing a chapter 11 case was in the best interests of all of its creditors and other constituents.

10. As to the IP, two interested parties emerged – the Stalking Horse Bidder and one other. Through a series of negotiations, and after asking for both parties' best offers, the Stalking Horse Bid was the best offer received for the IP, as well as for a portion of the Debtor's equipment.

11. Pursuant to the terms of the Agreement, the Stalking Horse Bidder is entitled to a break-up fee (the "Break-up Fee") of 3% of the purchase price, or $21,750 in the event it is not the Successful Bidder. I believe the Break-up Fee is necessary to preserve the value of the Debtor's estate because it will enable the Debtor to secure an adequate floor for the Purchased Assets and to therefore insist that competing bids be materially higher or otherwise better than the Agreement. Moreover, the Break-up Fee was the result of good faith, arms' length negotiations between the

Debtor and the Stalking Horse Bidder (an unaffiliated third-party to the Debtor) and after a fully vetted sale process from the efforts of the Debtor and its advisors.

12. Further, the Stalking Horse Bidder would not agree to act as a "stalking horse" without the Break-up Fee given the substantial time and expense that it has incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.

13. Further, the bid of the Stalking Horse Bidder attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the Agreement and the schedules thereto, in making their bid. In sum, if all or a portion of the Purchased Assets are sold to a Successful Bidder other than the Stalking Horse Bidder, the sale likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Purchased Assets and establishing a minimum acceptable price and offer against which other parties can bid.

14. Based upon the aforementioned, and for the reasons stated in the Sale Motion and proposed order, I believe the Debtor has demonstrated good and sufficient reasons: (1) for the approval of the Bidding Procedures; (2) to set the Auction and the Sale Hearing and approve the form and manner of notice of the Auction and the Sale Hearing; and (3) for granting the Break-up Fee as provided in the Agreement and in the Bidding Procedures Order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States, that the foregoing statements are true and correct.

DATED: August 31, 2022.                                  Respectfully submitted,

                                                         _____
                                                         Jay Quickel