## **Exhibit 4**

**Stalking Horse Agreement**

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of August 31, 2022, by and between True Value Company, L.L.C., a Delaware limited liability company (together with its affiliates, "Buyer") and Agway Farm & Home Supply, LLC, a Delaware limited liability company ("Seller"). Hereinafter, Buyer and Seller may be referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, on July 5, 2022, the Seller filed a voluntary petition for relief under Chapter 11 of United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") as Case No. 22-10602 ("Bankruptcy Case");

WHEREAS, subject to the approval of the Bankruptcy Court, Buyer desires to purchase all rights/ownership from Seller, and Seller desires to sell to Buyer all rights/ownership of the assets of the Seller defined below as the Purchased Assets;

WHEREAS, the sale of the Purchased Assets will be on an "As Is" and "Where Is" basis, without any representations or warranties of any kind, free and clear of any and all existing liens, encumbrances and/or outstanding liabilities and subject to the overbid procedures defined below; and

WHEREAS, pursuant to 11 U.S.C. Section 363, the Seller and/or its attorneys will seek a Bankruptcy Court Order authorizing the sale of the Purchased Assets.

1.    **Purchase and Sale.**

**NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION,** the adequacy of which is hereby acknowledged by each Party, and in consideration of the mutual promises and covenants set forth below, the Parties agree as follows:

1.1    Purchased Assets.  Subject to the terms and conditions herein contained, Seller agrees to sell, transfer, assign and deliver to Buyer, and Buyer agrees to purchase and accept from Seller on the Closing Date (as hereinafter defined) free and clear of all claims, liens, interests and encumbrances, all of Seller's right, title and interest in and to the following assets (collectively, the "Purchased Assets"):

(a)    the brand/trademark portfolio as detailed in Schedule 1.1 hereto. domain name/registration, dealer agreements and customer list (collectively, the "IP"), including, to the extent applicable, any related service marks, tradenames, brand names, logos, trade dress and other similar designations of source or origin, registrations, applications, and/or common law rights for the IP, together with passwords, contracts and any registration documents or communication to/from governmental entities regarding the IP; and

(b)    the equipment identified in Schedule 1.2 attached hereto (the "Equipment").

Notwithstanding anything to the contrary in the foregoing, Buyer hereby grants Seller a non-exclusive, non-transferable license to use the Seller's brand/trademark, service marks, tradenames, brand names, and logos, as reasonably necessary solely for purposes of selling its remaining assets until the later of: (i) Seller completes its auction and/or sale of substantially all of its assets; or (ii) the buyers that purchase Seller's inventory during the Bankruptcy Case on a bulk basis for resale purposes have completed all sales of the inventory they purchased from Seller and no longer need the use of Seller's trade name, etc., for resale purposes. Notwithstanding the foregoing, the Seller's rights under this paragraph shall not extend beyond March 31, 2023.

1.2   <u>Purchase Price</u>.  The Seller agrees to sell, and the Buyer agrees to purchase, the IP being sold pursuant to Section 1.1 on an "As Is" and "Where Is" basis, without any warranties either express or implied, for Six Hundred Twenty-Seven Thousand Five Hundred Dollars ($627,500.00), and the Equipment being sold pursuant to Section 1.2 on an "As Is" and "Where Is" basis, without any warranties either express or implied, for Ninety-Seven Thousand Five Hundred Dollars ($97,500.00), for a total purchase price of Seven Hundred Twenty-Five Thousand Dollars ($725,000.00) ("<u>Initial Purchase Price</u>"), or an amount as increased by successful overbid in accordance with this Agreement to be paid by the Buyer (provided the Buyer is the successful bidder) ("<u>Purchase Price</u>").  The Purchase Price shall be paid in Good Funds (defined below) as follows:

(a)   Concurrently with the mutual execution and delivery of this Agreement, Buyer shall deposit the sum of One Hundred Eighty-Three Thousand Dollars ($183,000.00) ("<u>Buyer's Deposit</u>") with the Seller.  The Buyer's Deposit shall be paid in Good Funds (defined below) and made payable to Shulman Bastian Friedman & Bui LLP Client Trust Account and sent to Shulman Bastian Friedman & Bui LLP, Attn: Melissa Lowe, 100 Spectrum Center Drive, Suite 600, Irvine, CA 92618, to be held in trust pending the auction of the Purchased Assets as set forth herein.  At the Closing, Buyer's Deposit shall be credited toward payment of the Purchase Price.  For purposes of this Agreement, "<u>Good Funds</u>" shall mean immediately available funds in the form of cash or wire transfer of funds.

(b)   In the event Buyer is the Successful Bidder (defined below), no later than one day prior to the Closing Date, Buyer shall deliver, in Good Funds, the Purchase Price less Buyer's Deposit payable to Shulman Bastian Friedman & Bui LLP Client Trust Account and sent to Shulman Bastian Friedman & Bui LLP, Attn: Melissa Lowe, 100 Spectrum Center Drive, Suite 600, Irvine, CA 92618, to be held in trust pending the Closing.

1.3   <u>Free and Clear</u>.  Buyer is not assuming any liability, debt or obligations of Seller attributable to the Purchased Assets prior to Closing, and Buyer shall have no obligation or responsibility therefor.  All of the Purchased Assets being sold hereunder shall be sold and assigned by Seller to Buyer free and clear of all liens, claims, encumbrances and interests, in accordance with 11 U.S.C. § 363(f).

1.4   <u>Exclusion of Liabilities and Obligations</u>.  Buyer does not assume any liabilities, obligations or commitments of the Seller, whether absolute or contingent, known or unknown,

except as expressly set forth in this Agreement.

**2.    Closing; Deliveries at the Closing.**

2.1    Closing.   The closing of the purchase and sale of the Purchased Assets as contemplated by this Agreement (referred to throughout this Agreement as the "Closing") shall take place at the offices of Morris James LLP, located at 500 Delaware Avenue, Suite 1500, Wilmington, Delaware. The Closing shall be held within three (3) business days after the order of the Bankruptcy Court approving the sale of the Purchased Assets becomes a final non-appealable order, unless otherwise approved by Seller in writing (referred to throughout this Agreement as the "Closing Date").

