# **EXHIBIT B**

**Myron Bowling APA**

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of October 4, 2022, by and between MYRON BOWLING AUCTIONEERS, INC., with an office and place of business at 3901 Kraus Lane, Hamilton, Ohio ("Buyer" and "Seller's Agent") and AGWAY FARM & HOME SUPPLY, LLC, a Delaware limited liability company ("Seller").

## RECITALS

WHEREAS, Seller filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court, District of Delaware (the "Bankruptcy Court"), Petition # 22-10602-JKS (the "Bankruptcy Case") and with Bankruptcy Court approval desires to sell to Buyer all furniture, fixtures and equipment at Seller's distribution centers located at 1796 Lee Highway, Cloverdale, Virginia 24077 (the "Cloverdale Location") and 323 Lockhouse Road, Westfield, Massachusetts (the "Westfield Location" and collectively with the Cloverdale Location, the "Premises"), wall-to-wall and floor-to-ceiling, with all related tooling packages, related items, any and all computer hardware and software and mechanisms used to operate the software associated with the equipment and miscellaneous contents of the building as further described in this Agreement BUT SPECIFICALLY EXCLUDING the High Bay Racking System at the Westfield, Massachusetts location in addition to leased equipment and any third party items at both DCs which is not owned by Seller;

WHEREAS, the sale of the Purchased Assets (defined below) will be sold on an "As Is" and "Where Is" basis, without any representations or warranties or recourse of any kind, free and clear of any and all existing liens, encumbrances and/or outstanding liabilities and subject to the overbid procedures defined below; and

WHEREAS, pursuant to 11 U.S.C. Section 363, the Seller and/or its attorneys will seek a Bankruptcy Court Order authorizing the sale of the Purchased Assets.

## 1.    Purchase and Sale.

**NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION,** the adequacy of which is hereby acknowledged by each Party, and in consideration of the mutual promises and covenants set forth below, the Parties agree as follows:

1.1    Purchased Assets. Subject to the terms and conditions herein contained and so long as all machines remain under power or as originally inspected, Seller agrees to sell, transfer, assign and deliver to Buyer, and Buyer agrees to purchase and accept from Seller on the Closing Date (as hereinafter defined), free and clear of all claims, liens, interests and encumbrances, all of Seller's right, title and interest in and to all furniture, fixtures and equipment at the Premises, wall-to-wall and floor-to-ceiling, including but not limited to the items listed in Schedule 1.1 attached hereto, with all related tooling packages, related items, any and all computer hardware and software and mechanisms used to operate the software

associated with the equipment and miscellaneous contents of the building (the "Purchased Assets"). Expressly excluded from the Purchased Assets are the items listed in Schedule 1.2, including but not limited to the High Bay Racking System at the Seller's Westfield, Massachusetts location and leased equipment and any third party items at the Premises which are not owned by Seller.

        1.2    Purchase Price.  The Seller agrees to sell, and the Buyer agrees to purchase, the Purchased Assets, on an "As Is" and "Where Is" basis, without any warranties either express or implied, in the amount of Six Hundred Fifteen Thousand Dollars ($615,000.00), or an amount as increased by successful overbid to be paid by the Buyer (provided the Buyer is the successful bidder) ("Purchase Price").  The Purchase Price shall be paid in Good Funds (defined below) as follows:

        (a)    Concurrently with the mutual execution and delivery of this Agreement, Buyer shall deposit the sum of Sixty-One Thousand Five Hundred Dollars ($61,500.00 ("Buyer's Deposit") with the Seller.  The Buyer's Deposit shall be paid in Good Funds (defined below) and made payable to Shulman Bastian Friedman & Bui LLP Client Trust Account and sent to Shulman Bastian Friedman & Bui LLP, Attn: Melissa Lowe, 100 Spectrum Center Drive, Suite 600, Irvine, CA 92618, to be held in trust pending the auction of the Purchased Assets as set forth herein.  At the Closing, Buyer's Deposit shall be credited toward payment of the Purchase Price.  For purposes of this Agreement, "Good Funds" shall mean immediately available funds in the form of cash or wire transfer of funds.

        (b)    In the event Buyer is determined to be the highest or otherwise best bid (the "Successful Bidder"), no later than one (1) day prior to the Closing Date, Buyer shall deliver the Seller, in Good Funds, the Purchase Price less Buyer's Deposit.

        1.3    Allocation of Purchase Price.  The Purchase Price is allocated as follows: $307,500.00 is attributable to the Purchased Assets located at the Cloverdale Location and $307,500.00 is attributable to the Purchased Assets located at the Westfield Location.

        1.4    Auction of Purchased Assets and Remnant Inventory.

        (a)    On October 12, 2022, Seller will conduct an auction of the Purchased Assets pursuant to the Bidding Procedures attached hereto as Exhibit B.

        (b)    Buyer will act as Seller's Agent to conduct a commercially reasonable sale of Seller's "Remnant Inventory" located at the Premises sometime after November 15, 2022 (the "Sale") which includes collecting all sales tax, resale licenses and Bills of Lading and remittance to the appropriate taxing agencies. For avoidance of doubt, the Florida Hardware Inventory is not part of the Remnant Inventory. The Florida Hardware Inventory is defined as the inventory being sold to Florida Hardware, LLC ("Florida Hardware") as the Stalking Horse Bidder (or successful overbidder) pursuant to the Asset Purchase and Sale Agreement between Seller and Florida Hardware dated August 31, 2022.  Seller's Agent will charge Seller no

commission or expenses related to the Remnant Inventory sale, but will charge and retain an 18% Buyer's Premium collected from buyers on top of the sale price. Buyer acknowledges that Seller has already started picking, packing and staging the Florida Hardware Inventory for delivery and that Florida Hardware has 21 days from the closing date of its sale to remove the Florida Hardware Inventory from the Premises, which is estimated to conclude on or before November 7, 2022 (21 days from October 17, 2022).