2.2    Deliveries at the Closing.

(a)    Deliveries by Buyer.   No later than (1) day prior to the Closing Date, Buyer shall deliver, or cause to be delivered in Good Funds, the Purchase Price less Buyer's Deposit pursuant to Section 1.2(b) of this Agreement.

(b)    Deliveries by Seller.   At Closing, Seller shall deliver to Buyer the following: (1) an original Bill of Sale including an Intellectual Property Bill of Sale and Assignment Agreement substantially in the form attached hereto as Exhibits A and B, executed by the Seller dated as of the Closing Date; and (2) such additional documentation as Buyer may reasonably request to consummate the transaction contemplated hereby.

**3.    Bankruptcy Covenants.**

3.1    Entry of Sale Approval Order.   Buyer acknowledges and agrees that this Agreement is subject to the approval of the Bankruptcy Court (the "Sale Approval Order"). The Parties will in good faith exercise all reasonable efforts required to obtain the entry of the Sale Approval Order, including executing and delivering any motions, declarations or other items of support reasonably required in connection therewith.

3.2    Sale Subject to Overbid.   In order to obtain the highest and best offer for the Purchased Assets, the sale of the Purchased Assets shall be subject to the following bidding procedures ("Bidding Procedures"):

(a)    Potential overbidders ("Bidder(s)") must bid an initial amount of at least $94,250.00 over the Purchase Price or $819,250.00. Minimum bid increments thereafter shall be $10,000.00. The Seller shall have sole discretion in determining which overbid is the best for the Seller's bankruptcy estate ("Estate") and will seek approval from the Court of the same.

(b)    Overbids ("Bid(s)") must be in writing and be received by Seller and its counsel no later than 4:00 p.m. Eastern time on October 10, 2022.

(c)     Overbids must be accompanied by a deposit in the form of certified funds in the amount of at least $108,750.00.

(d)     The Overbid must also disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such Bid (provided, however, that if the entity that is the Bidder is a special purpose vehicle or other entity without existing operations (as determined by Seller), the Bid must disclose the identity or identities of each ultimate owner or participant in the entity that is the Bidder);

(e)     The Overbid must also be in the form of a duly authorized, executed, and non-contingent purchase agreement, together with all schedules, exhibits, and related documents thereto in substantially the same form as this Agreement and include clearly marked versions of the Bid against this Agreement showing all changes requested by the Bidder.

(f)     The Overbidder must also provide evidence of having sufficient specifically committed funds to complete the transaction for the Bid amount and such other documentation relevant to the Bidder's ability to qualify as the Buyer and ability to close the sale and immediately and unconditionally pay the winning Bid purchase price at closing.

(g)     The Overbidder must seek to acquire the Purchased Assets on terms and conditions not less favorable to the Estate than the terms and conditions to which the Buyer has agreed to purchase the Purchased Assets, including but not limited to, waiver of any and all due diligence and other contingencies such that all Bidders shall become non-contingent as provided in this Agreement and closing on the sale of the Purchased Assets in the same time parameters as the Buyer.

(h)     Upon the conclusion of the auction, Seller, in consultation with the statutory committee appointed in the Bankruptcy Case (the "Committee"), the Committee's counsel and the Committee's financial advisor (the "Consultation Parties") will determine in their reasonable judgment what is the highest or otherwise best Qualified Bid (the "Successful Bidder"). The auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, as determined by Seller, to submit an Overbid at the auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid.

(i)     If an auction is conducted, the entity with the second highest or otherwise best Qualified Bid at the auction (the "Backup Bidder"), as determined by Seller, in consultation with the Consultation Parties, will be designated as the Backup Bidder. The Backup Bidder shall be required to keep its initial Bid (or, if the Backup Bidder submitted one or more Overbids at the auction, its final Overbid) open and irrevocable until the earlier of (i) the closing of the transaction with the Successful Bidder; or (ii) thirty days following entry of the Sale Approval Order.

(j)     Following the Sale Hearing, if the Successful Bidder fails to consummate the Successful Bid, Seller shall proceed to consummate the Backup Bid with the Backup Bidder. A hearing to authorize a sale to the Backup Bidder will be held before the Court on no less than

five (5) days' notice, with objections due at least one (1) day prior to such hearing. For the avoidance of doubt, the scope of such hearing shall be limited to issues relating to the identity of the Backup Bidder.

3.3    <u>Break-up Fee</u>. Buyer shall act as the stalking horse bidder in connection with the auction (the "<u>Stalking Horse Bidder</u>"). In the event all or a portion of the Purchased Assets are sold to a Successful Bidder other than the Buyer, Buyer shall be entitled to a breakup fee of three percent (3%) of the Initial Purchase Price, or $21,750.00 (the "<u>Break-Up Fee</u>"). The Break-Up Fee and refund of Buyer's Deposit shall be paid to Buyer within two (2) business days of the date of closing the transaction with the Successful Bidder other than the Buyer.

3.4    <u>Subject to Bankruptcy Court Approval</u>. Seller shall use its best efforts to cause the Bankruptcy Court to enter the Sale Approval Order. The Agreement is expressly contingent upon the Seller obtaining Bankruptcy Court approval of the sale of the Purchased Assets with a finding that Buyer is in good faith pursuant to Bankruptcy Code section 363(m). The Seller makes no warranties, either express or implied, as to its ability to obtain approval of the Bankruptcy Court and entry of a Sale Approval Order. Buyer's Deposit shall be immediately refunded in the event such approval is not obtained.

**4.    <u>Representations and Warranties of Seller</u>.** Seller hereby represents and warrants to Buyer that the following are true and correct as of the date hereof and will be true as of the Closing (except as otherwise specifically and expressly permitted under this Agreement).

4.1    <u>Authorization</u>. Subject to the Bankruptcy Court approval of this Agreement and all other documents to be executed by Seller and delivered to Buyer prior to or at the Closing, Seller has full power and authority to enter into this Agreement and has duly authorized, executed and delivered the same. The Agreement, when executed and delivered by Seller, will constitute valid and legally binding obligations of Seller, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

4.2    <u>Title to Purchased Assets</u>. Seller holds good and valid title to the Purchased Assets and, subject to the entry of the Sale Approval Order, has the ability to transfer such assets to Buyer free and clear of all liens, claims and encumbrances in accordance with the terms of this Agreement.