(c)      Buyer is responsible for discarding unsold Purchased Assets and Remnant Inventory in dumpsters that will be provided by Seller. Seller is responsible for providing pallets and shrink wrap for the Remnant Inventory; provided, however, that Buyer shall not be required to sell or remove any Purchased Assets or supplies identified as hazardous materials, including but not limited to paints, chemicals, oils, etc., believed to contain hazardous material.

(d)      Buyer shall be granted access to and use of the Premises up to and including January 30, 2023 or for a period of seventy (70) calendar days following entry of an order by the Bankruptcy Court approving the employment of Buyer as auctioneer, whichever occurs last, including all utilities and dumpsters for trash, including any additional dumpsters for unsold Remnant Inventory, in which to prepare for and hold the Sale and for post-Sale activities. Buyer acknowledges and agrees that Seller and its employees will have access to the Premises concurrently with Buyer and have exclusive use at no cost to Seller to sufficient forklift trucks to complete the pick, pack and loading of the Florida Hardware Inventory sale onto delivery trucks until completed, which is scheduled to end on or before November 7, 2022. Buyer agrees that to the extent that the employee(s) of the Seller agree to stay beyond the November 7, 2022 scheduled end date for the removal of the Florida Hardware Inventory through November 30, 2022, the chain of command would be from Buyer's management directly to the DC Manager (Bob at Westfield & Julie at Cloverdale). Moreover, the scope of services for the Seller's employees would be limited to the movement and shrink wrapping of the Remnant Inventory to assist Buyer with staging the Remnant Inventory for auction.

(e)      Seller is responsible for draining and capping the sprinkler system at the Premises, and Buyer is responsible for removal.

(f)      Buyer shall handle pre-Sale inquiries from prospective Sale buyers, supervise on-site inspections prior to the Sale and supervise post-Sale activities, including:

> 1. Cutting pallet racking floor bolts level with the floor,
> 2. Making sure that all power disconnect to machines are properly taped off and the electrical power is shut off at the main power panel,
> 3. The building is left in broom clean condition,
> 4. Hazardous liquids, material, etc., is palletized and staged in one central location to be designated by Seller, and
> 5. Buyer will coordinate with Seller to provide sufficient advanced notice to order Dumpsters.

1.5     Free and Clear.  Except with respect to obligations and liabilities relating to and arising on and after the Closing, Buyer is not assuming any liability, debt or obligations of Seller attributable to the Purchased Assets prior to Closing, and Buyer shall have no obligation or responsibility therefor.  As of the Closing, the Seller will have good and valid title to the Purchased Assets and all of the Purchased Assets being sold hereunder shall be sold and assigned by Seller to Buyer free and clear of all liens and interests, in accordance with 11 U.S.C. § 363(f).

## 2.     Closing; Deliveries at the Closing.

2.1     Closing.   The closing of the purchase and sale of the Purchased Assets as contemplated by this Agreement (referred to throughout this Agreement as the "Closing") shall take place at the offices of Morris James LLP, located at 500 Delaware Avenue, Suite 1500, Wilmington, Delaware.  The Closing shall be held within three (3) business days after the Bankruptcy Court enters an order approving the sale of the Purchased Assets unless otherwise approved by Seller (referred to throughout this Agreement as the "Closing Date").

2.2     Deliveries at the Closing.

(a)     Deliveries by Buyer.  At least one (1) business day prior to the Closing Date, Buyer shall deliver, or cause to be delivered to Seller in Good Funds, the Purchase Price less Buyer's Deposit.

(b)     Deliveries by Seller.   At Closing, Seller shall deliver to Buyer the following: (1) an original Bill of Sale substantially in the form attached hereto as Exhibit A, executed by the Seller dated as of the Closing Date; and (2) such additional documentation as Buyer may reasonably request to consummate the transaction.

## 3.     Bankruptcy Covenants.

3.1     Entry of Sale Approval Order.   Buyer acknowledges and agrees that this Agreement is subject to the approval of the Bankruptcy Court (the "Sale Approval Order").  In the event that Seller accepts this Agreement, the Parties will in good faith exercise all reasonable efforts required to obtain the entry of the Sale Approval Order, including executing and delivering any motions, declarations or other items of support reasonably required in connection therewith.  The Sale Approval Order shall be acceptable to Buyer in all material respects and shall authorize and approve the sale of the Purchased Assets to the Buyer free and clear of all liens, claims and encumbrances pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, on the terms and conditions contained in this Agreement.

3.2     Sale Subject to Overbid.  In order to obtain the highest and best offer for the Purchased Assets, the sale of the Purchased Assets shall be subject to the bidding procedures ("Bidding Procedures"), to be approved pursuant to a Bankruptcy Court order approving the Bidding Procedures in substantially the same form as attached hereto as Exhibit B.  In the event that Buyer is not the Successful Bidder with respect to the Purchased Assets located at just one

of the Westfield Location or the Cloverdale Location, but not both, Buyer shall not be responsible for auctioning the Remnant Inventory located at the location for which Buyer is not the Successful Bidder.