**5.    <u>Representations and Warranties of the Buyer</u>.** Buyer hereby represents and warrants to Seller that:

5.1    <u>Authorization</u>. Buyer has full power and authority to enter into this Agreement and has duly authorized, executed and delivered the same. The Agreement, when executed and delivered by Buyer, will constitute valid and legally binding obligations of the Buyer, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general

application affecting enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

5.2    <u>Waiver of Contingencies</u>.  Buyer's due diligence has been completed prior to Buyer's execution of this Agreement, and Buyer hereby waives any and all contingencies to consummation of the transactions contemplated herein, including, without limitation, all due diligence and financing contingencies.  Buyer expressly disclaims, and this transaction shall not be conditioned on, any right of Buyer to receive a fee analogous to a break-up fee (except as set forth in Section 3.3), expense reimbursement, termination fee, or any other similar form of compensation.

5.3    <u>Payment of Taxes</u>.  Any transfer, documentary, sales, use, stamp, registration, and other such taxes, and all conveyance fees, recording charges, and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, the "<u>Transfer Taxes</u>") shall be borne by Buyer.  Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Assets from any Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.  Buyer will, at its own expense, file all necessary tax returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will join in the execution of any such tax returns and other documentation. Seller shall cooperate with Buyer and provide all information reasonably requested by Buyer to file all tax returns and other documentation respect to all Transfer Taxes.

5.4    <u>As Is-Where Is</u>.

(a)    IT IS UNDERSTOOD AND AGREED THAT SELLER (INCLUDING ANY OF SELLER'S PROFESSIONALS) IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OR REPRESENTATIONS AS TO: (I) MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; (II) THE EXISTENCE, VALIDITY OR COMPLETENESS OF ANY OF THE PURCHASED ASSETS; OR (III) OPERATING HISTORY OR PROJECTIONS, VALUATION, RECOVERIES, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PURCHASED ASSETS WITH GOVERNMENTAL OR OTHER APPLICABLE LAWS, THE TRUTH, ACCURACY, OR COMPLETENESS OF ANY DOCUMENT RELATED TO THE PURCHASED ASSETS, OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE PURCHASED ASSETS.  NONE OF THE DOCUMENTS OR MATERIALS PROVIDED TO BUYER IN CONNECTION WITH THE SALE TRANSACTION CONSTITUTE AN OPINION WITH RESPECT TO THE NATURE, EXTENT, OR VALIDITY OF ANY OF THE PURCHASED ASSETS.

(b)    BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE

PURCHASED ASSETS "**AS IS, WHERE IS, WITH ALL FAULTS.**" BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATION OR INFORMATION PERTAINING TO THE PURCHASED ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE PURCHASED ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS."

BUYER ACKNOWLEDGES TO SELLER THAT BUYER HAD AN OPPORTUNITY PRIOR TO EXECUTING THIS AGREEMENT TO CONDUCT SUCH DUE DILIGENCE, INSPECTIONS AND INVESTIGATIONS OF THE PURCHAED ASSETS AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE PURCHASED ASSETS AND ITS ACQUISITION THEREOF, AND THAT BUYER DID NOT RELY ON ANY OF SELLER'S OR ANY OF ITS PROFESSIONALS' WRITTEN OR ORAL STATEMENTS, REPRESENTATIONS, PROMISES, WARRANTIES, OR GUARANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, REGARDING THE PURCHASED ASSETS, THE DEBTOR'S BUSINESS OR THE COMPLETENESS OF ANY INFORMATION PROVIDED IN CONNECTION THEREWITH. BUYER HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS, AND SELLER AND ITS PROFESSIONALS SHALL HAVE NO LIABILITY WHATSOEVER TO BUYER, ITS RELATED ENTITIES OR ANY OTHER PARTY FOR CLAIMS ARISING FROM, OR RELATED TO, THE DUE DILIGENCE DOCUMENTS AND MATERIALS PROVIDED.

**6.** **Conditions to Buyer's Obligation to Close.** The obligations of Buyer to Seller under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

6.1 Representations and Warranties. The limited representations and warranties of Seller contained in Section 4 above, shall be true and correct on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

6.2 Performance. All covenants, agreements and conditions contained in this Agreement to be performed by Seller on or prior to the Closing shall have been performed or complied with in all material respects.

6.3 Bankruptcy Court Matters. The Bankruptcy Court shall have entered the Sale Approval Order, the Sale Approval Order shall not have been vacated, stayed, reversed, or modified, amended, or supplemented in any manner, and such order shall have become a final non-appealable order.

**7.      Conditions to the Obligations of Seller.**  The obligations of Seller to Buyer under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

7.1      Representations and Warranties.  The representations and warranties of Buyer contained in Section 5 shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

7.2      Performance.  All covenants, agreements and conditions contained in this Agreement to be performed by Buyer on or prior to the Closing shall have been performed or complied with in all material respects.

7.3      Bankruptcy Court Matters.  The Bankruptcy Court shall have entered the Sale Approval Order, the Sale Approval Order shall not have been vacated, stayed, reversed, or modified, amended, or supplemented in any manner, and such order shall have become a final non-appealable order..

7.4      Payment of Purchase Price.  Buyer shall deliver the Purchase Price in Good Funds as set forth in Section 1.2 of this Agreement.