3.4    <u>Subject to Bankruptcy Court Approval</u>.    In the event Buyer is the Successful Bidder, Seller shall use its best efforts to cause the Bankruptcy Court to enter the Sale Approval Order.    The Agreement is expressly contingent upon the Seller obtaining Bankruptcy Court approval of the sale of the Purchased Assets with a finding that Buyer is in good faith pursuant to Bankruptcy Code section 363(m). The Seller makes no warranties, either express or implied, as to its ability to obtain approval of the Bankruptcy Court and entry of a Sale Approval Order, and in the event that the Seller is unable to obtain said approval and Sale Approval Order, Buyer and its officers, directors, shareholders, agents, successors and assigns shall hold Seller and its attorneys and agents harmless from any and all damages which Buyer may allege he has suffered as a result therefrom. Buyer's Deposit shall be immediately refunded in the event such approval is not obtained.

3.5    <u>Break-up Fee</u>.    Buyer shall act as the stalking horse bidder in connection with the auction of the Purchased Assets (the "<u>Stalking Horse Bidder</u>").    Conditioned upon, and subject to Bankruptcy Court approval, in the event all of the Purchased Assets are sold to a Successful Bidder other than the Buyer, Buyer shall be entitled to a breakup fee of three percent (3%) of the Purchase Price, or $18,450.00 (the "<u>Break-Up Fee</u>"). The Break-Up Fee and refund of Buyer's Deposit shall be paid to Buyer within two (2) business days of the date of closing the transaction with the Successful Bidder other than the Buyer.

**4.    <u>Representations and Warranties of Seller</u>.**    Seller hereby represents and warrants to Buyer that the following are true and correct as of the date hereof and will be true as of the Closing (except as otherwise specifically and expressly permitted under this Agreement).

4.1    <u>Authorization</u>.    Subject to the Bankruptcy Court approval of this Agreement and all other documents to be executed by Seller and delivered to Buyer prior to or at the Closing, Seller has full power and authority to enter into this Agreement and has duly authorized, executed and delivered the same. The Agreement, when executed and delivered by Seller, will constitute valid and legally binding obligations of Seller, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

4.2    <u>No Proceedings</u>.    There are no pending or threatened actions, suits, proceedings, claims, investigations, applications or complaints (whether or not purportedly on behalf of the Seller) against or affecting the Seller, which in any way relate to or involve or could adversely affect the Purchased Assets, in law or in equity, which could affect the validity of this Agreement, the title to the Purchased Assets, the value of the Purchased Assets or the conveyance of any of the Purchased Assets to the Buyer of which Seller is aware. The Seller is not aware of any restrictions related to the sale of the Purchased Assets and owns or has valid

rights to use all of the intellectual property necessary, or used by it in the ownership and sale of the Purchased Assets.

**5.     Representations and Warranties of the Buyer.** Buyer hereby represents and warrants to Seller that:

5.1     Authorization. Buyer has full power and authority to enter into this Agreement and has duly authorized, executed and delivered the same. The Agreement, when executed and delivered by Buyer, will constitute valid and legally binding obligations of the Buyer, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

5.2     Waiver of Contingencies. Buyer's due diligence has been completed prior to Buyer's execution of this Agreement, and Buyer hereby waives any and all contingencies to consummation of the transactions contemplated herein, including, without limitation, all due diligence and financing contingencies.

5.3     Payment of Taxes. Any transfer, documentary, sales, use, stamp, registration, and other such taxes, and all conveyance fees, recording charges, and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, the "Transfer Taxes") shall be borne by Buyer. Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Assets from any Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code. Buyer will provide Seller with a copy of its Certificate of Resale License Number. Buyer will, at its own expense, file all necessary tax returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Parties will join in the execution of any such tax returns and other documentation.

5.4     Insurance. Buyer maintains and will continue to maintain liability insurance in the amount of Two Million Dollars ($2,000,000.00). Buyer will provide Seller with proof of insurance and will name Seller and landlord as additionally insured. Seller represents and warrants that it maintains and will continue to maintain property coverage on the Purchased Assets until the Purchase Price has been paid in full.

5.5     As Is-Where Is.

(a)     IT IS UNDERSTOOD AND AGREED THAT SELLER (INCLUDING ANY OF SELLER'S PROFESSIONALS) IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OR REPRESENTATIONS AS TO: (I) MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; (II) THE EXISTENCE, VALIDITY OR COMPLETENESS OF

ANY OF THE PURCHASED ASSETS; OR (III) OPERATING HISTORY OR PROJECTIONS, VALUATION, RECOVERIES, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PURCHASED ASSETS WITH GOVERNMENTAL OR OTHER APPLICABLE LAWS, THE TRUTH, ACCURACY, OR COMPLETENESS OF ANY DOCUMENT RELATED TO THE PURCHASED ASSETS, OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE PURCHASED ASSETS. NONE OF DOCUMENTS OR MATERIALS PROVIDED TO BUYER IN CONNECTION WITH THE SALE TRANSACTION CONSTITUTE AN OPINION WITH RESPECT TO THE NATURE, EXTENT, OR VALIDITY OF ANY OF THE PURCHASED ASSETS.

(b)    BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE PURCHASED ASSETS **"AS IS, WHERE IS, WITH ALL FAULTS**." BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATION OR INFORMATION PERTAINING TO THE PURCHASED ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE PURCHASED ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS."

BUYER ACKNOWLEDGES TO SELLER THAT BUYER HAD AN OPPORTUNITY PRIOR TO EXECUTING THIS AGREEMENT TO CONDUCT SUCH DUE DILIGENCE, INSPECTIONS AND INVESTIGATIONS OF THE PURCHAED ASSETS AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE PURCHASED ASSETS AND ITS ACQUISITION THEREOF, AND THAT BUYER DID NOT RELY ON ANY OF SELLER'S OR ANY OF HER PROFESSIONALS' WRITTEN OR ORAL STATEMENTS, REPRESENTATIONS, PROMISES, WARRANTIES, OR GUARANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, REGARDING THE PURCHASED ASSETS, THE DEBTOR'S BUSINESS OR THE COMPLETENESS OF ANY INFORMATION PROVIDED IN CONNECTION THEREWITH. BUYER HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS, AND SELLER AND ITS PROFESSIONALS SHALL HAVE NO LIABILITY WHATSOEVER TO BUYER, ITS RELATED ENTITIES OR ANY OTHER PARTY FOR CLAIMS ARISING FROM, OR RELATED TO, THE DUE DILIGENCE DOCUMENTS AND MATERIALS PROVIDED.