**8.      Termination.**

8.1      Termination Events.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)      by either Seller or Buyer:

(i)      by mutual written consent of Seller and Buyer;

(ii)      if the Closing shall not have occurred by the close of business on October 31, 2022 unless otherwise extended in writing by both Seller and Buyer (the "Outside Date"); or

(iii)      if, prior to the Closing Date, the Bankruptcy Court enters an order dismissing, or converting into a case under chapter 7 of the Bankruptcy Code, the Bankruptcy Case and such order is final;

(b)      by Buyer:

(i)      in the event of any material breach by Seller of any of Seller's agreements, covenants, representations, or warranties contained herein, and the failure of a Seller to cure such breach before the earlier of: (A) the Outside Date, or (B) five (5) days after receipt of the Buyer Termination Notice (as defined hereinbelow); provided, however, that (I) Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (II) Buyer notifies Seller in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Section 8.1(b) as a result of the breach, and (III) Buyer specifies in

the Buyer Termination Notice the representation, warranty, covenant, or agreement contained herein of which Seller is allegedly in breach and a description of the specific factual circumstances to support the allegation; or

        (ii)     if Buyer is not the Successful Bidder or the Back-Up Bidder;

    (c)     by Seller:

        (i)     in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein, and the failure of Buyer to cure such breach before the earlier of: (A) the Outside Date, or (B) five (5) days after receipt of the Seller Termination Notice (as defined hereinbelow); provided, however, that Seller (I) is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (II) notify Buyer in writing (the "Seller Termination Notice") of its intention to exercise its rights under this Section 8.1(c) as a result of the breach, and (III) specify in the Seller Termination Notice the representation, warranty, covenant, or agreement contained herein of which Buyer is allegedly in breach and a description of the specific factual circumstances to support the allegation; or

        (ii)     if Buyer is not the Successful Bidder or the Back-Up Bidder.

    8.2    Effect of Termination.

    (a)     Except as provided below in Section 8.2(b), in the event of termination of this Agreement by Buyer or Seller pursuant to this Section 8, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party; provided, however, that nothing herein shall relieve any Party from liability for breach of this Agreement prior to such termination. The provisions of this Section 8.2 shall expressly survive the termination of this Agreement.

    (b)     The Buyer's Deposit shall be returned to Buyer (except where termination is a result of the sale not closing by the Outside Date pursuant to Section 8.1(a)(ii) as a result of Buyer's breach of this Agreement, or is a result of a material breach by Buyer pursuant to Section 8.1(c)(i)). In the event the Buyer's Deposit is not returned to Buyer due to a termination in accordance with (i) Section 8.1(a)(ii) and such termination is a result of Buyer's breach of this Agreement or (ii) Section 8.1(c)(i) due to a material breach of this Agreement by Buyer, the Parties agree that the Buyer's Deposit is not a penalty right and shall constitute liquidated damages in a reasonable amount that will compensate Seller for Buyer's breach of the Agreement, and Seller shall not be entitled to any other damages or form of relief against Buyer.

    (c)     Each Party acknowledges that (i) the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement, (ii) without these agreements such Party would not have entered into this Agreement, and (iii) such agreements shall survive the Closing.

9.    **Miscellaneous**.

9.1    <u>Time Is Of The Essence</u>.  Seller and Buyer acknowledge and agree that TIME IS OF THE ESSENCE with respect to each and every term, condition, obligation, and provision hereof and that failure to timely perform any of the terms, conditions, obligations, or provisions hereof by either Party shall constitute a material breach of the Agreement by the Party so failing to perform.

9.2    <u>Waiver</u>.  Effective as of the Closing, Buyer hereby acknowledges and waives any and all claims, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment and legal fees against Seller of every kind and nature and interests in the Purchased Assets being sold to Buyer pursuant to this Agreement; and the Purchase Price shall not be subject to any offset, decrease, reductions, deductions, or counterclaim of any kind or nature whatsoever.  For the avoidance of doubt, nothing in this Section shall be deemed to waive any responsibilities or obligations of Seller under this Agreement and Exhibits A and B to the Agreement.

9.3    <u>Additional Agreements; Reasonable Efforts</u>.  Subject to the terms and conditions of this Agreement, the Parties agree to use all commercially reasonable efforts to take, or cause to be taken, action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including cooperating fully with the other Party and providing to the other Party any information reasonably required.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, the Parties shall take all such necessary action.

9.4    <u>Expenses</u>.  Except as set forth to the contrary in this Agreement, each of the Parties hereto shall be responsible for its own fees and expenses, including, but not limited to, fees and expenses with respect to the engagement of outside accountants and attorneys, incurred by it in connection with this Agreement and the transactions contemplated with respect to this Agreement.

9.5    <u>Entire Agreement; Amendments</u>.  This Agreement, and the documents referred to herein constitute the entire agreement between the Parties hereto pertaining to the subject matter hereof, and any and all other written or oral agreements relating to the subject matter hereof existing between the Parties hereto are expressly canceled.

9.6    <u>Effect of Headings</u>:  The titles and headings of this Agreement are for convenience and identification only, and shall not be deemed to limit, amplify, or define the contents of the respective sections or paragraphs to which they pertain.

9.7    <u>Counterparts</u>.  This Agreement may be executed in one or more counter-parts (multiple signatures) each of which shall be deemed an original, and all of which constitute one and the same instrument.

9.8     Invalidity.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, by held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement or any other such instrument.

9.9     Attorneys' Fees.  If any legal action is brought for the enforcement of this Agreement, the prevailing party shall be entitled to an award of its costs and reasonable attorneys' fees from the other party, provided that the amount of such award shall be limited to reasonable costs and attorneys' fees incurred in connection with enforcing the terms of this Agreement, as determined by the Bankruptcy Court.

9.10    Governing Law.  This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Delaware shall govern, without giving effect to principles of conflicts of law.

9.11    Jurisdiction of the Bankruptcy Court.  Any and all disputes which involve in any manner the Estate or the Seller, arising from the Agreement or relating in any manner to the Purchased Assets, shall be resolved only in the United States Bankruptcy Court, District of Delaware.

9.12    Knowing and Voluntary Agreement.  Each Party hereto acknowledges that it has entered into this Agreement knowingly and voluntarily of its own free will and under no duress of any nature.

9.13    Survival of Warranties.  Unless otherwise set forth in this Agreement, the warranties, representations and covenants of Seller and Buyer contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing.

9.14    Successors and Assigns.  This Agreement shall inure to the benefit of, and shall be binding upon the Parties, and each of them, and their respective successors, assigns, heirs, partners, agents, officers, corporations, partnerships, partners, shareholders, representatives, and each of them.

9.15    Amendments and Waivers.  Any term of this Agreement may be amended or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Parties hereto.