**6.**    **Conditions to Buyer's Obligation to Close.** The obligations of Buyer to Seller under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

6.1    Representations and Warranties.  The limited representations and warranties of Seller contained in Section 4 above, shall be true and correct on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

6.2    Performance.    All covenants, agreements and conditions contained in this Agreement to be performed by Seller on or prior to the Closing shall have been performed or complied with in all material respects.

6.3    Bankruptcy Court Matters.  The Bankruptcy Court shall have entered the Sale Approval Order, and the Sale Approval Order shall not have been vacated, stayed, reversed, or modified, amended, or supplemented in any manner.

6.4    Access.  The Seller shall provide the Buyer and its representatives keys and alarm codes to the Premises for use to conduct the sale of the Purchased Assets together with the public sale of the Remnant Inventory, acting as Seller's Agent where the Purchased Assets and Remnant Inventory are located.  Seller shall do all things necessary, proper, or advisable to ensure access to such locations, including payment of all rents and other amounts necessary to allow Buyer access necessary to sell and remove the Purchased Assets and Remnant Inventory, up to and including January 30, 2022.  In the event Seller has not fully vacated from the Premises by January 31, 2022, Seller shall be responsible for the payment of rent pursuant to the leases for the Premises.  As consideration for access to the Premises, Buyer agrees to pay to Seller by no later than December 15, 2022, the sum of $30,000.00 toward the rent for the Premises.

**7.    Conditions to the Obligations of Seller.**  The obligations of Seller to Buyer under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

7.1    Representations and Warranties.  The representations and warranties of Buyer contained in Section 5 shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

7.2    Performance.    All covenants, agreements and conditions contained in this Agreement to be performed by Buyer on or prior to the Closing shall have been performed or complied with in all material respects.

7.3    Bankruptcy Court Matters.  The Bankruptcy Court shall have entered the Sale Approval Order, and the Sale Approval Order shall not have been vacated, stayed, reversed, or modified, amended, or supplemented in any manner.

7.4    Payment of Purchase Price.  Buyer shall deliver the Purchase Price in Good Funds as set forth in Section 1.2 of this Agreement.

8.    **Termination.**

8.1    <u>Termination Events</u>.    Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)    by either Seller or Buyer:

(i)    by mutual written consent of Sellers and Buyer;

(ii)    if the Closing shall not have occurred by the close of business on December 31, 2022 (the "<u>Outside Date</u>"); however, Buyer shall still have access to and use of the Premises until January 30, 2023 or for a period of seventy (70) calendar days following Closing, whichever occurs last, in the event the Closing takes place later than as described in Section 2.1, or

(iii)    if the Bankruptcy Court enters an order dismissing, or converting into a case under chapter 7 of the Bankruptcy Code, the Bankruptcy Case and such order is final;

(b)    by Buyer:

(i)    in the event of any material breach by Seller of any of Seller's agreements, covenants, representations, or warranties contained herein, and the failure of a Seller to cure such breach before the earlier of: (A) the Outside Date, or (B) five (5) days after receipt of the Buyer Termination Notice (as defined hereinbelow); provided, however, that (I) Buyer is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (II) Buyer notifies Sellers in writing (the "<u>Buyer Termination Notice</u>") of its intention to exercise its rights under this Section 8.1(b) as a result of the breach, and (III) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant, or agreement contained herein of which a Seller is allegedly in breach and a description of the specific factual circumstances to support the allegation; or

(ii)    if Buyer is not the Successful Bidder or the Back-Up Bidder;

(c)    by Seller:

(i)    in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein, and the failure of Buyer to cure such breach before the earlier of: (A) the Outside Date, or (B) five (5) days after receipt of the Seller Termination Notice (as defined hereinbelow); provided, however, that Seller (I) is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (II) notify Buyer in writing (the "<u>Seller Termination Notice</u>") of its intention to exercise its rights under this Section 8.1(c) as a result of the breach, and (III) specify in the Seller Termination Notice the representation, warranty, covenant, or agreement contained herein of which Buyer is allegedly in breach and a description of the specific factual circumstances to support the allegation; or

(ii)    if Buyer is not the Successful Bidder or the Back-Up Bidder.

8.2    Effect of Termination.

(a)    Except as provided below in Section 8.2(b), in the event of termination of this Agreement by Buyer or Seller pursuant to this Section 8, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party; provided, however, that nothing herein shall relieve any Party from liability for breach of this Agreement prior to such termination.  The provisions of this Section 8.2 shall expressly survive the termination of this Agreement.

(b)    The Deposit shall be paid to Buyer (except where termination is a result of a material breach by Buyer pursuant to Section 8.1(b)(ii) or the Closing fails to occur as per Section 8.1(a)(2)).

(c)    Each Party acknowledges that (i) the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement, (ii) without these agreements such Party would not have entered into this Agreement, and (iii) such agreements shall survive the Closing.