9.16    Brokers.  Buyer represents and warrants to Seller that it dealt with no broker in connection with, nor has any broker had any part in bringing about, this transaction.  Buyer shall indemnify, defend, and hold harmless the Seller from and against any claim of any broker, or any other person for any brokerage commissions, finder's fees, or other compensation in connection with this transaction if such claim is based in whole or in part by, through or on account of, any acts of Buyer or its agents, employees, or representatives and from all losses, liabilities, costs,

and expenses in connection with such claim, including without limitation, reasonable attorneys' fees, court costs, and interest. The provisions of this Section shall survive the Closing, or the termination of this Agreement prior to the Closing.

IN WITNESS WHEREOF, each of the Parties hereto has caused this Asset Purchase and Sale Agreement to be executed on its behalf by its officer thereunto duly authorized, all on or as of the day and year first above written.

**SELLER:**

Dated: ~~XXXXXXXXXXX~~
September 1, 2022

Agway Farm & Home Supply, LLC
By: Jay Quickel
Its: President and CEO

**BUYER:**

Dated: August **31**, 2022

True Value Company, L.L.C.
By: Eric Lane
Its: Senior Vice President, Sales

## EXHIBIT A

### FORM OF BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale"), dated as of [_____], 2022 (the "Effective Date"), is entered into between by and between True Value Company, L.L.C., a Delaware limited liability company (together with its affiliates, "Buyer") and Agway Farm & Home Supply, LLC, a Delaware limited liability company ("Seller").

For good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, Seller does give, grant, bargain, sell, transfer, assign, convey and deliver to Buyer, within one (1) week of the Effective Date, all of the following: (1) 2019 Powerboss Nautilus HD MDL PB45HLP Ride-On 45" Floor Scrubber/Sweeper, LPG, S/N 19PB1389; (2) 2020 Raymond MDL 8410 Electric Ride-On Pallet Jack, 6,000lb CAP, S/N 841-20-56820; (3) 2020 Raymond MDL 7500 DR32TT Electric Reach Truck, 300lb CAP, S/N 750-20-AC80505; and (4) three (3) – 2020 Raymond MDL 5600 OPC30TT Electric Order Picker 300 LBS CAP, Serial Number(s), S/N 560,20-A52206, S/N 560-20-A52215, S/N 560-20-A52198. All capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase and Sale Agreement dated as of August 31, 2022 between, inter alia, Seller and Buyer.

Seller hereby covenants that it will, upon reasonable written request therefor and at Buyer's sole cost and expense, execute and deliver such other documents; and do such other acts and things, all as Buyer, its nominees, successors and/or assigns may reasonably request in order to fully assign and transfer to and vest in Buyer, its nominees, successors and/or assigns, and protect its or their rights, title and interest in and enjoyment of, all of the assets of such Seller intended to be transferred and assigned hereby.

All references to "Seller" and "Buyer" herein shall be deemed to include their respective designees, nominees, successors and/or assigns, where the context permits.

This Bill of Sale is governed by the laws of the State of Delaware without regard to its conflicts of law principles that would cause the application of the laws of another jurisdiction.

**IN WITNESS WHEREOF,** the parties hereto have executed this Bill of Sale as of the date first written above.

**SELLER**:

By: _____

Name:  Jay Quickel

Title:  President and CEO

**BUYER:**

By: _____

Name: Eric Lane

Title: Senior Vice President, Sales_____

**FORM OF INTELLECTUAL PROPERTY BILL OF SALE AND**

**ASSIGNMENT AGREEMENT**

THIS INTELLECTUAL PROPERTY BILL OF SALE AND ASSIGNMENT AGREEMENT (this "**Bill of Sale and Assignment**"), dated as of August __, 2022 (the "**Effective Date**"), is entered into by and between True Value Company, L.L.C., a Delaware limited liability company (together with its affiliates, "**Assignee**") and Agway Farm & Home Supply, LLC, a Delaware limited liability company ("**Assignor**"). Capitalized terms used but not otherwise defined herein shall have the respective meanings set forth in that certain Asset Purchase Agreement dated as of August 31, 2022 by and between Assignor and Assignee ("**APA**"). Hereinafter, Assignor and Assignee, may be referred to individually as a "**Party**", and collectively as the "**Parties**".

**RECITALS**

**WHEREAS,** pursuant to the APA, Assignor has agreed to sell, assign, convey, transfer and deliver to Assignee, and Assignee has agreed to purchase and acquire from Assignor, certain rights, title, claims, and interests in and to the intellectual property rights ("**IP**") owned by the Estate (as defined in the APA) and as listed on **Schedule A** hereto.

**WHEREAS,** pursuant to the APA, Assignor has agreed to execute this Bill of Sale and Assignment in order to effectively assign, transfer, and convey to Assignee such assets.

**NOW THEREFORE,** in consideration of the foregoing and the representations, warranties and agreements herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee, intending to be legally bound, hereby agree as follows:

1.  Assignment of Intellectual Property Rights. Upon the terms set forth in the APA, Assignor hereby irrevocably sells, conveys, assigns, transfers, delivers and sets over to Assignee and its successors and assigns all of the Assignor's right, title, claim, and interest in and to any and all of the IP, and including all goodwill associated therewith and all income and royalties hereafter due or payable to Assignor with respect to the IP, to be held and enjoyed by Assignee for its own use and benefit and for the use and benefit of its subsidiaries, affiliates, successors, assigns, licensees and legal representatives, including all rights to sue for any past infringement or unauthorized use of any of the foregoing and to recover all damages therefrom for its own use and behalf and for the use and behalf of its successors and assigns or other legal representatives as such rights would have been held and enjoyed by Assignor had this Bill of Sale and Assignment not been made (including, without limitation, the right to renew and/or apply for trademark and/or service mark registrations within or outside the United States based in whole or in part upon the IP, and including any priority right that may have arisen from Assignor's use of the IP and/or prior ownership of the registration of the IP). In order to enable the use by Assignee of the website names and addresses set forth on **Schedule A** hereto ("**Domain Names**"), Assignor agrees to provide Assignee, on the Effective Date, with any account information with which the Domain Names are registered, including any user names and passwords relating thereto.

2.      <u>Authorization</u>. Assignor authorizes and requests the United States Commissioner of Patents and Trademarks and any other official throughout the world whose duty is to register and record ownership in the IP, to record Assignee as the assignee and owner of any and all of Assignor's rights in the IP.