8.3    Force Majeure.

If by reason of acts of God, winds, fires, epidemics, pandemics, landslides, floods, droughts, famines, acts of public enemies, acts or orders or any kind of any governmental authority, insurrection, military action, war (whether or not declared), sabotage, riots, civil disturbances, terrorist acts, explosions or other similar disasters or catastrophes (each, a "force majeure event"), Buyer is unable in whole or in part to carry out the duties and obligations on its part herein contained, Buyer shall promptly notify the contracting party of such event, and Buyer shall not be deemed to be in default during the continuance of such inability.  Buyer shall, however, promptly use its best efforts and in good faith to remedy with all commercial reasonable diligence the cause or causes preventing it from carrying out its duties and obligations hereunder.  If a force majeure event remains un-remediated or if Buyer is unable to recommence performance of the services pursuant to its agreement within thirty (30) days of any force majeure event, Buyer upon giving written notice may terminate this agreement.

9.    **Miscellaneous**.

9.1    Time Is of The Essence.  Seller and Buyer acknowledge and agree that TIME IS OF THE ESSENCE with respect to each and every term, condition, obligation, and provision hereof and that failure to timely perform any of the terms, conditions, obligations, or provisions hereof by either party shall constitute a material breach of the Agreement by the party so failing to perform.

9.2    <u>Waiver</u>.  Buyer hereby acknowledges and waives any and all claims, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment and legal fees against Seller of every kind and nature and interests in the Purchased Assets being sold to Buyer pursuant to this Agreement; and the Purchase Price shall not be subject to any offset, decrease, reductions, deductions, or counterclaim of any kind or nature whatsoever.

9.3    <u>Additional Agreements; Reasonable Efforts</u>.  Subject to the terms and conditions of this Agreement, the Parties agree to use all commercially reasonable efforts to take, or cause to be taken, action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including cooperating fully with the other Party and providing to the other Party any information reasonably required.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, the Parties shall take all such necessary action.

9.4    <u>Expenses</u>.  Except as set forth to the contrary in this Agreement, each of the Parties hereto shall be responsible for its own fees and expenses, including, but not limited to, fees and expenses with respect to the engagement of outside accountants and attorneys, incurred by it in connection with this Agreement and the transactions contemplated with respect to this Agreement.

9.5    <u>Entire Agreement; Amendments</u>.  This Agreement, and the documents referred to herein constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and any and all other written or oral agreements relating to the subject matter hereof existing between the parties hereto are expressly canceled.

9.6    <u>Effect of Headings</u>:  The titles and headings of this Agreement are for convenience and identification only, and shall not be deemed to limit, amplify, or define the contents of the respective sections or paragraphs to which they pertain.

9.7    <u>Counterparts</u>.  This Agreement may be executed in one or more Counter-parts (multiple signatures) each of which shall be deemed an original, and all of which constitute one and the same instrument.

9.8    <u>Invalidity</u>.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, by held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement or any other such instrument.

9.9    <u>Attorneys' Fees</u>.  If any legal action is brought for the enforcement of this Agreement or because of any alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, each party shall bear their own legal costs and

expenses, and the prevailing party shall not be entitled to an award of its fees from the other party.

9.10    Governing Law.    This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of Delaware shall govern, without giving effect to principles of conflicts of law.

9.11    Jurisdiction of the Bankruptcy Court.    Any and all disputes which involve in any manner the Estate or the Seller, arising from the Agreement or relating in any manner to the Purchased Assets, shall be resolved only in the United States Bankruptcy Court, District of Delaware.

9.12    Knowing and Voluntary Agreement.    Each Party hereto acknowledges that it has entered into this Agreement knowingly and voluntarily of its own free will and under no duress of any nature.

9.13    Survival of Warranties.    Unless otherwise set forth in this Agreement, the warranties, representations and covenants of Seller and Buyer contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing.

9.14    Assignment.    This Agreement is not assignable without the written consent of Seller.

9.15    Amendments and Waivers.    Any term of this Agreement may be amended or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the parties hereto.

9.16    Notice. Any notice to be given hereunder shall be given in writing and delivered personally or by registered or certified mail, postage prepaid as follows:

> IF TO BUYER, ADDRESS TO:
>     Christopher Lee
>     Myron Bowling Auctioneers, Inc.
>     3901 Kraus Lane
>     Hamilton, Ohio  45014
>
>
> IF TO SELLER, ADDRESS TO:
>
>     Jay Quickel
>     Agway Farm & Home Supply, Inc.
>     c/o Charles Klaus
>     ABC Services Group, Inc.

13681 Newport Avenue, #8-609
Tustin, CA  92780

9.17    Brokers.  Buyer represents and warrants to Seller that it dealt with no broker in connection with, nor has any broker had any part in bringing about, this transaction.  Buyer shall indemnify, defend, and hold harmless the Seller from and against any claim of any broker, or any other person for any brokerage commissions, finder's fees, or other compensation in connection with this transaction if such claim is based in whole or in part by, through or on account of, any acts of Buyer or its agents, employees, or representatives and from all losses, liabilities, costs, and expenses in connection with such claim, including without limitation, reasonable attorneys' fees, court costs, and interest. The provisions of this Section shall survive the Closing, or the termination of this Agreement prior to the Closing.

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be executed on its behalf by its officer thereunto duly authorized, all on or as of the day and year first above written.

**SELLER:**

Dated: October _5_, 2022

Agway Farm & Home Supply, LLC
By: Jay Quickel
Its: President and CEO

**BUYER:**

Dated: October _5_, 2022

Myron Bowling Auctioneers, Inc., an Ohio corporation, by MBA Acquisitions, LLC, on Ohio limited liability company, sole shareholder
By: _Christopher Lee_
Its: Authorized Member

**Schedule 1.1**

**Schedule 1.2**

## EXHIBIT A

## FORM OF BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale"), dated as of [_____], 2022, is entered into between by and between Myron Bowling Auctioneers, Inc. ("Buyer") and Agway Farm & Home Supply, LLC, a Delaware limited liability company ("Seller").