3.      <u>Further Assurances</u>. Assignor and Assignee agree to execute and deliver such other assignment agreements and other instruments of conveyance and assignment and will do such other acts and things, at the requesting Party's expense, in each case as that Party may reasonably request, as shall be reasonably necessary to vest in Assignee such title to such IP, to transfer the Domain Names and to fulfill and discharge each Party's obligations of conveyance and discharge hereunder and under the APA. The Parties agree to develop and implement a plan to transfer all the IP using the appropriate personnel designated by each Party. Assignor acknowledges and agrees that it will take all reasonably necessary steps to protect and maintain the goodwill associated with the IP prior to Closing and will refrain from any actions that would materially impair the goodwill associated with the IP post-Closing.

4.      <u>Governing Law</u>. This Bill of Sale and Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware without giving effect to conflict of law provisions thereof.

5.      <u>Purchase Agreement</u>. This Bill of Sale and Assignment is executed and delivered pursuant to Section 2 of the APA, and is subject to the terms of the APA, and nothing contained herein is intended to alter, modify, expand or diminish the terms set forth in the APA.

6.      <u>Counterparts</u>. This Bill of Sale and Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Copies (including delivery by facsimile, electronic mail (PDF) or other electronic transmission or original) of signatures to this Bill of Sale and Assignment shall be deemed to be originals and shall be binding to the same extent as original signatures.

7.      <u>Severability</u>. Each provision of this Bill of Sale and Assignment is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of the Bill of Sale and Assignment.

*[Signature page to follow]*

**IN WITNESS WHEREOF,** the Parties hereto have executed this Bill of Sale and Assignment as of the date first written above.

**ASSIGNOR**:

By: _____

Name:  Jay Quickel

Title:  President and CEO

**ASSIGNEE:**

By: _____

Name:_____

Title:_____

## SCHEDULE 1.1

### AGWAY LOGOS







## DOMAIN NAMES / DIGITAL CERTIFICATES



# TRADEMARKS

**AGWAY FARM AND HOME SUPPLY, LLC**
**TRADEMARK/SERVICE MARK STATUS CHART**
**MATTER NO. 0178866**

Last Updated: June 22, 2022

| TRADEMARK / SERVICE MARK | CLASS | GOODS / SERVICES | SERIAL NO. REGISTRATION NO. | DATE FILED DATE ISSUED | LAST ACTION | NEXT ACTION |
|---|---|---|---|---|---|---|
| TRUE BALANCE | 003 | pet deodorizer, non-medicated pet shampoo, non-medicated pet conditioner | 97050954 | 09/29/2021 | 06/14/22 – Notice of Allowance Issued | 12/14/22 – SOU or 1 EOT |
| TRUE BALANCE | 005 | dietary pet supplements | 97050957 | 09/29/2021 | 06/14/22 – Notice of Allowance Issued | 12/14/22 – SOU or 1 EOT |
| TRUE BALANCE | 006 | metal pet tags | 97050959 | 09/29/2021 | 06/14/22 – Notice of Allowance Issued | 12/14/22 – SOU or 1 EOT |
| TRUE BALANCE | 020 | pet beds, cat scratching posts, cat scratching pads, non-metal pet tags, pet crates | 97050967 | 09/29/2021 | 06/14/22 – Notice of Allowance Issued | 12/14/22 – SOU or 1 EOT |
| TRUE BALANCE | 021 | pet combs, pet brushes, pet feeding and drinking bowls, pet cages, portable water and fluid dispenses for pets | 97050969 | 09/29/2021 | 06/14/22 – Notice of Allowance Issued | 12/14/22 – SOU or 1 EOT |
| TRUE BALANCE | 028 | dog toys, cat toys | 97050970 | 09/29/2021 | 06/14/22 – Notice of Allowance Issued | 12/14/22 – SOU or 1 EOT |
| TRUE BALANCE | 031 | dog food, dog treats, cat treats, dog biscuits, cat biscuits, cat litter, livestock feed, animal feed, pet food | 97050972 | 09/29/2021 | 06/14/22 – Notice of Allowance Issued | 12/14/22 – SOU or 1 EOT |
| TRUE BALANCE | 008 | Hair clippers for pets, hand-operated shears for pets, non-electric hair clippers for pets, nail clippers for pets | 97050961 | 09/29/2021 | 06/21/22 – NOA issued | 12/21/22 – SOU or 1 EOT due |
| TRUE BALANCE | 018 | leashes for animals, harnesses for animals, clothing for pets, pet tags specially adapted for attaching to pet leashes or collars | 97050964 | 09/29/2021 | 06/21/22 – NOA issued | 12/21/22 – SOU or 1 EOT due |
| AGWAY ARMOR | 001 | hydraulic fluid | 90862272 | 08/03/2021 | 06/21/22 – NOA issued | 12/21/22 – SOU or 1 EOT due |
|  | 004 | Motor oil, engine oil, hydraulic oil and gear oil |  |  |  |  |