For good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, Seller does give, grant, bargain, sell, transfer, assign, convey and deliver to Buyer, all of the equipment and machinery listed in Schedule 1.1 to the Asset Purchase and Sale Agreement dated as of _____, 2022 between, inter alia, Seller and Buyer.

Seller hereby covenants that it will, upon reasonable written request therefor and at Buyer's sole cost and expense, execute and deliver such other documents; and do such other acts and things, all as Buyer, its nominees, successors and/or assigns may reasonably request in order to fully assign and transfer to and vest in Buyer, its nominees, successors and/or assigns, and protect its or their rights, title and interest in and enjoyment of, all of the assets of such Seller intended to be transferred and assigned hereby.

All references to "Seller" and "Buyer" herein shall be deemed to include their respective designees, nominees, successors and/or assigns, where the context permits.

This Bill of Sale is governed by the laws of the State of Delaware without regard to its conflicts of law principles that would cause the application of the laws of another jurisdiction.

**IN WITNESS WHEREOF,** the parties hereto have executed this Bill of Sale as of the date first written above.

**SELLER**:

By: _____
Name:  Jay Quickel
Title:  President and CEO

**BUYER:**

Myron Bowling Auctioneers, Inc., an Ohio
corporation, by MBA Acquisitions, LLC, on Ohio
limited liability company, sole shareholder

By: _____

Name:_____

Title:_____

# EXHIBIT B

# BIDDING PROCEDURES

## BIDDING PROCEDURES

## Access to Diligence Materials

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), an entity (as defined in the Bankruptcy Code) must submit to the Debtor an executed confidentiality agreement in the form and substance satisfactory to the Debtor.

An entity who qualifies for access to Diligence Materials shall be a "Preliminary Interested Bidder." All requests for Diligence Materials must be directed to the Debtor.

Before receiving any Diligence Materials, any Preliminary Interested Bidder must disclose whether it is a competitor of the Debtor or is affiliated with any competitor of the Debtor. For any Preliminary Interested Bidder who is a competitor of the Debtor or is affiliated with any competitor of the Debtor, the Debtor reserves the right, following consultation with the Consultation Parties, to withhold any Diligence Materials that the Debtor determines are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Bidder at such time.

The Debtor shall provide the Stalking Horse Bidder with access to all written Diligence Materials, on-site inspections, and other information provided to any Preliminary Interested Bidder that were not previously made available to the Stalking Horse Bidder as soon as reasonably practicable after the date the Debtor made such information available to any Preliminary Interested Bidder; provided, however, that this requirement shall be deemed satisfied by the Debtor if such information is posted to the data room established by the Debtor. Neither the Debtor nor any of its representatives will be obligated to furnish any information relating to the Purchased Assets to any entity other than to the Stalking Horse Bidder and Preliminary Interested Bidders. The Debtor makes no representations or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the Agreement or in any other definitive agreement the Debtor execute with a Successful Bidder (as defined herein).

## Bid Qualification Process

To be eligible to participate in the Auction (as defined herein), each offer, solicitation, or proposal (each, a "Bid"), and each entity submitting such a Bid (each, a "Bidder"), must be determined by the Debtor, in consultation with the Consultation Parties, to satisfy each of the following conditions (other than the Bid of the Stalking Horse Bidder):

(a)    Form: The Bid must: (i) be in writing; (ii) disclose the identity of each entity that will be bidding for the assets or otherwise participating in connection with such Bid (provided, however, that if the entity that is the Bidder is a special purpose vehicle or other entity without existing operations (as determined by the

Debtor, in consultation with the Consultation Parties) the Bid must disclose the identity or identities of each ultimate owner or participant in the entity that is the Bidder); (iii) be in the form of a duly authorized, executed, and non-contingent purchase agreement, together with all schedules, exhibits, and related documents thereto; (iv) include clearly marked versions of the Bid against the Agreement and the proposed Sale Order showing all changes requested by the Bidder; and (v) identify what assets are included in the overbid.

(b)     Good Faith Deposit: The Bid must be accompanied by a cash deposit in an amount equal to $61,500.00 to an interest-bearing segregated account to be identified and established by the Debtor (the "Good Faith Deposit").

(c)     Same or Better Terms: The Bid must be on terms and conditions that are substantially the same as or better than, not more burdensome in any material way than, and no more conditional than the terms of the Agreement, as determined by the Debtor, in consultation with the Consultation Parties, including but not limited to the terms set forth in Paragraph 1.4 of the Agreement regarding the auction of the Remnant Inventory.  The Bid may not contain additional termination rights, covenants, financing or due diligence contingencies, or closing conditions, other than as may be included in the Agreement (it being agreed and understood that such Bid shall modify the Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Stalking Horse Bidder as the stalking horse bidder).

(d)     Corporate Authority:  The Bid must include written evidence reasonably acceptable to the Debtor, in consultation with the Consultation Parties, demonstrating that the Bidder has full power and authority (including full corporate or other organizational power and authority) to consummate the proposed transaction contemplated by the Bid.

(e)     Proof of Financial Ability to Perform:  To the extent that the Bid is not accompanied by evidence of the Bidder's capacity to consummate the transaction contemplated by the Bid with unrestricted and fully available cash, the Bid must include written evidence of a firm, irrevocable commitment for financing or other evidence of ability to consummate the proposed transaction, documented to the satisfaction of the Debtor, in consultation with the Consultation Parties, by the submission of recent financial documentation (audited, if available), that will allow the Debtor (in consultation with the Consultation Parties) to make a reasonable determination as to the financial and other capabilities of the Bidder to consummate the transaction contemplated by the Bid.