| TRADEMARK / SERVICE MARK | CLASS | GOODS / SERVICES | SERIAL NO. REGISTRATION NO. | DATE FILED DATE ISSUED | LAST ACTION | NEXT ACTION |
|---|---|---|---|---|---|---|
| AGWAY ARMOR | 001 | hydraulic fluid | 90787171 | 06/22/2021 | 06/21/22 – NOA issued | 12/21/22 – SOU or 1 EOT due |
|  | 004 | Motor oil, engine oil, hydraulic oil and gear oil |  |  |  |  |
| AGWAY | 001 | hydraulic fluid | 90787173 | 06/22/2021 | 06/21/22 – NOA issued | 12/21/22 – SOU or 1 EOT due |
|  | 004 | Motor oil, engine oil, hydraulic oil and gear oil |  |  |  |  |
| AGWAY | 001 | hydraulic fluid | 90787176 | 06/22/2021 | 06/21/22 – NOA issued | 12/21/22 – SOU or 1 EOT due |
|  | 004 | Motor oil, engine oil, hydraulic oil and gear oil |  |  |  |  |
| AGWAY FARM & HOME | 035 1(b) | Wholesale general merchandise distributorship services; wholesale general merchandise distributorship services featuring pet and animal food and supplies, animal health products, bird food and supplies, lawn and garden products, seasonal home and hardware products and farm products and supplies | 90225805  6640614 | 9/30/2020  02/08/22 | 02/08/22 – Registration Issued | 02/08/27 – Window to file 8/15 opens  02/08/28 – Window to file Section 8/15 closes |
| **ALL MARKS BEYOND THIS POINT ARE ASSIGNED TO AGWAY FARM AND HOME SUPPLY, LLC as of 12/18/2020** | | | | | | |
| AGWAY | 042 | Retail general merchandise store services | 74/074,501  1,847,932 | 7/2/90  8/2/94 | 7/22/14 – Filed Section 8/9 | 8/2/23 – Window to file 8/9 opens  8/2/24 – Window to file 8/9 closes |
| GREEN LABEL PLUS | 022 | Binder and baler twine; twine | 86/320,371  4,671,803 | 6/25/14  1/13/15 | 1/13/21 – Section 8/15 filed by Buchalter, APC | 1/13/24 – Window to file 8/9 opens  1/13/25 – Window to file 8/9 closes |
| Greenlawn | 001 1(b) | Fertilizers | 88/067,896  5,853,095 | 8/7/18  9/3/19 | 9/3/19 – Registration issued | 9/3/24 – Window to file 8/15 opens  9/3/25 – Section 8/15 Due |

| Trademark / Service Mark | Class | Goods / Services | Serial No. / Registration No. | Date Filed / Date Issued | Last Action | Next Action |
|---|---|---|---|---|---|---|
| AGWAY | 035 | Retail general merchandise store services | 78/482,716 / 3,065,356 | 9/13/04 / 3/7/06 | 2/22/16 – Filed Section 8/9 | 3/7/25 – Window to file 8/9 opens / 3/7/26 – Window to file 8/9 closes |
| AGWAY | 035 | Retail general merchandise store services | 78/482,705 / 3,065,355 | 9/13/04 / 3/7/06 | 2/22/16 – Filed Section 8/9 | 3/7/25 – Window to file 8/9 opens / 3/7/26 – Window to file 8/9 closes |
| AGWAY | 001 | Lawn fertilizer, garden fertilizer, plan goods, mulches, composts, (liquid fertilizers), soil conditioners (ammonium sulfate sold as fertilizer) and peat moss | 72/224,365 / 0/808,749 | 7/28/65 / 5/24/66 | 2/17/16 – Filed Section 8/9 | 5/24/25 – Window to file 8/9 opens / 5/24/26 – Window to file 8/9 closes |
| GREENLAWN | 001 / 1(b) | Soil additives, namely, agricultural lime | 88/403,912 / 6,060,162 | 4/26/19 / 5/19/20 | 5/19/20 – Registration issued | 5/19/25 – Window to file 8/15 opens / 5/19/26 – Section 8/15 Due |
| Greenlawn | 001 / 1(b) | Soil additives, namely, agricultural lime | 88/403,906 / 6,061,161 | 4/26/19 / 5/19/20 | 5/19/20 – Registration issued | 5/19/25 – Window to file 8/15 opens / 5/19/26 – Section 8/15 Due |
| AGWAY | 001 | Lawn and grass seed, garden seed, field seed (ryegrass), clover seed, alfalfa seed, bean seed, bluegrass seed, plant bulbs, rose bushes, soil, limestone, packaged plug of turf, pet litter, oyster shells, calcite crystals, poultry grit, potting soils, granite grit for poultry, charcoal briquettes and charcoal lighter | 72/224,363 / 0,813,726 | 7/28/65 / 8/30/66 | 6/29/16 – Filed Section 8/9 | 8/30/25 – Window to file 8/9 opens / 8/30/26 – Window to file 8/9 closes |
| AGWAY | 007 | Hand and power operated sprayers for agricultural use | 72/224,366 / 0,816,100 | 7/28/65 / 10/4/66 | 9/12/16 – Filed Section 8/9 | 10/4/25 – Window to file 8/9 opens / 10/4/26 – Window to file 8/9 closes |

| Trademark / Service Mark | Class | Goods / Services | Serial No. / Registration No. | Date Filed / Date Issued | Last Action | Next Action |
|---|---|---|---|---|---|---|
| GREENLAWN | 008 / 1(b) | Hand operated spreaders for seed and dry lawn chemicals | 88/619,915 / 6,201,773 | 9/17/19 / 11/17/20 | 11/17/20 – Registration issued | 11/17/25 – Window to file 8/15 opens / 11/17/26 – Section 8/15 Due |
| Greenlawn | 008 / 1(b) | Hand operated spreaders for seed and dry lawn chemicals | 88/619,924 / 6,201,774 | 9/17/19 / 11/17/20 | 11/17/20 – Registration issued | 11/17/25 – Window to file 8/15 opens / 11/17/26 – Section 8/15 Due |
| FIELDMASTER | 009 | Electric fence chargers | 78/881,786 / 3,446,854 | 5/11/06 / 6/10/08 | 3/2/18 – Filed Section 8/9 | 6/10/27 – Window to file 8/9 opens / 6/10/28 – Window to file 8/9 closes |
| AGWAY | 021 | House brooms, barn brooms, household brushes, dairy brushes, and stock brushes | 72/189,675 / 0,858,931 | 3/26/64 / 10/22/68 | 6/4/18 – Filed Section 8/9 | 10/22/27 – Window to file 8/9 opens / 10/22/28 – Window to file 8/9 closes |
| STAGE | 001 | Lawn fertilizer for domestic use | 75/228,819 / 2,200,381 | 1/21/97 / 10/27/98 | 6/4/18 – Filed Section 8/9 | 10/27/27 – Window to file 8/9 opens / 10/27/28 – Window to file 8/9 closes |
| AGWAY | 001 | Insecticides, fungicides, herbicides, water softening preparations, preparation for controlling crab grass, rodenticide | 72/224,364 / 0,859,518 | 7/28/65 / 11/5/68 | 8/30/18 – Filed Section 8/9 | 11/5/27 – Window to file 8/9 opens / 11/5/28 – Window to file 8/9 closes |
| GOLD LABEL PLUS | 022 | Binder and baler twine; twine | 77/435,556 / 3,540,193 | 4/23/08 / 12/2/08 | 8/30/18 – Filed Section 8/9 | 12/2/27 – Window to file 8/9 opens / 12/2/28 – Window to file 8/9 closes |
| FEEDER'S SELECT | 031 | Bird seed | 73/764,675 / 1,560,070 | 11/21/88 / 10/10/89 | 9/12/2019 – Filed Section 8/9 | 10/10/28 – Window to file 8/9 opens / 10/10/29 – Window to file 8/9 closes |