(f)     Contingencies:   The Bid may not be conditioned upon obtaining financing, obtaining any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(g)    Irrevocable:  The Bid must be irrevocable through the Auction; provided, however, that if such Bid is accepted as the Successful Bid or a Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures until two (2) days after closing of the sale.

(h)    Bid Deadline.  Regardless of when an entity qualifies as a Preliminary Interested Bidder, the following entities must receive a Bid in writing, transmitted via email (in .pdf or similar format) so as to be received no later than 5:00 p.m. (prevailing Eastern time), on or before October 10, 2022 (the "Bid Deadline"): (i) the Debtor, jay.quickel@agway.com; (ii) counsel to the Debtor, Shulman Bastian Friedman & Bui LLP, Attn: Alan J. Friedman, afriedman@shulmanbastian.com, Melissa Lowe, mlowe@shulmanbastian.com, and Max Casal, mcasal@shulmanbastian.com and Morris James LLP, Attn: Jeffrey R. Waxman jwaxman@morrisjames.com and Brya Keilson bkeilson@morrisjames.com; (iii) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, Attn: Robert Feinstein, rfeinstein@pszjlaw.com, Bradford J. Sandler, bsandler@pszjlaw.com, and Paul J. Labov, plabov@pszjlaw.com; and (iv) the Stalking Horse Bidder, deanna@myronbowling.com.

(i)    Amount of Bid.  Each Bid must clearly show the amount of the purchase price.

If a Bid is for the entirety of the Purchased Assets, the Bid must include a cash purchase price that is (i) the consideration set forth in the Agreement in the amount of $615,000 plus (ii) the Stalking Horse Bidder's Break-up Fee of $18,450.00 plus (iii) overbid of $15,000, unless the overbidder can vacate the Premises on or before December 30, 2022, in which case the overbid shall be in the amount of $478,450 ($615,000 less saved rent in January 2023 of $170,000 plus Break-up Fee of $18,450 plus overbid of $15,000).

If a Bid is for the Purchased Assets located at either the Cloverdale Location only or the Westfield Location only, the Bid must include a cash purchase price that is (i) the consideration set forth in the Agreement in the amount of $307,500 plus (ii) overbid of $7,500 unless the overbidder can vacate the Premises on or before December 30, 2022, in which case the overbid shall be in the amount of $215,000 ($307,500 less saved rent in January 2023 of $100,000 plus overbid of $7,500).

(j)    Affirmative Statement.  Each Bid shall be accompanied by an affirmative statement that: (i) all Bidders submitting such Bid have acted in good faith consistent with section 363(m) of the Bankruptcy Code; (ii) all Bidders submitting such Bid have and will continue to comply with the Bidding

Procedures; and (iii) the Bid does not entitle such Bidder (other than the Stalking Horse Bidder) to, and such Bidder disclaims any right to, any expense reimbursement or break-up, termination, or similar fee or payment, and (iv) all Bidders submitting such Bid waive any substantial contribution (administrative expense) claims under section 503(b) of the Bankruptcy Code related to the bidding for the Debtor's assets or otherwise participating the Auction.

(k)    <u>Consent to Jurisdiction as Condition to Bidding</u>. All entities that participate in the bidding process of the Auction (as defined herein) shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware with respect to all matters related to the terms and conditions of the transfer of Purchased Assets, the Auction, and any transaction contemplated by the Bidding Procedures Order.

(l)    <u>Covenant Against Anti-Competitive Behavior</u>.    Each Bid shall be accompanied by a written covenant by the Bidder agreeing not to, without permission from the Debtor, affirmatively contact any of the Debtor's employees, contractors, vendors, or material customers from the date of such Bid until the Auction.  If the Bidder defaults with respect to the foregoing covenant, the Bid may be deemed by the Debtor, in its reasonable business judgment, in consultation with the Consultation Parties, to not be a Qualified Bid.

(m)    <u>Acknowledgement and Representation</u>. Each Bid shall include an acknowledgement and representation (i) that the Bidder has had an opportunity to conduct all due diligence regarding the Debtor's assets prior to submitting its bid and that it has relied solely upon its own independent review, investigation, and inspection of any documents and assets in making its Bid, and (ii) confirms the Bidder's completion of all due diligence required by such Bidder and does not include any due diligence contingencies as further defined in paragraph (g) herein.

The Debtor will review each Bid received from a Bidder to determine, in conjunction with the Consultation Parties, whether it meets the requirements set forth herein and in the Bidding Procedures Order.  A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "<u>Qualified Bid</u>," and such Bidder shall constitute a "<u>Qualified Bidder</u>."  The Debtor shall inform Bidders whether or not their Bids have been designated as Qualified Bids by the Debtor shall attempt to inform Bidders within twenty-four (24) hours after such Bids are received to either address any questions with respect to the Bid, if there are any, or to confirm that such Bid has been deemed a Qualified Bid.  Notwithstanding anything herein to the contrary, upon payment of the deposit by the Stalking Horse Bidder, (a) the Agreement submitted by the Stalking Horse Bidder shall be deemed a Qualified Bid, and (b) the Stalking Horse Bidder is a Qualified Bidder.

All entities that participate in the bidding process or the Auction (as defined herein) shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of the Court with respect to all matters related to the terms and conditions of the transfer of the Debtor's assets, the Auction, and any transaction contemplated by the Bidding Procedures Order.