| Trademark / Service Mark | Class | Goods / Services | Serial No. Registration No. | Date Filed Date Issued | Last Action | Next Action |
|---|---|---|---|---|---|---|
| WEAR GREEN | 031 | Grass seed mixture | 72/099,313 / 0,712,670 | 6/20/60 / 3/21/61 | 12/11/20 – Filed Section 8/9 | 3/21/30 – Window to file 8/9 opens / 3/21/31 – Window to file 8/9 closes |
| SPOT GREEN | 031 | Lawn grass seed | 74/060,379 / 1,640,717 | 5/18/90 / 4/9/91 | 04/01/2021 – Filed Sect. 8.9 | 4/9/30 – Window to file 8/9 opens / 4/9/31 – Window to file 8/9 closes |
| CARPETMAKER | 001 | Fertilizers for domestic and commercial use | 76/086,477 / 2,469,695 | 7/11/00 / 7/17/01 | 06/18/2021 – Filed Sect. 8/15 | 7/17/30 Window to file 8/9 opens / 7/17/31 – Window to file 8/9 closes |
| READY GREEN | 031 | Grass seed | 85/136,257 / 4,071,637 | 9/23/10 / 12/13/11 | 06/18/2021 – Filed Sect. 8/15 | 12/13/30 – Window to file 8/9 opens / 12/13/31 – Window to file 8/9 closes |
| SHADY GREEN | 031 | Grass seed mixtures | 73/243,701 / 1,188,858 | 12/21/79 / 2/2/82 | 12/21/21 – 8/9 Filed | 2/02/31 – Window to file 8/9 opens / 2/02/32 – Window to file 8/9 closes |
| SHADEE | 031 | Grass seed | 85/012,268 / 4,116,336 | 4/12/10 / 3/20/12 | 02/15/22 – Filed Section 8/9 | 3/20/31– Window to file 8/9 opens / 3/20/32 – Window to file 8/9 closes |
| DURA-GREEN | 031 | Grass seed | 72/073,176 / 0,730,224 | 4/23/59 / 4/24/62 | 12/21/21 – Section 8/9 filed | 4/24/31 – Window to file 8/9 opens / 4/24/32 – Window to file 8/9 closes |
| GREENLAWN | 001 | Fertilizers | 72/124,631 / 0,733,641 | 7/25/61 / 7/3/62 | 08/18/21 – Section 8/9 filed | 7/3/31 – Window to file 8/9 opens / 7/3/32 – Window to file 8/9 closes |
| **ALL MARKS BEYOND THIS POINT ARE ABANDONED** | | | | | | |

| Trademark / Service Mark | Class | Goods / Services | Serial No. Registration No. | Date Filed Date Issued | Last Action | Next Action |
|---|---|---|---|---|---|---|
| Greenlawn | 031 1(b) | Grass seed | 88/286,020 | 2/1/19 | 02/14/2022 – Filed fifth extension | 06/20/22 – client is not pursuing – ABANDONED |
| CRITTER FEAST | 031 | Foodstuffs for domestic and non-domestic animals | 76/297,584 / 2,578,415 | 8/9/01 / 6/11/02 | 06/07/21 – Client is no longer using this mark | Allow mark to be canceled 6/11/22 – Section 8/9 due |
| HI-TRACTION | 019 | Coal Tar based driveway sealer and filler | 73/814,143 / 1,622,533 | 7/24/89 / 11/13/90 | | 10/29/20 – ABANDON Per Southern States |
| GREENLAWN | 008 1(b) | Gardening tools, namely, manually operated long handled tools for working the ground | 88/403,895 | 4/26/19 | 3/6/20 – Filed first extension 10/8/19 – Received NOA | ABANDONED |
| Greenlawn | 008 1(b) | Gardening tools, namely, manually operated long handled tools for working the ground | 88,403,789 | 4/26/19 | 3/6/20 – Filed first extension 10/8/19 – Received NOA | ABANDONED |
| EASY STIR | 019 | Coal tar based driveway sealer and filler | 73/814,882 / 1,641,278 | 7/26/89 / 4/16/91 | | 3/31/21 – ABANDON Per Jay Quickel |

## SCHEDULE 1.2

## EQUIPMENT LIST

| # | QTY | AGWAY ASSET # | FIXED ASSETS DESCRIPTION PHYSICAL LOCATION: CLOVERDALE VIRGINIA DISTRIBUTION CENTER |
|---|---|---|---|
| | | | |
| | | | **MATERIAL HANDLING EQUIPMENT** |
| | | | |
| 26 | 1 | 420 | 2020, RAYMOND MDL. 560-OPC30TT ELECTRIC ORDER PICKER, ELECTRIC, 3000# CAP., SN: 560-20-A52206 |
| 27 | 1 | 520 | 2020, RAYMOND MDL. 560-OPC30TT ELECTRIC ORDER PICKER, ELECTRIC, 3000# CAP., SN: 560-20-A52215 |
| 28 | 1 | 320 | 2020, RAYMOND MDL. 560-OPC30TT ELECTRIC ORDER PICKER, ELECTRIC, 3000# CAP., SN: 560-20-A52198 |
| 34 | 1 | 120 | 2020, RAYMOND MDL. 750-DR32TT ELECTRIC REACH TRUCK, 3000# CAP., SN: 750-20-AC80505 |
| 35 | 1 | 220 | 2020, RAYMOND MDL. 8410 ELECTRIC RIDE-ON PALLET JACK, 6000# CAP., SN: 841-20-56820 |
| 76 | 1 | 819 | 2019, POWERBOSS NAUTILUS HD MDL. PB45HLP RIDE-ON FLOOR SCRUBBER/SWEEPER, LPG, SN: 19PB1389 |