## Auction

If one or more Qualified Bids (other than the Agreement submitted by the Stalking Horse Bidder) is received by the Bid Deadline, the Debtor will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid. If no Qualified Bid (other than the Agreement) is received by the Bid Deadline, no Auction shall be conducted and the Agreement shall be deemed to be the Successful Bid, the Stalking Horse Bidder shall be deemed to be the Successful Bidder, and the Debtor will seek approval of the Agreement and the Stalking Horse Bid at the Sale Hearing. All creditors and Qualified Bidders may attend the auction, however only Qualified Bidders may participate in the Auction. Immediately prior to the Auction, the Debtor shall provide copies of all Qualified Bids to all Qualified Bidders, including the Stalking Horse Bidder, at the same time.

The Auction shall take place on October 12, 2022 at 10:00 a.m. (prevailing Eastern time), at the offices of Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, DE, or such other place and time as set by the Debtor, in consultation with the Consultation Parties, after providing notice to all proposed attendees. All parties other than Debtor's local counsel may attend the Auction via Zoom video conference pursuant to instructions to be provided no later than twenty-four (24) hours prior to the Auction.

    (a)    <u>The Debtor Shall Conduct the Auction</u>. The Debtor shall direct and preside over the Auction in consultation with the Consultation Parties, and the Auction shall be recorded stenographically. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or sale of the Debtor's assets.

    1)    Only Qualified Bidders will be entitled to make any Bids at the Auction.

    2)    Prior to the Auction, the Debtor will share with all Qualified Bidders, the highest or otherwise best Qualified Bid received by the Bid Deadline (the "Baseline Bid"). All Qualified Bidders will have the right to make additional modifications to their Qualified Bid or Agreement, consistent with the Bidding Procedures, as applicable, at the Auction.

    (b)    <u>Terms of Overbids</u>. An "Overbid" is any Bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid that satisfies each of the following:

    *(i)* <u>Minimum Overbid Increment</u>. Any Overbid after the Baseline

Bid shall be made in increments valued at not less than $5,000; provided, however, the Debtor, in consultation with the Consultation Parties, may modify the Minimum Overbid Increment any time before or during the Auction.  Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or noncash consideration.  The value of any noncash consideration shall be determined by the Debtors in their reasonable business judgment (in consultation with the Consultation Parties).

*(ii)* Remaining Terms Are the Same as for Qualified Bids.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth herein; provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtor accepts a higher Overbid.

Notwithstanding the foregoing, the Debtor, in consultation with the Consultation Parties, shall have the right to (i) negotiate with any of the Qualified Bidders participating in the Auction; (ii) increase or decrease the bidding increments throughout the Auction; (iii) conduct the Auction in a format which maximizes the value of the Assets, which may include an open cry auction, one or more rounds of sealed bidding, or any combination of the foregoing and/or other means; (iv) reject a Bid; (v) request additional information of any Bidder necessary to clarify a Bid or determine the highest or best offer; and (vi) modify these Bidding Procedures as the Debtor, in consultation with the Consultation Parties, deems necessary in its reasonable business judgment.

(c)    Successful Bidder.    The Auction shall continue until the Debtor determines in its discretion (and in consultation with the Consultation Parties) that there is a highest or otherwise best Qualified Bid at the Auction (a "Successful Bid," and each Bidder submitting such Successful Bid, a "Successful Bidder"). The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, as determined by the Debtor, to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid.

(d)    Backup Bidder.    Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the entity with the second highest or otherwise best Qualified Bid at the Auction, as determined by the Debtor, in the exercise of its business judgment, will be designated as the backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or, if the Backup Bidder submitted one or more Overbids at the Auction, its final

Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the closing of the transaction with the Successful Bidder, subject to the Stalking Horse bidder's rights under the Agreement.  Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction), the Debtor shall proceed to consummate the Backup Bid with the Backup Bidder.  A hearing to authorize a sale to the Backup Bidder will be held before the Court on no less than five (5) days' notice, with objections due at least one (1) day prior to such hearing (the "<u>Backup Sale Hearing</u>").  For the avoidance of doubt, the scope of such hearing shall be limited to issues relating to the identity of the Backup Bidder.

(e)     <u>Closing the Auction</u>.  Within twenty-four (24) hours following the conclusion of the Auction, the Debtor shall file a notice on the Court's docket identifying (with specificity) the Successful Bidder for the Purchased Assets and any applicable Backup Bidder.  Subject to the fiduciary duties of the Debtor or its management or board of directors, attorneys, financial advisors or other professionals, or the Committee, its counsel and its financial advisors, the Debtor shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

## Sale Hearing

The Court has scheduled a hearing on October 14, 2022 at 12:00 p.m. (prevailing Eastern time), at which the Debtor will seek approval of the transactions contemplated by the agreement with the Successful Bidder (the "<u>Sale Hearing</u>").

## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in trust by Debtor's counsel but shall not become property of the Debtor's estate absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder(s) not later than two (2) business days after the Closing.  If the Successful Bidder timely closes the transaction contemplated by the Successful Bid, its Good Faith Deposit shall be credited towards its purchase price.  The return of the Good Faith Deposit of the Successful Bidder or the Back-Up Bidder who fails to close the transaction shall be determined by the terms of the applicable agreement.

## Consultation Parties

The term "Consultation Parties" shall mean the Committee, the Committee's counsel, and the Committee's financial advisor.  To the extent that a member of the Committee or their respective affiliates put forth a Bid, such member of the Committee shall not be a Consultation

Party. The Debtor shall consult with the Consultation Parties as required by these Bidding Procedures. Any failure to specifically identify consultation rights in any section of these Bidding Procedures shall not limit or otherwise impair the rights of the Consultation Parties to consult with the Debtor.

## **Fiduciary Duties**

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Debtor or its management, board of directors, attorneys, financial advisors or other advisors, or the Committee or its counsel or financial advisors from exercising their respective fiduciary duties under or otherwise complying with applicable law.